1  Julian Burns King (Bar No. 298617)
2  julian@kingsiegel.com
   Robert Johnston King (Bar No. 302545)
3  robert@kingsiegel.com
4  KING & SIEGEL LLP
   724 S. Spring Street, Ste. 201
5  Los Angeles, CA 90014
6  tel:    (213) 465-4802
   fax:    (213) 465-4803
7
8  Attorneys for Plaintiff Jennifer Brear Brinker

9              UNITED STATES DISTRICT COURT
10           SOUTHERN DISTRICT OF CALIFORNIA

11
   Jennifer Brear Brinker,                CASE NO.:  **'22 CV 0386 MMA MDD**
12
13            Plaintiff,                   **COMPLAINT FOR:**
14      v.                                 1) **Sarbanes Oxley Act (SOX)**
15                                            **Retaliation (18 U.S.C. § 1514A)**
16 AXOS Bank, AXOS Financial, Inc., John   2) **Whistleblower Retaliation in**
   Tolla, Eshel Bar-Adon, and Tom Constan-    **Violation of Cal. Lab. Code §**
17 tine,                                       **1102.5**
18
              Defendants.                  **<u>Demand for Jury Trial</u>**
19
20
21
22
23
24
25
26
27
28

COMPLAINT

## **INTRODUCTION**

1.     AXOS Bank ("Axos" or the "Bank") intentionally understaffs its compliance departments and hires inexperienced and under-qualified compliance personnel in an effort to conceal its failure to comply with federal banking regulations, safe and sound banking practices, and its own policies. Indeed, the Bank's prior employment practices have already given rise to several whistleblower lawsuits alleging that the Bank's compliance departments routinely swept misconduct and non-compliance under the rug.

2.     Like her predecessors, Ms. Brinker uncovered a dizzying array of compliance and risk-management issues that had previously been "overlooked," or undetected. In the approximately two-years that Ms. Brinker worked for AXOS she issued more negative findings than any Credit Review Officer in the history of the Bank.

3.     However, the Bank was not interested in addressing these issues and instead Ms. Brinker faced consistent hostility from management, improper efforts to dilute her findings, and retaliation for being honest about the state of the Bank's internal controls and compliance efforts.

4.     Finally, in January of 2021, Ms. Brinker was fired in the midst of her efforts to complete a report that highlighted significant issues in the Bank's Anti-Money-Laundering practices, repeat internal control deficiencies, and its failure to accurately report necessary information to its Board of Directors, among other serious issues. Ms. Brinker's colleagues, who supported her findings, were also fired, their silence purchased with minimal severance payments that bound them to secrecy and enticed them to waive their claims against the Bank.

5.     When Ms. Brinker refused to agree to the terms of the Bank's proposed severance, many of which were illegal on their face, the Bank sought to intimidate her into submission. The Bank has filed an arbitration against Ms. Brinker for taking Bank documents to provide to regulators, seeking to prohibit her from sharing any information about Axos with "*any* third party."

6.     Ms. Brinker is the quintessential Sarbanes-Oxley whistleblower and seeks redress for Axos's retaliation through this complaint.

## PARTIES

7.     **Defendant Axos Bank** is a wholly owned subsidiary of Axos Financial Inc.

8.     **Defendant Axos Financial Inc.** is a Bank holding company that is publicly traded on the New York Stock Exchange.

9.     **Defendant John Tolla** is Executive Vice President, Chief Governance, Risk, and Compliance Officer for Axos Bank. Mr. Tolla is responsible for managing the Bank's overall risk management and compliance programs including Enterprise Risk Management, Consumer & Lending Compliance, BSA/AML, Third-Party Risk and Credit Risk management functions.

10.    **Defendant Eshel Bar-Adon** is the Chief Legal Officer of Axos Financial, Inc. and Executive Vice President, Strategic Partnerships for Axos Bank.

11.    **Defendant Tom Constantine** is Executive Vice President & Chief Credit Officer at Axos Bank and Chief Credit Officer & Executive Vice President for Axos Financial, Inc.

12.    **Plaintiff Jennifer Brear Brinker** was hired by Axos Bank in October of 2018 as a Senior Independent Credit Review Officer for the Governance, Risk Management and Compliance Department. Ms. Brinker was responsible for reviewing the Bank's loan portfolios to examine, measure, monitor and report weaknesses and deficiencies with the Banks lending and risk management standards and practices.

## VENUE AND JURISDICTION

13.    This action arises under the whistleblower protection provisions of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A *et seq.* This Court has original jurisdiction over Plaintiff's First cause of action in this complaint pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28

USCA § 1367 because the facts are so related to her First Cause of action that they form part of the same case or controversy.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant is a resident of San Diego County, Ms. Brinker worked for Defendant in San Diego County, and a substantial part of the events or omissions giving rise to this case occurred in San Diego County.

## FACTUAL ALLEGATIONS

### Axos's History of Negligence and Retaliation

15.     Axos has a long history of high employee turnover in the Bank's compliance, risk management, and internal audit functions. These turnover rates are caused in part by the Bank's practice of hiring audit and credit review professionals who lack the skills required to identify the Bank's many failures, and then retaliating against those who do.

16.     Ms. Brinker understood that the Bank had previously been sanctions by its primary regulator in connection with deficiencies caused by Axos's failure to hire credit review officers with the experience and training necessary to adequately perform their jobs, as well as failures to generate independent and substantive portfolio reviews, among other factors.

17.     Prior to Ms. Brinker's hire, Axos had also terminated a number of audit and review employees because they had raised concerns about the Bank's practices, irregularities and abuses.

### Ms. Brinker's Correspondent Lending Review

18.     In November of 2018, Ms. Brinker began review of the Bank's "Correspondent Lending" portfolio. Corresponding Lending ("CL") is a third-party lending product ("TPL") where the Bank serves as lender of record for non-Bank entities that cannot extend loans in their own names.

19.     Ms. Brinker uncovered numerous problems with the CL program during her review, including problems with internal financial controls, compliance with AML

best practices, failure to monitor compliance with lending guidelines, failure to monitor program risk factors pursuant to a directive from the Bank's primary regulator, systematic financial and credit formula errors, and failure to monitor and accurately report borrower creditworthiness.

20.    Underwriting Failures—Ms. Brinker noted many deficiencies related to underwriting the loans issued in Axos' name, including a failure to collect and use customer financial statements as required by loan covenants; failure to collect borrower bank account statements; and underwritten loans that failed to meet the Bank's credit approval policies for various reasons, including inferior FICO scores, ineffective personal guarantors, borrowers with open Bankruptcy proceedings, and contractor licensing deficiencies. Some of these problems were caused by the fact that the bank was not underwriting the loans or enforcing underwriting standards. Instead, the Bank was conducting a cursory underwriting "review" of the loans which failed to ensure that they were meeting the Bank's lending standards. As a result, many of the loans did not comply with the strict credit approval memoranda between Axos and its customers and were not properly identified as exceptions and reported.

21.    Failure to Monitor Loan Covenants—Ms. Brinker also noted that the bank was routinely failing to monitor the loan covenants and related financial information for the loans that it was issuing.

22.    AML Concerns—Ms. Brinker also raised concerns about a high risk of potential money-laundering customers because the Bank's customers were not doing appropriate Know-Your-Customer ("KYC") due diligence and the Bank was not taking adequate steps to ensure that its lending partners complied with AML standards or implementing appropriate safeguards on its own behalf.

23.    Among other issues, her audit sample contained a disproportionately high number of borrowers that appeared to lack evidence of real business activities and deceptive documentation.  One El Paso-based trucking company had suspicious bank statements, the lease appeared fraudulent, high volumes in foreign bank

payments. Ms. Brinker observed, among other signs, inflated account balances on bank statements with high volume "round-trip transactions" where nearly identical sums of money were deposited into and then withdrawn from the same account or related accounts in a short period of time, a high volume of large ATM deposits, failure to verify certificates of beneficial ownership or to collect certificates from all beneficial owners, and improper waiver of restrictions on loans in high-intensity drug trafficking areas. Ms. Brinker was directed to exclude findings related to AML from her final report by her supervisor because it was "outside the scope" of the ICR audit.

24. <u>Failure to Implement Contingency Plan</u>—At least one of the Bank's correspondent lending customers was at significant risk of insolvency. However, Ms. Brinker noted that the Bank had not put in place a contingency plan, as required by OCC regulations, in the event that the customer suffered from a business disruption and could no longer service the loans issued in Axos's name.

25. <u>Failure to Analyze CL Portfolio</u>—Axos' primary regulator required the Bank to conduct annual independent analyses of the risk factors associated with the Correspondent Lending Portfolio, including separate studies on the risk factors that could affect the Bank as an enterprise. Ms. Brinker determined that an analysis required of the Bank by its primary regulator had not been done according to schedule. which she pointed out to management and her supervisor, who was responsible for the delayed analysis. In response, Ms. Brinker was directed to diminish the severity of the audit finding.

26. Ms. Brinker created a draft report containing her critiques, but was told to "*socialize*" the report findings with the business unit and senior management in a series of meetings. Ms. Brinker complained that the outsized involvement of Bank management in revising the reports was inappropriate and illegal since it diminished the objectivity and independence of the ICR unit.

27. In response to her CL draft report, management refused to provide any commentary or plans to remediate the deficiencies. The executive manager (and Chief

Legal Officer), Eshel Bar-Adon, refused to acknowledge the deficiencies, including the need for a contingency plan for the potential Bankruptcy of one of the primary customers. As a result of Mr. Bar-Adon's delay, the many "socialization" discussions, and the many management edits, the report was more than four months late and was significantly watered down before it was presented to the Board of Directors and released to the OCC.

28.     Following this report, Ms. Brinker's supervisor Manuel Cardoso told others at Axos that Ms. Brinker was "*too negative*," "*needed to lower her standards*," was "*too demanding*" had "*communication problems*," and that Ms. Brinker should have "*socialized*" her findings earlier with management earlier in the process.

29.     After finally negotiating remediation plans with senior management, Ms. Brinker continued communicating with CL personnel who ignored her remediation efforts and reminders, so the audit records repeatedly became past due during 2019. The CL deputy manager also resigned after complaining about protracted delays and the ICR findings remained open until mid-2020.

30.     By early 2020, Axos's Chief Risk Officer instructed Ms. Brinker to host daily meetings with the CL business unit to close out several past-due findings. Eventually, she was thwarted by the Chief Legal Officer who criticized her for being "too bureaucratic" when she sought to establish accurate and effective risk management practices relevant to a customer shared with another business unit that held an $87.5 million credit line from the Bank.

**Ms. Brinker's Equipment Finance Portfolio**

31.     While still attempting to negotiate her findings from the review of the Correspondent Lending Portfolio, Ms. Brinker embarked on a review of Axos's Equipment Finance ("EQF") Portfolio that represented approximately $150M in lending assets at the time. She visited the EQF business unit in Utah, travelling with an internal auditor, Daniel Kreutzmann, who told Ms. Brinker that he felt pressured

King & Siegel ‖ LLP

from management to water-down the audit reports and frustrated with the Bank's un-willingness to close out audit findings.

32.     <u>Concerns With Underwriting Standards</u>—Ms. Brinker discovered that the Bank was not including in its calculations debt held off the balance sheets, *e.g.*, operating leases.[1] As a result, the Bank was underestimating indebtedness ratios used to determine creditworthiness for borrowers. Ms. Brinker also noted that the under-writers were failing to consider other risk factors including underfunded and unfunded pension obligations that raised insolvency concerns for several material contracts and could trigger bankruptcy risks.  Borrower risk ratings were frequently inflated and ap-peared arbitrary at times, in the absence of objective risk factors, and erratic oversight from Bank management undermined effective credit decisions and accurate loan loss reserves (ALLL).

33.     <u>Accounting Problems</u>—Axos failed to account for the operating lease schedules in the portfolio in which the Bank was the lessor, which also resulted in misstatements on Axos's own financials, which failed to comply with US GAAP. Ms. Brinker reported her observation to the accounting department, which was hostile to her complaint and complained to her supervisor that she was meddling beyond the scope of her duties. Ms. Brinker continued to report the issue to others including the Bank's SOX consultant and the CFO.

34.     In response, several members of Axos management told Ms. Brinker that management wanted her to "*let it go*" and criticized her for not compromising. Her finding was ultimately excluded from her report by management since it was not a "credit" but a "financial accounting" finding. The Bank never addressed the issue.

35.     Ms. Brinker also discovered evidence that suggested the Bank was over-stating the yields on equipment leases held in its portfolio because it was not collecting

---

[1] Recent changes to GAAP required that off-balance sheet debts were supposed to be brought onto the balance sheets.

King & Siegel ‖ LLP

the residual payments on outstanding leases. Ms. Brinker recommended further study into this issue to determine if her preliminary findings were justified. Instead, Axos ignored her and failed to investigate the problem.

36.     <u>Improper Risk Ratings</u>—Ms. Brinker also discovered a trend of increased borrower concentration, pricing pressures, and tightening credit spreads, which should have resulted in a lower risk-ratings for impacted loans. She recommended downgrading the risk ratings of several large borrowers, including one borrower that presented significant exposure for the Bank. After significant pushback and controversy, Axos ultimately downgraded the borrower by a nominal amount, which conveniently left the loss reserves unchanged.

37.     Ms. Brinker also pushed for a more objective risk-rating scale in accordance with risk management regulatory expectations, but her complaints were initially rebuffed. Even after the Bank agreed with her findings, it failed to remediate the issues appropriately.

38.     During the EQF ICR "exit meeting" with Chief Credit Officer Tom Constantine to review her draft report, he attacked her findings, attacked the scope of the report, and attacked Ms. Brinker's recommendations to improve the credit underwriting policies and risk rating criteria. Mr. Constantine demanded that Ms. Brinker re-write the report as he was unwilling to provide any of the required management responses to remediate credit deficiencies or findings presented in the draft report.

39.     Management at the Bank ultimately delayed and watered down the ICR report relating to the Equipment Finance Portfolio over Ms. Brinker's objections, and she was later told the EQF business unit thought she was "crazy."

40.     To further sideline Ms. Brinker, she was excluded from presenting the report to the ICR Management and Compliance Board Committees. Instead, John Tolla and Manuel Cardoso presented the watered-down ICR report.

**Ms. Brinker's Warehouse Lending Review in 2019**

41.     After her Equipment Finance Review, Ms. Brinker started a review of the Warehouse Lending Portfolio, which represented approximately $430 million in lending assets at the time. As with her other reviews, Ms. Brinker uncovered a host of problems.

42.     Lack of Skilled Credit Analysts—Ms. Brinker quickly discovered that the business unit dominated the credit decisions because the credit department relied on review by junior credit personnel who lacked experience, training, and supervision. Junior analysts also rotated out of each department every three months so there was a lack of accountability and experience that would otherwise accrue about the market, business models, customers, and risk factors. Despite the lack of experienced credit analysists, supervisory credit personnel were not meaningfully involved, which resulted in errors and misrepresentations in the Bank's analysis of loans.

43.     This problem was consistent with the Bank's general approach to compliance—relying on under-skilled and overwhelmed junior employees. This approach had previously earned the Bank several reprimands from its primary regulator.

44.     Underwriting and AML Deficiencies—During Ms. Brinker's review, she uncovered internal control deficiencies and AML issues including loans issued based on incomplete loan applications, lack of due diligence into take-out investors, which subjected the Bank to risks of AML and SEC fraud, a credit line that appeared to violate an FDIC Consent Decree, and incomplete underwriting packages.

45.     Ms. Brinker also noted that the underwriting team was only considering warehouse lines of credit in calculating borrower leverage and ignoring other sources of debt, which resulted in the appearance of lower corporate leverage ratios.

46.     Improper Risk Ratings and Covenant Monitoring—Ms. Brinker discovered that the Bank was using improper risk ratings that did not rely on objective criteria, was using unaudited financial statements for financial covenant monitoring, and

that the failure to consider lines of credit other than the warehouse lines lead to a failure to accurately monitor compliance with debt ratios required in the loan covenants.

47.    Insider Dealing and Investor Fraud—Ms. Brinker also discovered that the Bank had extended an outsized line of credit to a business run by a friend of several bank executives at terms that did not appear to be arm's length. The Executive had previously been forced to step down as CEO of a bank in California due to allegations of fraud and Ms. Brinker also raised concerns about Axos' recent acquisition of COR Securities—a firm owned by the same customer—prior to its purchase by Axos. Ms. Brinker noted that following the acquisition Axos took a write-down for $16 million in bad debt. Ms. Brinker raised concerns about potential duty of loyalty violations and/or lack of adequate diligence related to the purchase in one-one-one meetings with her supervisor.

48.    Ms. Brinker raised all these concerns with management and prepared a draft report. Once again, her draft report was watered down and delayed by management during the "socializing" process through edits made over Ms. Brinker's objections. All the same, her final report contained nine negative findings that were significant enough to be escalated to the Board of Directors.

49.    While remediating findings from her Warehouse report into the Spring of 2020, she discovered that there was a significant volume of non-qualifying mortgage loans that were out of compliance with policy due to a liquidity shock from the Covid pandemic. Ms. Brinker also reported that the credit exposure from these loans was not properly reported on the Bank's books.

50.    Axos had established warehouse lending relationships with non-Bank mortgage originators that was collateralized by the mortgages themselves. The collateral mortgages were separately subject to underwriting standards established by the non-Bank lenders. Secondary market buyers would then buy the mortgages from the non-Bank lender. Commerce Home Mortgage and A&D Mortgage had financed approximately $45 million of non-qualifying mortgage loans in March 2020, a product

1    that had concurrently been discontinued due to an illiquid market. As a result, Com-

2    merce Home Mortgage and A&D Mortgage could not sell their mortgages on the sec-

3    ondary market and the loans were aging as collateral for the warehouse line beyond

4    the terms permitted by the loan agreement and the Bank's policy.

5        51.    These out of compliance loans were supposed to be reported to the Axos

6    management credit committee and Board of Directors pursuant to Bank Policy. In or-

7    der to rehabilitate the loans and avoid reporting them as exceptions, the Bank created

8    a special line of credit for the two lenders in order to avoid identifying the loans as

9    exceptions on their current line of credit. Axos referred to this new product as a "hos-

10    pital line"—apparently a reference to the status of the loans on life support.

11       52.    Ms. Brinker pointed out that this effort to conceal the noncompliant

12    loans created other disclosure issues. Specifically, the Bank was required to disclose

13    the new credit product to the Board and credit committees and ultimately in Axos's

14    financial reports for Shareholders. Ms. Brinker sent emails to Mr. Tolla and the lead

15    Warehouse Banker, Mr. Martini, asking them to explain reporting standards for the

16    novel "hospital line" but they refused to do so. After the exchange, Mr. Martini indi-

17    cated that he agreed with Ms. Brinker that the "nonQM" exposure and new "hospital

18    line" needed to be documented but that "Tom wouldn't allow it." The characteris-

19    tics of such "hospital lines" meant problem loans with a higher risk profile deserving

20    an increase in reserves, which Ms. Brinker later challenged after the Fiscal 2020 earn-

21    ings call with investors and the Bank's 10k failed to disclose the issues.[2]

22

23

24    _____

25

26    [2] Ms. Brinker also complained about the fact that the terms of the lending agreement
     for the "Hospital Line" and that pledged funds used to hedge against the risk were
27    released prior to authorization by the credit department. These exceptions were not
     reported to the Board of Directors as required, which was consistent with a Bank
28    practice of not reporting exceptions to loans.

King & Siegel ‖ LLP

53.   Mr. Martini further recounted that Tom had told him to contact Joel Kodish to explore ways to hide the aging collateral underlying the "hospital line" in the Lender Finance Portfolio.

### The Board Expresses Concern Over Ms. Brinker's Findings

54.   In January of 2020 Ms. Brinker was told to work full-time on remediating the findings that she had put in her reports because the Board of Directors was concerned with the number of findings that she had issued and the lack of remediation progress by the Bank.

55.   Because the Bank Business Units refused to remediate the findings, Ms. Brinker had to do much of the work herself, rewriting policies, editing, and checking procedures, etc. Many of the remediation periods were again extended because of the Bank's refusal to resolve these issues. Ms. Brinker repeatedly complained about the length of time involved in remediating her findings.

### Ms. Brinker's Lender Finance Review

56.   Ms. Brinker started her report on Axos's Lender Finance Portfolio in April of 2020. She immediately discovered that Axos had not resolved many of the issues raised in her prior ICR report, including issues related to loan monitoring and administration.

57.   Ms. Brinker also discovered a number of other problems with the credit approval process and monitoring of loans. Junior analysts did not understand the credit products and were failing to properly underwrite the loans. Among other things, Ms. Brinker discovered use of an ineffective "Probability of Default" scale, failure to validate risk rating models, failure to standardize loan to value ratios, failure to conduct field reviews, using inappropriate risk ratings that were based on outdated assumptions regarding the collateral[3] and which failed to test or conduct diligence on

---

[3] In some cases, the Bank had not reviewed the collateral for the finance loans for six to twelve months in violation of its own policies.

the reported collateral, and failure to forecast prospectively. Ms. Brinker also discovered ongoing problems with monitoring loans, including loans that were in breach of the relevant loan agreements, failure to make required UCC filings to secure collateral, failure to monitor collateral, and failure to monitor and collect fee income.

58.  Ms. Brinker also identified a problem with the Bank's reporting of loan to value rates, where the Bank was reporting participation rates and estimated advance rates instead of true loan to value rates. As a result, the Bank routinely misrepresented the average loan to value ratio's of its loans to investors. Ms. Brinker raised concerns about this issue to her supervisor Manuel Cardoso and other ICR team members and created an audit finding to establish standards that would correct inconsistent loan to value rates. This finding had become overdue and unresolved by the time Ms. Brinker was fired.

59.  In July 2020, Ms. Brinker circulated a draft of her Lender Finance report. The draft report was passed around the Bank, with various officers editing and modifying the report in an effort to reduce the severity of Ms. Brinker's findings and exclude her from the internal actions to rewrite her report. There were at least eight draft versions circulated and Ms. Brinker expressed concern over the management involvement. Even with management interference, the final report contained 11 negative findings about gaps in internal controls, documentation, reporting, collateral monitoring, risk ratings and credit administration.

**Ms. Brinker's HR Complaint and First "Severance" Offer**

60.  As a result of Ms. Brinker's vigorous efforts to perform her job, she faced with hostility at Axos. She was repeatedly told that she was "too negative" and needed to "lower her standards." She was also repeatedly told that she should not identify problems that the Bank viewed as outside the scope of her work, and that various officers of the Bank did not like her. Ms. Brinker was also given unfairly negative performance reviews, excluded from meetings with senior management, denied a promotion, and other career opportunities to which she applied. Further, Ms. Brinker

King & Siegel ‖ LLP

was denied opportunities to speak with the Board of Directors and OCC examiners, and consistently harassed to finish her investigations more quickly to prevent her from digging too deeply into Axos's practices.

61.     Faced with hostility to her work and retaliation, Ms. Brinker complained about retaliation and other issues to HR in October of 2020. The stress of dealing with her managers also began to take a toll on her and around the same time she began to work a reduced schedule on a medical leave of absence.

62.     In early November, the Executive Vice President of Human Resources, Mary Ellen Ciafardini told Ms. Brinker that she had found "no merit" to the complaints and that Ms. Brinker had to "solve" the problem because "it couldn't go on like this any longer." Ms. Ciafardini indicated that Ms. Brinker would have to leave the Bank, asking what kind of severance would make her happy to leave and asking her to propose a severance in return for a full release of any claims against the Bank.

63.     Two days after this meeting, Mary Ellen called Ms. Brinker back to reiterate the offer to leave Axos and asked Ms. Brinker to "let her know" what it would take to get her to leave Axos.

**Ms. Brinker's Warehouse Lending Supplemental Report**

64.     In or around September of 2020, Ms. Brinker and her colleague, Anthony Maniscalco began working on a 2020 Warehouse Lending Portfolio audit.

65.     Ms. Brinker and Mr. Maniscalco both raised significant concerns regarding compliance with AML laws and procedures, including failure to collect information on beneficial owners, failure to assess the strength of personal guarantees made to secure loans, failure to obtain spousal consents, failure to investigate the propriety of SEC waivers, failure to collect required tax return information, failure to obtain audited financials to determine creditworthiness of borrowers, failure to properly underwrite increases in credit lines, and failure to acquire appropriate corporate documents, among others.

King & Siegel ‖ LLP

66.     Ms. Brinker and Mr. Maniscalco both reported these concerns throughout her investigation and through draft reports submitted to her supervisor. They both reiterated these findings in numerous communications with John Tolla in December 2020.

67.     Ms. Brinker also raised concerns about the fact that the Bank was not reporting loan exceptions to the Board as required. During her review, she discovered that the Warehouse Lending Unit maintained an internal report of loans that were out of compliance, but that these loans were not being identified to the Board as required by Bank procedures. When she asked about the report, she was told not to use it and the Bank later deleted the information.

68.     Ms. Brinker also reviewed an internal report in which the Credit Department reported average Warehouse line exposure terms that appeared to be artificially low. Ms. Brinker determined that the reports erroneously omitted certain loans with credit weaknesses, creating a survival bias that excluded nonperforming mortgages. When she reported this to management, she was told that the report was not "live" but only used for training purposes so her finding was irrelevant. Ms. Brinker's permission to access the database was subsequently blocked by her supervisor.

69.     On or around December 17, 2020, Ms. Brinker and Mr. Maniscalco submitted an initial draft 2020 summary on the Warehouse Lending Portfolio that raised a number of issues, including poor risk rating procedures, problems with underwriting of loans, including failure to collect necessary documents, failure to monitor the loans, including failure to monitor the financial condition of loan guarantors, failure to amend CRA's to reflect changes in the Credit Approval Memo, continued failure to use an accurate leverage ratio, continued lack of expertise of credit professionals, and continued failure to monitor loan covenants.

**Ms. Brinker's Complaints About Axos's Review and Compliance Practices**

70.     In addition to the specific weaknesses that Ms. Brinker identified through her review of various Axos business units, she complained throughout her

King & Siegel ‖ LLP

tenure about Axos's audit, review, and compliance practices more generally. Ms. Brinker repeatedly pointed out that many of the staff Axos employed to underwrite loans and monitor credit exposure lacked credit experience and the training necessary to adequately perform their jobs.

71. Ms. Brinker also complained that Axos was understaffed, did not hire enough professionals in the ICR unit, and set unrealistic deadlines for completing reports, which had the effect of limiting the scope and depth of analyses necessary to conduct adequate compliance and credit reviews.

72. The low pay, brutal hours, and hostility from senior management that compliance professionals at Axos faced also lead to a high rate of turnover, which also limited the effectiveness of the compliance functions due to a lack of institutional knowledge and lack of familiarity with the specifics of Axos's business units.

73. All in all, the undertrained, underpaid, and overworked risk management and compliance staff represented a significant weakness in Axos's internal controls and risk management systems.

74. Ms. Brinker and other members of the ICR team also complained about the number of Information Technology systems and data discrepancies at the Bank in addition to the lack of integration between systems. The proliferation of systems and lack of integration was a deficiency in the Bank's internal controls that resulted in errors and inconsistencies essential for reporting purposes.

**Ms. Brinker And Other ICR Personnel Who Supported Her Are Terminated and Axos Attempts to Intimidate Her Into Staying Silent**

75. On January 5, Mr. Tolla informed Ms. Brinker and several other members of the ICR team that they were being terminated.

76. Ms. Brinker was offered a severance of $27,076.96 in return for a "settlement and general release" of any claims against Axos and for signing an over-the-top declaration under oath. Among other terms, Axos demanded that Ms. Brinker declare under oath that she was "not aware of any conduct by anyone I worked with that

was improper, against policy, illegal, or in violation of the letter or spirit of any applicable laws or regulations," that she "observed that Axos implements and enforces appropriate and effective corporate policies and practices, including, without limitation, those related to employment practices and legal and regulatory compliance," and that despite the severance payment she had "not been intimidated or otherwise induced by anyone at Axos to sign this Declaration."

77.     Axos also sought to prevent Ms. Brinker from engaging in whistleblower activity. Among other things, Axos's settlement agreement required her to agree that she had "neither filed, directly or indirectly, nor caused to be filed, any action or complaint, or initiated, cooperated or participated in any proceeding (collectively, an "Action") against the Releasees in any forum, including any action before any federal, state or local court, any arbitration, or any administrative proceeding before any federal, state or local administrative agency" and demanded that Ms. Brinker inform them if she had "cooperated" in any such action against the Bank.

78.     Axos's settlement agreement also required Ms. Brinker to not disclose any information obtained during her work for the Bank to any third party and required her to certify that she had destroyed any documents or information that she obtained in the course of her work.

79.     When Ms. Brinker declined to sign the release, Axos increased its efforts at intimidation, sending her a "cease and desist" letter on January 12 that threatened litigation and demanded Ms. Brinker not provide any information pertaining to Axos to any third party and inform Axos if she had previously shared any such information with a third-party. Axos also demanded that Ms. Brinker sign another absurd declaration that stated, among other things, that she "underst[ood] that if it is discovered that I have used such Proprietary information for any purpose or provided such Proprietary Information to a third party or third parties to use, I will be exposed to have improperly used stolen information."

80.     Axos subsequently has pursued its claims against Ms. Brinker in arbitration.

### Ms. Brinker Was Harmed Through Axos's Illegal Retaliation

81.     As a result of Axos's illegal conduct Ms. Brinker has lost income, opportunities for professional growth, and has suffered significant emotional distress. Indeed, towards the end of her tenure at Axos she was placed on reduced hours due to the stress caused by Axos's hostility towards her.

82.     Ms. Brinker seeks redress for her damages, including attorneys fees and the costs of this action against Axos.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Sarbanes Oxley Act (SOX) Retaliation

### 18 U.S.C. §1514A

### (Plaintiff against Defendants)

83.     Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

84.     At all material times Defendant was subject to 18 U.S.C. § 1514A, which prohibits the company "or any officer, employee, contractor, subcontractor, or agent of such company" from "discharge[ing], demot[ing], suspend[ing], threaten[ing], harass[ing], or in any other manner discriminat[ing] against an employee in the terms and conditions of employment because of any lawful act done by the employee to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by a Federal regulatory or law enforcement agency . . . or a person with supervisory authority over the employee (or such other

person working for the employer who has the authority to investigate, discover, or terminate misconduct).

85.    Plaintiff actually and reasonably believed that the conduct and actions listed above violated federal statutes, rules and regulations, including Section 404 of the Sarbanes Oxley Act of 2002 and the Securities Fraud Statutes.

86.    Defendants harassed, threatened, discharged and retaliated against Plaintiff because she made oral and written complaints regarding weaknesses in Axos's internal financial controls and what she reasonably believed to be illegal or unlawful conduct in violation of state and federal statutes, rules and regulations. Plaintiff made these complaints to her employer, by and through its agents and employees, as well as to the OCC.

87.    Plaintiff timely filed a whistleblower complaint with OSHA, and 180 days have elapsed since filing that complaint. No final decision has been issued by OSHA, and Plaintiff has not been the cause of any delay in the issuance of a decision. Accordingly, Plaintiff is entitled to seek relief in district court by jury trial. Moreover, no pre-dispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this section of SOX.

88.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer pain and mental anguish and emotional distress.

89.    As a direct and proximate result of Defendant's actions, Plaintiff has further suffered and will continue to suffer loss of earnings and other employment benefits, in an amount to be proven at trial.

90.    Defendant's actions constituted a willful violation of the above-mentioned federal laws and regulations. As a direct result, Plaintiff has suffered and continues to suffer substantial losses related to the loss of wages and is entitled to recover costs and expenses and attorney's fees in seeking to compel Defendant to fully perform its obligations under state and federal law, in amounts according to proof at time of trial.

91.     The conduct of Defendant described hereinabove was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff. Plaintiff is thus entitled to recover punitive and exemplary damages in amounts according to proof at the time of trial, to the full extent allowable by law, in addition to any other remedies and damages allowable by law.

## SECOND CAUSE OF ACTION

### Whistleblower Retaliation

### Cal. Labor Code § 1102.5

### (Plaintiff against Defendants)

92.     Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

93.     At all times material to this First Amended Complaint, California Labor Code § 1102.5 was in effect and binding on Defendant. This section requires Defendant to refrain from retaliating against an employee for reporting or refusing to engage in activity that the employee reasonably believes would result in a violation of a state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

94.     As alleged herein, Plaintiff had a reasonable belief that Defendant was violating state and federal laws and/or state and federal regulations relating to its internal controls and compliance with mandated banking practices, and reported those violations to Defendant's management.

95.     Defendant retaliated against Plaintiff for her whistleblowing by taking away her job responsibilities, denying her meaningful promotions and/or transfers, harassing her, and terminating her employment in violation of Labor Section § 1102.5.

96.     As a direct and proximate result of such retaliation, Plaintiff has been damaged in a sum according to proof.

97.     Plaintiff requests all available relief under Labor Code § 1102.5, including damages, the imposition of a civil penalty of $10,000 for each violation, and an award of reasonable attorney's fees and costs of litigation.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby requests a jury trial on all issues raised in this complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays judgment as follows:

A.     For general and special damages according to proof at trial;

B.     For statutory and civil penalties according to proof at trial;

C.     For punitive and exemplary damages according to proof;

D.     For pre- and post-judgment interest on monetary damages;

E.     For reasonable attorney's fees and costs and expert fees and costs as allowed by law; and

F.     For such other relief as this Court deems just and proper.


Dated: March 14, 2022

Respectfully submitted,

**KING & SIEGEL LLP**


By: *Robert King*
ROBERT JOHNSTON KING
JULIAN BURNS KING
Attorneys for Plaintiff

- 21 -
COMPLAINT