1   Julian Burns King (Bar No. 298617)
2   julian@kingsiegel.com
    Robert Johnston King (Bar No. 302545)
3   robert@kingsiegel.com
4   KING & SIEGEL LLP
    724 S. Spring Street, Ste. 201
5   Los Angeles, CA 90014
6   tel:    (213) 465-4802
    fax:    (213) 465-4803
7
8   Attorneys for Plaintiff Jennifer Brear Brinker

9           **UNITED STATES DISTRICT COURT**
10          **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 11  Jennifer Brear Brinker, | CASE NO.: 3:22-cv-00386-MMA-DDL |
| 12          Plaintiff, | **SECOND AMENDED COMPLAINT FOR:** |
| 13 | |
| 14          v. | 1.  **Sarbanes Oxley Act (SOX) Retaliation (18 U.S.C.  § 1514A)** |
| 15  AXOS Bank, AXOS Financial, Inc., and | 2.  **Whistleblower Retaliation in Violation of Cal. Lab. Code § 1102.5** |
| 16  John Tolla, | 3.  **Violation of California Equal Pay Act Lab. Code § 1197.5** |
| 17          Defendants. | 4.  **Gender Discrimination in Violation of FEHA Gov. Code § 12940, et seq.** |
| 18 | 5.  **Failure to Prevent Discrimination and Harassment in Violation of Gov. Code § 12940(j)(k)** |
| 19 | |
| 20 | 6.  **Retaliation in Violation of FEHA** |
| 21 | 7.  **Wrongful Termination in Violation of Public Policy** |
| 22 | |
| 23 | 8.  **Unlawful Business Practices (Cal. Bus. & Prof. Code §§ 17200, et seq.)** |
| 24 | |
| 25 | |
| 26 | |
| 27 | **Demand for Jury Trial** |
| 28 | |

## INTRODUCTION

1.      AXOS Bank ("Axos" or the "Bank") and its alter ego, Axos Financial, Inc. intentionally understaffs its compliance departments and hires inexperienced and under-qualified compliance personnel in an effort to conceal its failure to comply with federal banking regulations, safe and sound banking practices, and its own policies. Indeed, the Bank's prior employment practices have already given rise to several whistleblower lawsuits alleging that the Bank's compliance departments routinely swept misconduct and non-compliance under the rug.

2.      Like her predecessors, Ms. Brinker uncovered a dizzying array of compliance and risk-management issues that had previously been "overlooked," undetected or resulted in highly watered-down findings for reporting purposes. In the approximately two-years that Ms. Brinker worked for AXOS she issued more negative findings than any Credit Review Officer in the history of the Bank.

3.      However, the Bank was not interested in addressing these issues and instead Ms. Brinker faced consistent hostility from management, improper efforts to dilute her findings, and retaliation for being honest about the state of the Bank's internal controls, risk management and compliance practices.

4.      Finally, in January of 2021, Ms. Brinker was fired in the midst of her efforts to complete a report that highlighted significant issues in the Bank's Anti-Money-Laundering practices, repeat internal control deficiencies, and its failure to accurately report necessary information to its Board of Directors, among other serious issues. Ms. Brinker's colleagues, who supported her findings, were also fired, their silence purchased with minimal severance payments that bound them to secrecy and enticed them to waive their claims against the Bank.

5.      When Ms. Brinker refused to agree to the terms of the Bank's proposed severance, many of which were illegal on their face, the Bank sought to intimidate her into submission. The Bank has filed an arbitration against Ms. Brinker for taking Bank

SECOND AMENDED COMPLAINT

documents to provide to regulators, seeking to prohibit her from sharing any information about Axos with "*any* third party."

6.   Ms. Brinker is the quintessential Sarbanes-Oxley whistleblower and seeks redress for Axos's retaliation through this complaint.

## PARTIES

7.   **Defendant Axos Bank** is a wholly owned subsidiary of Axos Financial Inc. At all times relevant herein, Defendant Axos Bank was an employer within the meaning of FEHA.

8.   **Defendant Axos Financial Inc.** is a Bank holding company that is publicly traded on the New York Stock Exchange. At all times relevant herein, Defendant Axos Financial Inc. was an employer within the meaning of FEHA. At all times relevant herein, Defendant Axos Financial Inc. was the alter ego of Defendant Axos Bank.

9.   **Defendant John Tolla** is Executive Vice President, Chief Governance, Risk, and Compliance Officer for Axos Bank. Mr. Tolla is responsible for managing the Bank's overall risk management and compliance programs including Enterprise Risk Management, Consumer & Lending Compliance, BSA/AML, Third-Party Risk and Credit Risk management functions.

10.   **Plaintiff Jennifer Brear Brinker** was hired by Axos Bank in October of 2018 as a Senior Independent Credit Review Officer for the Governance, Risk Management and Compliance Department. Ms. Brinker was responsible for reviewing the Bank's loan portfolios to examine, measure, monitor and report weaknesses and deficiencies with the Banks lending and risk management standards and practices.

## VENUE AND JURISDICTION

11.   This action arises under the whistleblower protection provisions of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A *et seq.* This Court has original jurisdiction over Plaintiff's First cause of action in this complaint pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to

28 USCA § 1367 because the facts are so related to her First Cause of action that they form part of the same case or controversy.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant is a resident of San Diego County, Ms. Brinker worked for Defendant in San Diego County, and a substantial part of the events or omissions giving rise to this case occurred in San Diego County.

## RELEVANT SEC RULES AND REGULATIONS

13.    15 U.S.C. § 78m(b)(2)(B) requires that a securities issuer: "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances" that "transactions are executed in accordance with management's general or specific authorization; **(ii)** transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets . . . ; and **(iv)** the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

14.    Federal law and SEC regulations require that Axos maintain adequate "internal control over financial reporting," 17 C.F.R. § 240.13a-15(a), and that Axos evaluate its internal controls on a yearly basis and certify that its controls are adequate, as well as disclose any control deficiencies. *Id.*, 17 C.F.R. § 240.13a-14.

15.    Exchange Act Rules 13a-15(f) and 15d-15(f), 17 CFR 240.13a-15(f) and 15d-15(b), define internal control over financial reporting as: A process . . . to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that: (1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the registrant; and (2) Provide reasonable assurance that transactions are recorded as necessary to permit

preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the registrant are being made only in accordance with authorizations of management and directors of the registrant.

16.     Federal Law and SEC rules also prohibit fraud against shareholders by a publicly traded company such as Axos Financial. *See*, *e.g.*, 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

## **FACTUAL ALLEGATIONS**

### **Axos Financial, Inc. and Axos Bank**

17.     The Axos companies were originally branded as Bank of Internet USA, and they opened on July 4, 2000, to show that they were different from other banks which recognized, among other things, holidays.[1] On September 12, 2018, BofI Holding, Inc., parent of BofI Federal Bank, announced that its new corporate name was Axos Financial, Inc. ("Axos Financial"). BofI Federal Bank became Axos Bank on October 1, 2018.[2]

18.     Axos Financial and Axos Bank are the alter egos of one another. Among other things, they maintain interlocking boards and employ many of the same management personnel.  They commingle funds and assets, or divert funds or assets from one entity to another.  They frequently use the same offices or business locations. They conceal or misrepresent their financial interests so as to benefit each other. They manipulate corporate assets and liabilities in entities to concentrate the assets in one and the liabilities in another, and contract with each other as a shield against personal liability in their external corporate contracts.

---

[1] "History of Axos Bank," available at https://www.axosbank.com/About-Us/History-of-Axos ("Our opening on the Fourth of July was purposeful. It symbolized our independence from traditional banking constraints and highlighted our innovative online banking platform that provided our customers with 24/7 access — including evenings, weekends, and holidays.").

[2] "BofI Holding, Inc. is Now Axos Financial, Inc." available at https://www.axos-bank.com/About-Us/Press-and-News/BofI-Holding-Inc-is-Now-Axos-Financial-Inc (Sept. 12, 2018).

19.     Axos Bank and Axos Financial have the same executive officers: Gregory Gerrabrants serves as the CEO and President of both institutions and Derek Walsh serves as the CFO of both Axos Bank and Axos Financial. Eshel Bar-Adon serves as the Chief Legal Officer of both institutions. Thomas Constantine serves as the Chief Credit Officer and Executive Vice President of both institutions. Raymond Matsumoto serves as the Chief Operating Officer of both institutions. Andrew Micheletti serves as the Executive Vice President of Finance of both institutions. David Park serves as the Executive Vice President of Commercial Banking and Treasury Management of both institutions. Brian Swanson serves as the head of Consumer Banking of both institutions. Candace Thiele serves as the Chief Administrative Officer of both institutions. John Tolla serves as the Chief Governance, Risk, and Compliance officer of both institutions.

20.     Axos Bank and Axos Financial similarly share the same Board members, consisting of Paul Grinberg, Nicholas Mosich, James Argalas, Tamara Bohlig, Stefani Carter, James Court, Uzair Dada, Gregory Gerrabrants, Edward Ratinoff, and Roque Santi.

21.     Axos Bank and Axos Financial refer to themselves as a single combined entity, "the company" in public disclosures. For example, on August 22, 2019, Axos Financial and Axos Bank caused a press release to be issues stating in part, "Axos Financial, Inc. (NYSE: AX) and Axos Bank (together, the "Company"), announced the election of investment and asset-management marketing executive Tamara Bohlig to the Board of Directors of the Company, effective August 31, 2019."

**Axos's History of Negligence and Retaliation**

22.     Axos has a long history of high employee turnover in the Bank's compliance, risk management, and internal audit functions. These turnover rates are caused in part by the Bank's practice of hiring audit and credit review professionals who lack the skills required to identify the Bank's many failures, and then retaliating against those who do.

23.     Ms. Brinker understood that the Bank had previously been sanctioned by its primary regulator in connection with deficiencies caused by Axos's failure to hire credit review officers with the experience and training necessary to adequately perform their jobs, as well as failures to generate independent and substantive portfolio reviews, among other factors.

24.     Prior to Ms. Brinker's hire, Axos had also terminated a number of audit, review and compliance employees because they had raised concerns about the Bank's practices, irregularities and abuses.

### Ms. Brinker's Correspondent Lending Review

25.     In November of 2018, Ms. Brinker began review of the Bank's "Correspondent Lending" portfolio. Corresponding Lending ("CL") is a third-party lending product ("TPL") where the Bank serves as lender of record for non-Bank entities that cannot extend loans in their own names.

26.     Ms. Brinker uncovered numerous problems with the CL program during her review, including problems with internal financial controls, compliance with AML best practices, failure to monitor compliance with lending guidelines, failure to monitor program risk factors pursuant to a directive from the Bank's primary regulator, systematic financial and credit formula errors, failure to implement controls required by the OCC, failure to monitor and accurately report borrower creditworthiness.

27.     Underwriting Failures—Ms. Brinker noted many deficiencies related to underwriting the loans issued in Axos' name, including a failure to collect and use customer financial statements as required by loan covenants; failure to collect borrower bank account statements; and underwritten loans that failed to meet the Bank's credit approval policies for various reasons, including inferior FICO scores, ineffective personal guarantors, borrowers with open Bankruptcy proceedings, and contractor licensing deficiencies. Some of these problems were caused by the fact that the bank was not underwriting the loans or enforcing underwriting standards.

Instead, the Bank was conducting a cursory underwriting "review" of the loan factors which failed to ensure that they were meeting the Bank's credit and lending standards. As a result, many of the loans did not comply with the strict credit approval memoranda between Axos and its customers and were not properly identified as exceptions and reported.

28.    <u>Failure to Monitor Loan Covenants</u>—Ms. Brinker also noted that the bank was routinely failing to monitor the loan covenants and related financial information for the loans that it was issuing.

29.    <u>AML Concerns</u>—Ms. Brinker also raised concerns about a high risk of potential money-laundering customers because the Bank's customers were not doing appropriate Know-Your-Customer ("KYC") due diligence and the Bank was not taking adequate steps to ensure that its lending partners complied with AML standards or implementing appropriate safeguards on its own behalf.

30.    Among other issues, her audit sample contained a disproportionately high number of borrowers that appeared to lack evidence of real business activities and deceptive documentation.  One El Paso-based trucking company had suspicious bank statements, the lease appeared fraudulent, high volumes in foreign bank payments. Ms. Brinker observed, among other signs, inflated account balances on bank statements with high volume "round-trip transactions" where nearly identical sums of money were deposited into and then withdrawn from the same account or related accounts in a short period of time, high volumes of large ATM deposits, failure to collect bank statements or verify certificates of beneficial ownership as well as collect certificates from all beneficial owners, and improper waivers of restrictions on loans in high-intensity drug trafficking areas. Ms. Brinker was directed to exclude findings related to AML from her final report by her supervisor because it was "outside the scope" of the ICR audit.

31.    <u>Failure to Implement Contingency Plan</u>—At least one of the Bank's correspondent lending customers was at significant risk of insolvency. However, Ms.

SECOND AMENDED COMPLAINT

1  Brinker noted that the Bank had not put in place a contingency plan, pursuant to OCC
2  regulations, in the event that the customer suffered from a business disruption and
3  could no longer service the loans issued in Axos's name.

4      32.    <u>Failure to Analyze CL Portfolio</u>—Axos' primary regulator required the
5  Bank to conduct annual independent analyses of the risk factors associated with the
6  Correspondent Lending Portfolio, including separate studies on the risk factors that
7  could affect the Bank as an enterprise. Ms. Brinker determined that an analysis re-
8  quired of the Bank by its primary regulator had not been done according to schedule,
9  which she pointed out to management and her supervisor, who was responsible for
10  the delayed analysis. In response, Ms. Brinker was directed to diminish the severity
11  of the audit finding and allow his team to resolve the issue contemporaneously.

12      33.    Ms. Brinker reasonably believed that Axos' failure to adequately under-
13  write the loans that it was issuing, failure to monitor compliance with loan covenants,
14  and failure to conduct a risk analysis of its CL Portfolio violated Axos' obligation to
15  maintain adequate controls over its financial reporting. Ms. Brinker believed that the
16  Bank's failures left it at risk of holding loans that were more risky than they appeared
17  on the Bank's books, that these failures left the Bank with inaccurate reserves for loan
18  losses, and that the Bank's certification of inadequate controls was inaccurate.

19      34.    Ms. Brinker further believed that the Bank's failure to adequately under-
20  write, monitor, and assess the risks associated with loans issued within this portfolio
21  that exceeded $592.9 million in loans underwritten annually, as of 2018 constituted
22  a violation of laws and regulations relating to shareholder fraud, specifically 15 U.S.C.
23  § 78m(b)(2)(B)(ii), 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5.

24      35.    Ms. Brinker created a draft report containing her critiques, but was told
25  to "*socialize*" the report findings with the business unit and senior management in a
26  series of meetings. Ms. Brinker complained that the outsized involvement of Bank
27  management in revising the reports was inappropriate and illegal since it diminished
28  the objectivity and independence of the ICR unit. Ms. Brinker believed that that the

King & Siegel ⫴ LLP

excessive role of management in editing these reports was a violation of Axos' obligation to maintain adequate controls over its financial reporting, because it created the risk that numbers on financial statements would not reflect the conclusions of independent credit analysis, but instead would reflect the self-interest conclusions of Bank management.

36.     In response to her CL draft report, management refused to provide any commentary or plans to remediate the deficiencies. The executive manager (and Chief Legal Officer), Eshel Bar-Adon, refused to acknowledge the deficiencies, including the need for a contingency plan for the potential Bankruptcy of one of the primary customers. As a result of Mr. Bar-Adon's delay, the many "socialization" discussions, and the many management edits, the report was more than four months late and was significantly watered down before it was presented to the Board of Directors and released to the OCC.

37.     Following this report, Ms. Brinker's supervisor Manuel Cardoso told others at Axos that Ms. Brinker was "*too negative*," "*needed to lower her standards*," was "*too demanding*" had "*communication problems*," and that Ms. Brinker should have "*socialized*" her findings earlier with management earlier in the process.

38.     After finally negotiating remediation plans with senior management, Ms. Brinker continued communicating with CL personnel who ignored her remediation efforts and reminders, so the audit records repeatedly became past due during 2019. The CL deputy manager also resigned after complaining about protracted delays and the ICR findings remained open until mid-2020.

39.     By early 2020, Axos's Chief Risk Officer instructed Ms. Brinker to host daily meetings with the CL business unit to close out several past-due findings. Eventually, she was thwarted by the Chief Legal Officer who criticized her for being "too bureaucratic" when she sought to establish accurate and effective risk management practices relevant to a customer shared with another business unit that held an $87.5 million credit line from the Bank.

## Ms. Brinker's Equipment Finance Portfolio Review

40.     While still attempting to negotiate her findings from the review of the Correspondent Lending Portfolio, Ms. Brinker embarked on a review of Axos's Equipment Finance ("EQF") Portfolio that represented approximately $150M in lending assets at the time. She visited the EQF business unit in Utah, travelling with an internal auditor, Daniel Kreutzmann, who told Ms. Brinker that he felt pressured from management to water-down the audit reports and frustrated with the Bank's unwillingness to close out audit findings.

41.     <u>Concerns With Underwriting Standards</u>—Ms. Brinker discovered that the Bank was not including in its calculations debt held off the balance sheets, *e.g.*, operating leases.[3] As a result, the Bank was underestimating indebtedness ratios used to determine creditworthiness for borrowers. Ms. Brinker also noted that the under-writers were failing to consider other risk factors including underfunded and un-funded pension obligations that raised insolvency concerns for several material contracts and could trigger bankruptcy risks.  Borrower risk ratings were frequently in-flated and appeared arbitrary at times, in the absence of objective risk factors, and erratic oversight from Bank management undermined effective credit decisions and accurate loan loss reserves (ALLL).

42.     <u>Accounting Problems</u>—Axos failed to account for the operating lease schedules in the portfolio in which the Bank was the lessor, which also resulted in misstatements on Axos's own financials, which failed to comply with US GAAP. Ms. Brinker reported her observation to the accounting department, which was hostile to her complaint and complained to her supervisor that she was meddling beyond the scope of her duties. Ms. Brinker continued to report the issue to others including the Bank's SOX consultant and the CFO.

---

[3] Recent changes to GAAP required that off-balance sheet debts were supposed to be brought onto the balance sheets.

43.   In response, several members of Axos management told Ms. Brinker that management wanted her to "*let it go*" and criticized her for not conceding. Her finding was ultimately excluded from her report by management since it was not a "credit" but a "financial accounting" finding. The Bank never addressed the issue.

44.   Ms. Brinker also discovered evidence that suggested the Bank was overstating the yields on equipment leases held in its portfolio because it was not collecting the residual payments on outstanding leases. Ms. Brinker raised the observations to her supervisor and recommended further study into this issue to determine if her preliminary findings were justified. Instead, Axos ignored her and failed to investigate the problem.

45.   <u>Improper Risk Ratings</u>—Ms. Brinker also discovered that risk ratings were inaccurate and lacked sound standards that would understate loan loss reserves on Axos balance sheet.  She observed a trend of increased borrower concentrations, pricing pressures, tightening credit spreads, and structuring complexities that should have resulted in a lower risk-ratings for impacted leases. She recommended downgrading the risk ratings of several large borrowers with material financial weaknesses by external rating agencies including two related borrowers that presented significant exposure for the Bank (i.e. $15.4MM, $35.5MM and $36MM in three original lease balances in a portfolio of $157MM in 2018). After significant pushback and controversy, Axos ultimately downgraded the borrower by one level and a nominal change that conveniently left the loss reserves unchanged.

46.   Ms. Brinker also pushed for a more objective risk-rating scale in accordance with risk management regulatory expectations, but her complaints were initially rebuffed.Even after the Bank agreed with her findings, it failed to remediate the issues appropriately.

47.   Individually and collectively, Ms. Brinker reasonably believed that the following problems violated the Bank's obligation to establish adequate internal controls over financial reporting in connection with her 2018 EQ lending review: (1) the

SECOND AMENDED COMPLAINT

Bank's failure to adequately calculate borrower risk ratings and the weakness of its processes for doing so, including its failure to appropriately calculate debt ratios and bankruptcy risk, as well as the overall failures in its borrower risk rating methodology and improper risk ratings assigned to several large borrowers; (2) the Bank's failure to account for operating leases for loans in which the Bank was the lessor; (3) over-statement of yields on equipment leases and failure to adequately respond to investigate her concerns in this area; (4) the Bank's failure to take actions to address the concerns that she was raising.

48.     Collectively, Ms. Brinker believed that these problems left the Bank over-exposed to risky borrowers and unable to accurately state the value of assets on its balance sheet or assign loss reserves in connection with these loans. Ms. Brinker believed that these deficiencies, along with the other detailed in this Complaint, made the financial statements that Axos provided to investors materially misleading and further rendered its and that the Bank's certification of adequate controls inaccurate. Ms. Brinker reasonably believed that collectively the Bank's failures and statements constituted violations of laws and regulations relating to shareholder fraud, specifically 15 U.S.C. § 78m(b)(2)(B)(ii), 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5.

49.     During the EQF ICR "exit meeting" with Chief Credit Officer Tom Constantine to review her draft report, he attacked her findings, attacked the scope of the report, and attacked Ms. Brinker's recommendations to improve the credit underwriting policies and risk rating criteria. Mr. Constantine demanded that Ms. Brinker re-write the report as he was unwilling to provide any of the required management responses to remediate credit deficiencies or findings presented in the draft report.

50.     Management at the Bank ultimately delayed and watered down the ICR report relating to the Equipment Finance Portfolio over Ms. Brinker's objections, and she was later told the EQF business unit thought she was "crazy."

Second Amended Complaint

51.     Even after the Bank agreed with her findings, it failed to remediate the issues appropriately and the audit records became overdue and unresolved until April of 2020 after lackluster progress to address the findings gained attention of a Board member and John Tolla instructed Ms. Brinker to hold daily calls with EQF management until her findings were closed.

52.     To further sideline Ms. Brinker, she was excluded from presenting the report to the ICR Management and Compliance Board Committees as Ms. Brinker was no longer permitted to attend Board meetings. Instead, John Tolla and Manuel Cardoso presented the watered-down ICR report.

### Ms. Brinker's Warehouse Lending Review in 2019

53.     After her Equipment Finance Review, Ms. Brinker started a review of the Warehouse Lending Portfolio, which represented approximately $430 million in lending assets at the time. As with her other reviews, Ms. Brinker uncovered a host of problems.

54.     <u>Lack of Skilled Credit Analysts</u>—Ms. Brinker quickly discovered that the business unit dominated the credit decisions because the credit department relied on review by junior credit personnel who lacked experience, training, and supervision. Junior analysts also rotated out of each department every three months so there was a lack of accountability and experience that would otherwise accrue about the market, business models, customers, and risk factors. Despite the lack of experienced credit analysists, supervisory credit personnel were not meaningfully involved, which resulted in errors and misrepresentations in the Bank's analysis of loans.

55.     This problem was consistent with the Bank's general approach to compliance—relying on under-skilled and overwhelmed junior employees. This approach had previously earned the Bank several reprimands from its primary regulator.

56.     <u>Underwriting and AML Deficiencies</u>—During Ms. Brinker's review, she uncovered internal control deficiencies and AML issues including loans issued

Second Amended Complaint

based on incomplete loan applications, lack of due diligence into take-out investors, which subjected the Bank to risks of AML and SEC fraud, a credit line that appeared to violate an FDIC Consent Decree, with incomplete underwriting packages and loan covenant violations that were ignored despite borrower insolvency issues.

57.     Ms. Brinker also noted that the underwriting team was only considering warehouse lines of credit in calculating borrower leverage and ignoring other sources of debt, which resulted in the appearance of lower corporate leverage ratios.

58.     <u>Improper Risk Ratings and Covenant Monitoring</u>—Ms. Brinker discovered that the Bank was using improper risk ratings that did not rely on objective criteria, was using unaudited financial statements for financial covenant monitoring, and that the failure to consider lines of credit other than the warehouse lines lead to a failure to accurately monitor compliance with debt ratios required in the loan covenants.

59.     Individually and collectively, Ms. Brinker reasonably believed that the following problems violated the Bank's obligation to establish adequate internal controls over financial reporting in connection with her 2019 Warehouse Lending Review: (1) the Bank's failure to properly underwrite loans and ensure that loans were issued according to Axos' standards, including loans issued in violations of government consent decrees; (2) Axos' use of underqualified and underexperienced junior credit analysts to approve loans;  (3) Axos' failure to calculate borrower risk ratings and the weakness of its processes for doing so, including its failure to appropriately calculate debt ratios, as well as the overall failures in its borrower risk rating methodology; (4) the Bank's failure to adequately monitor covenant compliance and changes in the risk profile of the borrowers; and (5) the Bank's failure to take actions to address the concerns that she was raising.

60.     Collectively, Ms. Brinker believed that these problems left the Bank over-exposed to risky borrowers and unable to accurately state the value of assets on its balance sheet or assign loss reserves in connection with these loans. Ms. Brinker

SECOND AMENDED COMPLAINT

King & Siegel ⫴ LLP

1    believed that these deficiencies, along with the other detailed in this Complaint, made

2    the financial statements that Axos provided to investors materially misleading and

3    further rendered its and that the Bank's certification of adequate controls inaccurate.

4    Ms. Brinker reasonably believed that collectively the Bank's failures and statements

5    constituted violations of laws and regulations relating to shareholder fraud, specifi-

6    cally 15 U.S.C. § 78m(b)(2)(B)(ii), 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5.

7        61.    Insider Dealing and Investor Fraud—Ms. Brinker also discovered that

8    the Bank had extended an outsized line of credit to a business run by a friend of sev-

9    eral bank executives at terms that did not appear to be arm's length. The Executive

10   had previously been forced to step down as CEO of a bank in California due to alle-

11   gations of fraud. Ms. Brinker was informed by Mr. Tolla that this former executive

12   from Banc of California was influential in getting employment for several members

13   in management at Axos. Around the same time, Axos announced an acquisition of a

14   separate company owned by this same Banc of California executive, COR Securities.

15   Ms. Brinker noted that following the acquisition Axos took a write-down for $16 mil-

16   lion in bad debt and she raised the issue with Chief Risk Officer, John Tolla, who

17   retorted that it was not a problem because the loss would become an insurance claim

18   for the bank. Ms. Brinker deemed this to be a credit loss and requested to include

19   COR in the ICR project rotation given the materiality of the loss that failed to be

20   detected during entity acquisition due diligence.  Ms. Brinker's supervisor rebuked

21   her suggestion stating that COR is owned by the holding company which is outside

22   our purview and the bank does not extend credit to COR.  Ms. Brinker raised con-

23   cerns about potential duty of loyalty violations and/or lack of adequate diligence re-

24   lated to the purchase in one-one-one meetings with her supervisor.

25       62.    Ms. Brinker raised all these concerns with management and prepared a

26   draft report. Once again, her draft report was watered down and delayed by manage-

27   ment during the "socializing" process through edits made over Ms. Brinker's

28

1    objections. All the same, her final report contained nine negative findings that were

2    significant enough to be escalated to the Board of Directors.

3        63.    While remediating findings from her Warehouse report into the Spring

4    of 2020, she discovered that there was a significant volume of non-qualifying mort-

5    gage loans that were out of compliance with policy due to a liquidity shock from the

6    Covid pandemic. Ms. Brinker also reported that the credit exposure from these loans

7    was not properly reported on the Bank's books.

8        64.    Axos had established warehouse lending relationships with non-Bank

9    mortgage originators that was collateralized by the mortgages themselves. The col-

10   lateral mortgages were separately subject to underwriting standards established by

11   the non-Bank lenders. Secondary market buyers would then buy the mortgages from

12   the non-Bank lender. Commerce Home Mortgage and A&D Mortgage had financed

13   approximately $45 million of non-qualifying mortgage loans in March 2020, a prod-

14   uct that had concurrently been discontinued due to an illiquid market. As a result,

15   Commerce Home Mortgage and A&D Mortgage could not sell their mortgages on

16   the secondary market and the loans were aging as collateral for the warehouse line

17   beyond the terms permitted by the loan agreement and the Bank's policy.

18       65.    These out of compliance loans were supposed to be reported to the Axos

19   management credit committee and Board of Directors pursuant to Bank Policy. In

20   order to rehabilitate the loans and avoid reporting them as exceptions, the Bank cre-

21   ated a special line of credit for the two lenders in order to avoid identifying the loans

22   as exceptions on their current line of credit. Axos referred to this new product as a

23   "hospital line"—apparently a reference to the status of the loans on life support.

24       66.    Ms. Brinker was increasingly concerned given Commerce Mortgage con-

25   tinued preferential lending terms and the disclosed relationship between the owner

26   who also sold Cor Clearing to the bank and close relationships with several Axos ex-

27   ecutives.

28

King & Siegel ⫴ LLP

King & Siegel ‖ LLP

67.     Ms. Brinker pointed out that this effort to conceal the noncompliant loans created other disclosure issues. Specifically, the Bank was required to disclose the new credit product to the Board and credit committees and ultimately in Axos's financial reports for Shareholders in terms of deteriorated credits. Ms. Brinker sent emails to Mr. Tolla and the lead Warehouse Banker, Mr. Martini, asking them to explain reporting standards for the novel "hospital line" but they refused to do so. After the exchange, Mr. Martini indicated that he agreed with Ms. Brinker that the "nonQM" exposure and new "hospital line" needed to be documented but that "Tom wouldn't allow it." The characteristics of such "hospital lines" meant problem loans with a higher risk profile deserving an increase in reserves, which Ms. Brinker later challenged after the Fiscal 2020 earnings call with investors and the Bank's 10k failed to disclose the issues.[4]

68.     Mr. Martini further recounted that Tom had told him to contact Joel Kodish to explore ways to hide the aging collateral underlying the "hospital line" in the Lender Finance Portfolio.

69.     Ms. Brinker reasonably believed that Axos' attempts to conceal the loans and failure to report the loan exceptions and new credit product to investors constituted investor fraud.

**The Board Expresses Concern Over Ms. Brinker's Findings**

70.     In January of 2020 Ms. Brinker was told to work full-time on remediating the findings that she had put in her reports because the Board of Directors was concerned with the number of findings that she had issued and the lack of remediation progress by the Bank.

_____

[4] Ms. Brinker also complained about the fact that the terms of the lending agreement for the "Hospital Line" and that pledged funds used to hedge against the risk were released prior to authorization by the credit department. These exceptions were not reported to the Board of Directors as required, which was consistent with a Bank practice of not reporting exceptions to loans.

71.     Because the Bank Business Units refused to remediate the findings, Ms. Brinker had to do much of the work herself, rewriting policies, editing, and checking procedures, etc. Many of the remediation periods were again extended because of the Bank's refusal to resolve these issues. Ms. Brinker repeatedly complained about the length of time involved in remediating her findings.

**Ms. Brinker's Lender Finance Review**

72.     Ms. Brinker started her report on Axos's Lender Finance Portfolio in April of 2020. She immediately discovered that Axos had not resolved many of the issues raised in her prior ICR report, including issues related to loan monitoring and administration.

73.     Ms. Brinker also discovered a number of other problems with the credit approval process and monitoring of loans. Junior analysts did not understand the credit products and were failing to properly underwrite the loans. Among other things, Ms. Brinker discovered use of an ineffective "Probability of Default" scale, failure to validate risk rating models, failure to standardize loan to value ratios, failure to conduct field reviews, using inappropriate risk ratings that were based on outdated assumptions regarding the collateral[5] and which failed to test or conduct diligence on the reported collateral, and failure to forecast prospectively. Ms. Brinker also discovered ongoing problems with monitoring loans, including loans that were in breach of the relevant loan agreements, failure to make required UCC filings to secure collateral, failure to monitor collateral, and failure to monitor and collect fee income.

74.     Individually and collectively, Ms. Brinker reasonably believed that the following problems violated the Bank's obligation to establish adequate internal controls over financial reporting in connection with her review of the Lender Finance Portfolio in 2020: (1) the Bank's failure to adequately address many of the problems

---

[5] In some cases, the Bank had not reviewed the collateral for the finance loans for six to twelve months in violation of its own policies.

that she previously identified; (2) The Bank's failure to adequately underwrite the loans to ensure that there being issued pursuant to Axos' policies; (3) Axos' use of an ineffective "Probability of Default" scale and use of unvalidated risk rating models; (3) Axos' failure to monitor changes in borrower an loan risk profiles and correspondingly out of date risk ratings for loans, which lead to misstated loss reserves; (5) Axos' failure to monitor loans for breaches of loan covenants, failure to monitor collateral, and failure to make UCC filings required to secure the Bank's interest in the collateral, and failure to ensure that the Bank was actually collecting fee income on the loans.

75.     Collectively, Ms. Brinker believed that these problems left the Bank over-exposed to risky borrowers and unable to accurately state the value of assets on its balance sheet or assign loss reserves in connection with these loans. Ms. Brinker believed that these deficiencies, along with the other detailed in this Complaint, made the financial statements that Axos provided to investors materially misleading and further rendered its and that the Bank's certification of adequate controls inaccurate. Ms. Brinker reasonably believed that collectively the Bank's failures and statements constituted violations of laws and regulations relating to shareholder fraud, specifically 15 U.S.C. § 78m(b)(2)(B)(ii), 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5.

76.     Ms. Brinker also identified a problem with the Bank's reporting of loan to value rates, where the Bank was reporting participation rates and estimated advance rates instead of true loan to value rates. As a result, the Bank routinely misrepresented the average loan to value ratio's of its loans to investors. Ms. Brinker raised concerns about this issue to her supervisor Manuel Cardoso and other ICR team members and created an audit finding to establish standards that would correct inconsistent loan to value rates. This finding had become overdue and unresolved by the time Ms. Brinker was fired.

77.     Ms. Brinker reasonably believed that statements made to investors by Bank Management regarding the Loan to Value ratios of its loans were materially

SECOND AMENDED COMPLAINT

King & Siegel | LLP

misleading because the numbers presented did not actually represent LTV ratios, but rather participation rates and estimated advance rates instead of true loan to value rates.  Ms. Brinker later discussed the problem with her team and supervisor following Axos' fiscal 1Q2021 earnings call while the related audit finding was pending remediation and the CEO made inaccurate statements to shareholders about LTV metrics for the Lender Finance portfolio.

78.    In July 2020, Ms. Brinker circulated a draft of her Lender Finance report. The draft report was passed around the Bank, with various officers editing and modifying the report in an effort to reduce the severity of Ms. Brinker's findings and exclude her from the internal actions to rewrite her report. There were at least eight draft versions circulated and Ms. Brinker expressed concern over the management involvement. Even with management interference, the final report contained 11 negative findings about gaps in internal controls, documentation, reporting, collateral monitoring, risk ratings and credit administration.

### Ms. Brinker's HR Complaint and First "Severance" Offer

79.    As a result of Ms. Brinker's vigorous efforts to perform her job, she faced with hostility at Axos. She was repeatedly told that she was "too negative" and needed to "lower her standards." She was also repeatedly told that she should not identify problems that the Bank viewed as outside the scope of her work, and that various officers of the Bank did not like her. Ms. Brinker was also given unfairly negative performance reviews, excluded from meetings with senior management, denied a promotion, and other career opportunities to which she applied. Further, Ms. Brinker was denied opportunities to speak with the Board of Directors and OCC examiners, and consistently harassed to finish her investigations more quickly to prevent her from digging too deeply into Axos's practices.

80.    Faced with hostility to her work and retaliation, Ms. Brinker complained about retaliation and other issues to HR in October of 2020. The stress of dealing

with her managers also began to take a toll on her and around the same time she began to work a reduced schedule on a medical leave of absence.

81.     In early November, the Executive Vice President of Human Resources, Mary Ellen Ciafardini told Ms. Brinker that she had found "no merit" to the complaints and that Ms. Brinker had to "solve" the problem because "it couldn't go on like this any longer." Ms. Ciafardini indicated that Ms. Brinker would have to leave the Bank, asking what kind of severance would make her happy to leave and asking her to propose a severance in return for a full release of any claims against the Bank.

82.     Two days after this meeting, Mary Ellen called Ms. Brinker back to reiterate the offer to leave Axos and asked Ms. Brinker to "let her know" what it would take to get her to leave Axos.

**Ms. Brinker's Warehouse Lending Supplemental Report**

83.     In or around September of 2020, Ms. Brinker and her colleague, Anthony Maniscalco began working on a 2020 Warehouse Lending Portfolio audit.

84.     Ms. Brinker and Mr. Maniscalco both raised significant concerns regarding compliance with AML laws and procedures, including failure to collect information on beneficial owners, failure to assess the strength of personal guarantees made to secure loans, failure to obtain spousal consents, failure to investigate the propriety of SEC waivers, failure to collect required tax return information, failure to obtain audited financials to determine creditworthiness of borrowers, failure to properly underwrite increases in credit lines, and failure to acquire appropriate corporate documents, among others.

85.     Ms. Brinker and Mr. Maniscalco both reported these concerns throughout her investigation and through draft reports submitted to her supervisor. They both reiterated these findings in numerous communications with John Tolla in December 2020.la did not adjust the deadline to complete the Warehouse review that he mandated to be complete by end of December.  Still, Ms. Brinker carried out her

portfolio review with increased hostility and pressures from Mr. Tolla despite being on her medical leave of absence.

86.     also raised concerns about the fact that the Bank was not reporting loan exceptions to the Board as required. During her review, she discovered that the Warehouse Lending Unit maintained an internal report of loans that were out of compliance, but that these loans were not being identified to the Board as required by Bank procedures. When she asked about the report, she was told not to use it and the Bank later deleted the information. Ms. Brinker also reviewed an internal report in which the Credit Department reported average Warehouse line exposure terms that appeared to be artificially low. Ms. Brinker determined that the reports erroneously omitted certain loans with credit weaknesses, creating a survival bias that excluded nonperforming mortgages. When she reported this to management, she was told that the report was not "live" but only used for training purposes so her finding was irrelevant. Ms. Brinker's permission to access the database was subsequently blocked by her supervisor.

87.     On or around December 17, 2020, Ms. Brinker and Mr. Maniscalco submitted an initial draft 2020 summary on the Warehouse Lending Portfolio that raised a number of issues, including poor risk rating procedures, problems with underwriting of loans, including failure to collect necessary documents, failure to monitor the loans, including failure to monitor the financial condition of loan guarantors, failure to amend CRA's to reflect changes in the Credit Approval Memo, continued failure to use an accurate leverage ratio, continued lack of expertise of credit professionals, and continued failure to monitor loan covenants. Ms. Brinker reasonably believed that these failures individually and collectively violated Axos' obligation to establish controls over financial reporting and further believed that collectively the Bank's failures and statements constituted violations of laws and regulations relating to shareholder fraud, specifically 15 U.S.C. § 78m(b)(2)(B)(ii), 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5.

**Ms. Brinker's Complaints About Axos's Review and Compliance Practices**

88.     In addition to the specific weaknesses that Ms. Brinker identified through her review of various Axos business units, she complained throughout her tenure about Axos's audit, review, and compliance practices more generally. Ms. Brinker repeatedly pointed out that many of the staff Axos employed to underwrite loans and monitor credit exposure lacked credit experience and the training necessary to adequately perform their jobs.

89.     Ms. Brinker also complained that Axos was understaffed, did not hire enough professionals in the ICR unit, and set unrealistic deadlines for completing reports, which had the effect of limiting the scope and depth of analyses necessary to conduct adequate compliance and credit reviews.

90.     The low pay, brutal hours, and hostility from senior management that compliance professionals at Axos faced also lead to a high rate of turnover, which also limited the effectiveness of the compliance functions due to a lack of institutional knowledge and lack of familiarity with the specifics of Axos's business units.

91.     All in all, Ms. Brinker reasonably believed that the undertrained, under-paid, and overworked risk management and compliance staff represented a signifi-cant weakness in Axos's internal controls and risk management systems.

92.     Ms. Brinker and other members of the ICR team also complained about the number of Information Technology systems and data discrepancies at the Bank in addition to the lack of integration between systems. Ms. Brinker reasonably be-lieved that the proliferation of systems and lack of integration was a deficiency in the Bank's internal controls that resulted in errors and inconsistencies essential for re-porting purposes.

**Ms. Brinker's Complaints About Axos's
Discriminatory Policies and Practices**

93.     On information and belief, Axos maintained and continues to maintain a policy and practice of paying women less than men in the same or substantially similar

job positions, even though those employees perform substantially equal or similar work. Moreover, Axos promotes men more frequently to better compensated job positions and levels than women despite similar qualifications and duties. During her employment, Ms. Brinker became aware of these policies and practices, through conversations with her fellow employees, including one male employee who was paid nearly twice as much as Ms. Brinker despite them having the same position. She was paid $88,000 per year as a base salary (plus bonus), while compensation was nearly double that despite the fact that he performed identical duties and held the same job title.  Furthermore, her male colleague admitted to lacking computer and technology skills thus relied on trained staff to supplement those job requirements for him.

94.    In addition to Axos's discriminatory pay policies and practices, Ms. Brinker experienced numerous other forms of discriminatory behavior aimed at women while employed with Axos. For instance, Ms. Brinker was subjected to insensitive and/or disparaging comments by Axos's CEO. Ms. Brinker was further told she was unlikely to have the opportunity to work in Axos's C&I Department because women cannot get in to the "biggest old boy network" at the bank.

95.    Ms. Brinker and other women were also delegated a significant amount of administrative tasks compared to their male counterparts in similar roles, creating an environment in which women, including Ms. Brinker, were treated as, as another employee described, "de facto secretaries." Men, in contrast, were provided opportunities to engage in leadership opportunities, including leading management committee presentations, opportunities that Axos denied giving to women and Ms. Brinker. Finally, women, including Ms. Brinker, were frequently denied requested equipment, including company laptop computers, despite the fact that Axos provided those same pieces of equipment to men with or without their request.

96.    Ms. Brinker first complained of these policies, practices, and comments to her supervisor and manager, Mr. Tolla, during the bank's semi-annual review

King & Siegel ‖ LLP

period in or around January 2020. However, on information and belief, Axos failed to conduct any further investigation.

97.    Ms. Brinker complained again to her supervisor and manager, Mr. Tolla, ,during the semi-annual performance review cycle around early Aug. 2020.  On information and believe, Axos failed again to conduct any further investigation.

98.    Finally, Ms. Brinker's formal complaint to HR in or around October 2020 also addressed the discrimination that Ms. Brinker had experienced. However, Ms. Brinker's complaints were once again dismissed and, in early November, Ms. Ciafardini told Ms. Brinker that she had found "no merit" to the complaints and that Ms. Brinker, herself, had to "solve" the problem. Thereafter, Ms. Ciafardini indicated that Ms. Brinker would have to leave the Bank, asking what kind of severance would make her happy to leave and asking her to propose a severance in return for a full release of any claims against the Bank.

99.    Two days after this meeting, Mary Ellen called Ms. Brinker back to reiterate the offer to leave Axos and asked Ms. Brinker to "let her know" what it would take to get her to leave Axos.

**Ms. Brinker And Other ICR Personnel Who Supported Her Are Terminated and Axos Attempts to Intimidate Her Into Staying Silent**

100.    On January 5, Mr. Tolla informed Ms. Brinker and several other members of the ICR team that they were being terminated. On information and belief, Mr. Bar-Adon and Mr. Constantine were involved in the decision to terminate Ms. Brinker and other member of the ICR team.

101.    Ms. Brinker was offered a severance of $27,076.96 in return for a "settlement and general release" of any claims against Axos and for signing an over-the-top declaration under oath. Among other terms, Axos demanded that Ms. Brinker declare under oath that she was "not aware of any conduct by anyone I worked with that was improper, against policy, illegal, or in violation of the letter or spirit of any applicable laws or regulations," that she "observed that Axos implements and

- 25 -

enforces appropriate and effective corporate policies and practices, including, without limitation, those related to employment practices and legal and regulatory compliance," and that despite the severance payment she had "not been intimidated or otherwise induced by anyone at Axos to sign this Declaration."

102.   Axos also sought to prevent Ms. Brinker from engaging in whistleblower activity and reporting any instances of discriminatory behavior she had experienced or observed. Among other things, Axos's settlement agreement required her to agree that she had "neither filed, directly or indirectly, nor caused to be filed, any action or complaint, or initiated, cooperated or participated in any proceeding (collectively, an "Action") against the Releasees in any forum, including any action before any federal, state or local court, any arbitration, or any administrative proceeding before any federal, state or local administrative agency" and demanded that Ms. Brinker inform them if she had "cooperated" in any such action against the Bank.

103.   Axos's settlement agreement also required Ms. Brinker to not disclose any information obtained during her work for the Bank to any third party and required her to certify that she had destroyed any documents or information that she obtained in the course of her work.

104.   When Ms. Brinker declined to sign the release, Axos increased its efforts at intimidation, sending her a "cease and desist" letter on January 12 that threatened litigation and demanded Ms. Brinker not provide any information pertaining to Axos to any third party and inform Axos if she had previously shared any such information with a third-party. Axos also demanded that Ms. Brinker sign another absurd declaration that stated, among other things, that she "underst[ood] that if it is discovered that I have used such Proprietary information for any purpose or provided such Proprietary Information to a third party or third parties to use, I will be exposed to have improperly used stolen information."

105.   Axos subsequently has pursued its claims against Ms. Brinker in arbitration.

King & Siegel ‖ LLP

**Ms. Brinker Was Harmed Through Axos's Illegal Retaliation**

106.    As a result of Axos's illegal conduct Ms. Brinker has lost income, opportunities for professional growth, and has suffered significant emotional distress. Indeed, towards the end of her tenure at Axos she was placed on reduced hours due to the stress caused by Axos's hostility towards her.

107.    Ms. Brinker seeks redress for her damages, including attorneys fees and the costs of this action against Axos.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

108.    Ms. Brinker has exhausted all administrative remedies required as a prerequisite to bringing this action. Ms. Brinker filed a complaint of discrimination and harassment against Defendants with the Department of Fair Employment and Housing ("DFEH") and obtained a right-to-sue letter authorizing her to enforce her rights through a civil action. Specifically, the right to sue letter authorizes Ms. Brinker to bring claims against Axos Bank for discrimination because of her gender and as a result of the discrimination was terminated, denied hire or promotion, denied equal pay, denied any employment benefit or privilege and for retaliation for "report[ing] or resist[ing] any form of discrimination or harassment."

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Sarbanes Oxley Act (SOX) Retaliation**

**18 U.S.C. §1514A**

**(Plaintiff against Defendants)**

109.    Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

110.    At all material times Defendant was subject to 18 U.S.C. § 1514A, which prohibits the company "or any officer, employee, contractor, subcontractor, or agent of such company" from "discharge[ing], demot[ing], suspend[ing], threaten[ing], harass[ing], or in any other manner discriminat[ing] against an employee in the terms

- 27 -

and conditions of employment because of any lawful act done by the employee to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by a Federal regulatory or law enforcement agency . . . or a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct).

111.    Plaintiff actually and reasonably believed that the conduct and actions listed above violated federal statutes, rules and regulations, including Section 404 of the Sarbanes Oxley Act of 2002 and the Securities Fraud Statutes.

112.    Specifically, Plaintiff believed that Axos' failure to adequately underwrite loans issued in its name, failure to monitor loan covenants, failure to adequately apply credit risk metrics, failure to adequately analyze risk factors associated with its loans, among other problems with Axos' processes and practice, violated Axos' obligation to ensure adequate internal controls over financial reporting as required by Section 404 of the Sarbanes Oxley Act. Plaintiff Further believed that Axos' failures with respect to monitoring, internal financial controls, and credit risk calculations— which left the bank with inaccurate loss reserves—resulted in inaccurate and materially false financial statements to investors, in violation of SEC Rule 10b-5 and Section 17(a)(2) of the Securities Act.

113.    Plaintiff believed that Axos' inadequate underwriting standards in its equipment finance portfolio, failure to follow US GAAP in calculating operating lease schedules in connection with its equipment finance portfolio, and improper risk ratings for loans in the equipment finance portfolio—which left the bank with inaccurate loss reserves—among other things, violated Axos' obligation to ensure adequate

Second Amended Complaint

internal controls as required by Section 404 of the Sarbanes Oxley Act. Plaintiff Further believed that these failures resulted in inaccurate and materially false financial statements to investors, in violation of SEC Rule 10b-5 and Section 17(a)(2) of the Securities Act.

114. Plaintiff believed that Axos' underwriting deficiencies, lack of adequate personnel, failure to account for debt owed by borrowers, improper risk ratings, failure to monitor and enforce covenants in the Bank's Warehouse Lending Portfolio violated Axos' obligation to ensure adequate internal controls as required by Section 404 of the Sarbanes Oxley Act. Plaintiff Further believed that these failures resulted in inaccurate and materially false financial statements to investors, in violation of SEC Rule 10b-5 and Section 17(a)(2) of the Securities Act.

115. Plaintiff further believed that Axos' failure to adequately report the "hospital" lending line that the Bank created in response to out of compliance mortgage loans held on the Bank's books, and efforts to "hide" the loans, violated Axos' obligation to ensure adequate internal controls as required by Section 404 of the Sarbanes Oxley Act. Plaintiff Further believed that these failures resulted in inaccurate and materially false financial statements to investors, in violation of SEC Rule 10b-5 and Section 17(a)(2) of the Securities Act.

116. Plaintiff further believed that the terms of Axos' line of credit extended to Steve Sugarman—a friend of several Axos Executives—and Axos' acquisition of Mr. Sugarman's COR Securities firm constituted violations of Axos' duty of loyalty to its shareholders and/or Axos' failure to engage in adequate diligence prior to the acquisition in violation of its fiduciary duties to its shareholders.

117. Plaintiff further believed that Axos' failure to resolve issues identified in her prior reports, inadequate credit approval process, and inadequate credit monitoring processes in the Bank's Lender Finance Portfolio violated Axos' obligation to ensure adequate internal controls as required by Section 404 of the Sarbanes Oxley Act. Plaintiff Further believed that these failures resulted in inaccurate and materially

SECOND AMENDED COMPLAINT

false financial statements to investors, in violation of SEC Rule 10b-5 and Section 17(a)(2) of the Securities Act.

118.    Plaintiff further believed that the Bank's statements to investors about "loan to value" ratios were materially misleading in violation of SEC Rule 10b-5 and Section 17(a)(2) of the Securities Act  because they were based on participation rates and estimated advance rates instead of true loan to value rates.

119.    Plaintiff further believed that Axos' failure to adequately underwrite loans, failure to properly report loan exceptions, failure to adequately account for loan exposure, failure to adequately implent credit risk rating procedures, failure to monitor the loans or update credit approval memos, failure to use accurate credit leverage ratios in calculating risk, and other issues with Axos' Warehouse Lending Portfolio violated Axos' obligation to ensure adequate internal controls as required by Section 404 of the Sarbanes Oxley Act. Plaintiff Further believed that these failures resulted in inaccurate and materially false financial statements to investors, in violation of SEC Rule 10b-5 and Section 17(a)(2) of the Securities Act.

120.    Plaintiff further believed that Axos' general attitude towards compliance, including its failure to ensure adequate staffing of compliance positions, training of underwriting personnel, and undue management influence on compliance reporting was a violation of Axos' obligation to ensure adequate internal controls as required by Section 404 of the Sarbanes Oxley Act.

121.    Plaintiff further believed that the Bank's many AML failures exposed the bank to risks not disclosed to investors in violation of SEC Rule 10b-5 and Section 17(a)(2) of the Securities Act and further failed to implement adequate internal controls as required by Section 404 of the Sarbanes-Oxley Act.

122.    Plaintiff further believed that all of the deficiencies detailed in this Complaint, individually and collectively, violated Axos' obligation to ensure adequate internal controls as required by Section 404 of the Sarbanes Oxley Act. Plaintiff Further believed that all of the deficiencies detailed in this Complaint, individually and

collectively, resulted in inaccurate and materially false financial statements to investors, in violation of SEC Rule 10b-5 and Section 17(a)(2) of the Securities Act.

123.   Defendants harassed, threatened, retaliated against and wrongfully discharged Plaintiff because she made oral and written complaints regarding weaknesses in Axos's internal financial controls and what she reasonably believed to be illegal or unlawful conduct in violation of state and federal statutes, rules and regulations. Plaintiff made these complaints to her employer, by and through its agents and employees, as well as to the OCC.

124.   Plaintiff timely filed a whistleblower complaint with OSHA, and 180 days have elapsed since filing that complaint. No final decision has been issued by OSHA, and Plaintiff has not been the cause of any delay in the issuance of a decision. Accordingly, Plaintiff is entitled to seek relief in district court by jury trial. Moreover, no predispute arbitration agreement shall be valid or enforceable, if the agreement requires arbitration of a dispute arising under this section of SOX.

125.   As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer pain and mental anguish and emotional distress.

126.   As a direct and proximate result of Defendant's actions, Plaintiff has further suffered and will continue to suffer loss of earnings and other employment benefits, in an amount to be proven at trial.

127.   Defendant's actions constituted a willful violation of the above-mentioned federal laws and regulations. As a direct result, Plaintiff has suffered and continues to suffer substantial losses related to the loss of wages and is entitled to recover costs and expenses and attorney's fees in seeking to compel Defendant to fully perform its obligations under state and federal law, in amounts according to proof at time of trial.

SECOND AMENDED COMPLAINT

### SECOND CAUSE OF ACTION

**Whistleblower Retaliation**

**Cal. Labor Code § 1102.5**

**(Plaintiff against Defendants AXOS Bank and AXOS Financial)**

128.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

129.   At all times material to this First Amended Complaint, California Labor Code § 1102.5 was in effect and binding on Defendant. This section requires Defendant to refrain from retaliating against an employee for reporting or refusing to engage in activity that the employee reasonably believes would result in a violation of a state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

130.   As alleged herein, Plaintiff had a reasonable belief that Defendant was violating state and federal laws and/or state and federal regulations relating to its internal controls and compliance with mandated banking practices, and reported those violations to Defendant's management.

131.   Defendant retaliated against Plaintiff for her whistleblowing by taking away her job responsibilities, denying her meaningful promotions and/or transfers, harassing her, and terminating her employment in violation of Labor Section § 1102.5.

132.   As a direct and proximate result of such retaliation, Plaintiff has been damaged in a sum according to proof.

133.   The conduct of Defendant described hereinabove was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff. Plaintiff is entitled to recover punitive and exemplary damages in amounts according to proof at the time of trial, to the full extent allowable by law, in addition to any other remedies and damages allowable by law.

134.   Plaintiff requests all available relief under Labor Code § 1102.5, including damages, the imposition of a civil penalty of $10,000 for each violation, and an award of reasonable attorney's fees and costs of litigation.

### THIRD CAUSE OF ACTION

### Violation of California Equal Pay Act

### Lab. Code § 1197.5

### (Plaintiff Against Defendants AXOS Bank and AXOS Financial)

135.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

136.   Labor Code section 1197.5(a) provides that "[a]n employer shall not pay any of its employees at wage rates less than the rates paid to employees of the opposite sex for substantially similar work." Lab. Code § 1197.5(a).

137.   Labor Code section 1197.5(b) provides that "[a]n employer shall not pay any of its employees at wage rates less than the rates paid to employees of another race or ethnicity for substantially similar work." Lab. Code § 1197.5(b).

138.   There is no intent requirement; it is sufficient to show that an employee was paid less than employees of other races who occupied comparable positions. *Green v. Par Pools, Inc.*, 111 Cal. App. 4th 620, 629 (2003). Further, "prior salary shall not, by itself, justify any disparity in compensation." Lab. Code § 1197.5(b)(3); *Rizo v. Yonivo*, No. 16-15372 (Ninth Circuit Feb. 27, 2020).

139.   Employers who fail to pay employees at wage rates less than employees of other races or ethnicities for substantially similar positions are liable for the amount of wages unlawfully withheld plus an equal amount as liquidated damages, interest, addition to attorneys' fees, and costs of suit. Lab. Code § 1197.5(c).

140.   Ms. Brinker is a woman who was paid wages lower than those paid to male employees of similar qualifications, seniority, and experience.

141.   Mr. Maniscalco—a male employee—held the exact same title as Ms. Brinker. Like Ms. Brinker, Mr. Maniscalco was responsible for reviewing the Bank's

loan portfolios to examine, measure, monitor and report weaknesses and deficiencies with the Banks lending and risk management standards and practices. Like Ms. Brinker, Mr. Maniscalco performed reviews of the Bank's major lending portfolios and issued reports regarding credit risks in those portfolios and deficiencies in the Bank's processes and practices. Indeed Mr. Maniscalco was tasked with conducting the 2020 Warehouse Lending supplemental report alongside Ms. Brinker. In other words, Mr. Maniscalco performed the exact same job duties under the exact same circumstances as Ms. Brinker.

142.    Despite the fact that ther performed the same work under the same circumstances, Mr. Maniscalco was paid nearly twice as much as Ms. Brinker. Their training, skills and qualifications were substantively similar, making the pay disparity between them unjustifiable.

143.    Defendants have no legal justification for their discriminatory pay practices.

144.    Accordingly, Defendants are liable for the amount of wages unlawfully withheld plus an equal amount as liquidated damages, interest, addition to attorneys' fees, and costs of suit. Lab. Code § 1197.5(c).

## FOURTH CAUSE OF ACTION

### Gender Discrimination in Violation of FEHA

### Gov. Code §§ 12940, et seq.

### (Plaintiff Against Defendants AXOS Bank and AXOS Financial)

145.    Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

146.    Defendants discriminated against Ms. Brinker because of her gender in violation of Government Code § 12940(a) by denying her equal pay to her male peers, subjecting her to different and/or more onerous requirements than her male peers, denying her professional opportunities, and, ultimately, terminating her for pretexual reasons.

King & Siegel ⫼ LLP

147.   Ms. Brinker's gender was the sole or motivating factor in Defendants' decision to take these or other adverse employment actions against her.

148.   As a direct and proximate result of Defendants' conduct, Ms. Brinker has suffered special damages in the form of lost earnings, benefits, and/or out-of-pocket expenses in an amount subject to proof at trial. As further direct and proximate result of Defendants' conduct, Ms. Brinker continues to suffer damages in the form of lost future earnings, benefits, and/or other prospective damages in an amount to be proven at trial.

149.   Defendants' conduct has further caused Ms. Brinker to lose financial stability, peace of mind, and future security. Defendants' conduct has caused her severe embarrassment, humiliation, and mental and emotional distress and discomfort in an amount not fully ascertained but subject to proof at trial.

150.   Because of the conduct alleged herein, Ms. Brinker hired attorneys to prosecute her claims under FEHA. Accordingly, Ms. Brinker is entitled to recover attorneys' fees and costs pursuant to Government Code § 12965(b), in addition to other damages as provided by law.

151.   Moreover, Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard for Ms. Brinker's rights, entitling her to punitive damages.

### FIFTH CAUSE OF ACTION

#### Failure to Prevent Discrimination and Harassment

#### In Violation of Gov. Code § 12940(j)(k)

#### (Plaintiff Against Defendants AXOS Bank and AXOS Financial)

152.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

153.   California law requires employers to take all reasonable steps necessary to prevent discrimination in violation of FEHA.

- 35 -

154.    Defendants failed to take all reasonable steps necessary to prevent gender discrimination in violation of FEHA. At all relevant times, Defendants had actual and constructive knowledge of the discriminatory conduct described and alleged in this complaint, and condoned, ratified, and participated in that conduct.

155.    As a direct and proximate result Defendants' conduct, Ms. Brinker has suffered special damages in the form of lost earnings, benefits, and/or out-of-pocket expenses in an amount subject to proof at trial. As further direct and proximate result of Defendants' conduct, Ms. Brinker continues to suffer damages in the form of lost future earnings, benefits, and/or other prospective damages in an amount to be proven at trial.

156.    Defendants' conduct has further caused Ms. Brinker to lose financial stability, peace of mind, and future security. Defendants' conduct has caused her severe embarrassment, humiliation, and mental and emotional distress and discomfort in an amount not fully ascertained but subject to proof at trial.

157.    Because of the conduct alleged herein, Ms. Brinker hired attorneys to prosecute her claims under FEHA. Accordingly, Ms. Brinker is entitled to recover attorneys' fees and costs pursuant to Government Code § 12965(b), in addition to other damages as provided by law.

158.    Moreover, Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard for Ms. Brinker's rights, entitling her to punitive damages.

### SIXTH CAUSE OF ACTION

**Gov. Code §§ 12940, et seq.**

**Retaliation in Violation of FEHA**

**(Plaintiff Against Defendants AXOS Bank and AXOS Financial)**

159.    Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

SECOND AMENDED COMPLAINT

160.   FEHA forbids an employer "to discharge, expel, or otherwise discrimi-nate against any person because the person has opposed any practices forbidden un-der" Gov. Code § 12940(h).

161.   Defendants retaliated against Ms. Brinker by terminating her because she made complaints regarding Axos's unlawful policies and practices discriminating against women.

162.   Ms. Brinker's complaints and resistance to Axos's discrimination was the sole or motivating factor in Defendants' decision to terminate her. Defendants' conduct constituted an adverse employment action and represented a materially ad-verse change in the terms of Ms. Brinker's employment.

163.   As a direct and proximate result of Defendants' conduct, Mr. Brinker has suffered damages in the form of lost earnings, benefits, and/or out-of-pocket ex-penses in an amount subject to proof at trial. As further direct and proximate result of Defendants' conduct, Ms. Brinker continues to suffer damages in the form of lost future earnings, benefits, and/or other prospective damages in an amount to be proven at trial.

164.   Defendants' conduct has further caused Ms. Brinker to lose financial sta-bility, peace of mind, and future security. Defendants' conduct has caused her severe embarrassment, humiliation, and mental and emotional distress and discomfort in an amount not fully ascertained but subject to proof at trial.

165.   Because of the conduct alleged herein, Ms. Brinker hired attorneys to prosecute her claims under FEHA. Accordingly, Ms. Brinker is entitled to recover attorneys' fees and costs pursuant to Government Code section 12965(b), in addition to other damages as provided by law.

166.   Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard for Ms. Brinker's rights, entitling her to punitive damages.

SECOND AMENDED COMPLAINT

**SEVENTH CAUSE OF ACTION**

**Wrongful Termination in Violation of Public Policy**

**(Plaintiff Against Defendants AXOS Bank and AXOS Financial)**

167.    Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

168.    It is against public policy in California to "discharge an employee or in any manner discriminate, retaliate, or take any adverse action against any employee or applicant for employment" because the employee made a complaint regarding unpaid wages or exercised any right afforded to them under the Labor Code. This conduct constitutes an unlawful employment practice in violation of California's well-established public policy as exemplified in Labor Code sections 98.6, 1102.5, and 6310.

169.    Defendants discriminated against Ms. Brinker because of her gender in violation of Government Code § 12940(a) by denying her equal pay to her male peers, subjecting her to different and/or more onerous requirements than her male peers, denying her professional opportunities, and, ultimately, terminating her for pretexual reasons.

170.    This discriminatory conduct constitutes an unlawful employment practice in violation of California's well-established public policy.

171.    As a direct and proximate result Defendants' conduct, Ms. Brinker has suffered special damages in the form of lost earnings, benefits, and/or out-of-pocket expenses in an amount subject to proof at trial. As further direct and proximate result of Defendants' conduct, Ms. Brinker continues to suffer damages in the form of lost future earnings, benefits, and/or other prospective damages in an amount to be proven at trial.

172.    Defendants' conduct has further caused Ms. Brinker to lose financial stability, peace of mind, and future security. Defendants' conduct has caused her severe

SECOND AMENDED COMPLAINT

embarrassment, humiliation, and mental and emotional distress and discomfort in an amount not fully ascertained but subject to proof at trial.

173.    Moreover, Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard for Ms. Brinker's rights, entitling her to punitive damages.

**EIGHTH CAUSE OF ACTION**

**California Business & Professions Code §§ 17200, et seq.**

**Unlawful Business Practices**

**(Plaintiff Against Defendants AXOS Bank and AXOS Financial)**

174.    Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

175.    Defendants are "persons" as defined by California Business & Professions Code sections 17201, as they are natural persons, corporations, firms, partnerships, joint stock companies and/or associations.

176.    Defendants' conduct, as alleged herein, has been, and continues to be, unfair, unlawful and harmful to Plaintiff and to the general public. Plaintiff has suffered injury in fact and has lost money as a result of Defendants' unlawful business practices. Plaintiff seeks to enforce important rights affecting the public interest within the meaning of Code of Civil Procedure § 1021.5.

177.    In particular, Defendants withheld wages from Ms. Brinker which she earned and would have received had she been paid the same wages as her male colleagues of comparable role, skill, training and experience. Because Defendants withheld moneys to which Ms. Brinker had a legal claim of right, Ms. Brinker is entitled to restitution of those monies.

178.    Defendants' activities, as alleged herein, are violations of California law, and constitute unlawful business acts and practices in violation of California Business & Professions Code sections 17200, et seq. A violation of California Business & Professions Code sections 17200, et seq. may be predicated on the violation of any state

King & Siegel ‖ LLP

1  or federal law. In the instant case, Defendants' policies and practices have violated
2  state law as described above.

3       179.   As a result of the violations of California law herein described, Defend-
4  ants unlawfully gained an unfair advantage over other businesses. Plaintiff has suf-
5  fered pecuniary loss by Defendants' unlawful business acts and practices alleged
6  herein.

7       180.   Plaintiff brings this cause of action seeking restitution of the amounts De-
8  fendant acquired through the unfair, un-lawful, and fraudulent business practices de-
9  scribed herein. In addition, Plaintiff seeks an award of costs and attorneys' fees pur-
10  suant to California Code of Civil Procedure § 1021.5.

11  ## DEMAND FOR JURY TRIAL
12  Plaintiff hereby requests a jury trial on all issues raised in this complaint.

13  ## PRAYER FOR RELIEF
14  WHEREFORE, Plaintiff respectfully prays judgment as follows:

15       1.    For general and special damages according to proof at trial;

16       2.    For statutory and civil penalties according to proof at trial;

17       3.    For punitive and exemplary damages according to proof;

18       4.    For pre- and post-judgment interest on monetary damages;

19       5.    For reasonable attorney's fees and costs and expert fees and costs
20  as allowed by law; and

21       6.    For such other relief as this Court deems just and proper.

22

23  Dated: January 17, 2023          Respectfully submitted,

24                     **KING & SIEGEL LLP**

25                     By: *Robert Johnston King*
26                     ROBERT JOHNSTON KING
27                     JULIAN BURNS KING
                   Attorneys for Plaintiff

28

King & Siegel ⫼ LLP

Second Amended Complaint