# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER BREAR BRINKER,<br><br>Plaintiff,<br><br>v.<br><br>AXOS BANK, et al.,<br><br>Defendants. | Case No. 22-cv-0386-MMA (DDL)<br><br>**ORDER: (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SANCTIONS;**<br><br>**(2) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO EXCLUDE DEFENDANT'S EXPERT ANDREW MICELETTI;** |
| AXOS BANK, et al.,<br><br>Counter-Claimants,<br><br>v.<br><br>JENNIFER BREAR BRINKER,<br><br>Counter-Defendant. | **(3) DENYING DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT BRAD ABBOTT;**<br><br>**(4) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; AND**<br><br>**(5) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. Nos. 197, 198, 199, 201, 202] |

Plaintiff Jennifer Brear Brinker ("Plaintiff") brings this whistleblower retaliation action against Defendant Axos Bank ("Defendant" or "Axos").[1]  *See* Doc. No. 44 ("Third Amended Complaint" or "TAC").  On March 14, 2025, Plaintiff filed a Motion for Sanctions; a Motion to Exclude Defendant's Expert Andrew Miceletti; and a Motion for Summary Judgment.  Doc. Nos. 197, 198, 202.  That same day, Axos filed a Motion to Exclude Plaintiff's Expert Brad Abbott and a Motion for Summary Judgment.  Doc. Nos. 199, 201.  Since then, the parties have filed their respective responses in opposition and replies.  Doc. Nos. 221, 224–26, 229, 230, 232–34, 239.  The Court found these motions suitable for disposition on the papers and without oral argument pursuant to Civil Local Rule 7.1.d.1.  Doc. Nos. 231, 242.  For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Sanctions, Doc. No. 197; **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion to Exclude Defendant's Expert Andrew Miceletti, Doc. No. 198; **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Summary Judgment, Doc. No. 202; **DENIES** Defendant's Motion to Exclude Plaintiff's Expert Brad Abbott, Doc. No. 199; and **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment, Doc. No. 201.

## I. BACKGROUND[2]

### A. Employment Background and Role

Brinker commenced her employment with Axos in October 2018 as a Senior Independent Credit Review ("ICR") Officer for the Governance, Risk and Compliance ("GRC") Department.  Brinker's Separate Statement of Undisputed Material Facts

---

[1] While Defendant John Tolla responded to the TAC and filed Counterclaims, he has since been dismissed from the case.  Doc. No. 192.

[2] These material facts are taken from Plaintiff's and Axos' separate statements of undisputed material facts and responses thereto, as well as the parties' supporting declarations and exhibits.  Disputed material facts are discussed in further detail where relevant to the Court's analysis.  Facts that are immaterial for purposes of resolving the current motion are not included in this recitation.

("Brinker's SSOF") ¶ 1; Brinker's Additional Material Facts in Support of Opposition to Motion for Summary Judgment ("Brinker's AMF") , Doc. No. 234-10 at ¶ 1; Axos' Corrected Separate Statement of Undisputed Material Facts ("Axos' SSOF"), Doc. No. 218 at ¶ 12.[3] The purpose of the ICR department was to monitor, test, evaluate and report on the adequacy of loan origination and credit administration practices in order to ensure that asset quality and credit risk were effectively and regularly measured, monitored, managed and reported. Axos' SSOF ¶ 4. ICR officers analyzed the Bank's credit risk of various portfolios and generated reports with analyses and findings. Axos' SSOF ¶ 5.

Manuel Cardoso ("Cardoso") was responsible for overseeing the ICR department starting in 2018, and was Brinker's direct supervisor during her tenure at Axos. Axos' SSOF ¶ 6; Brinker's AMF ¶ 3. Cardoso reported to Defendant John Tolla ("Tolla"), who oversaw the GRC Department. Axos' SSOF ¶ 7; Brinker's AMF ¶ 3. Tolla is Axos' Executive V.P. and Chief GRC Officer and is responsible for managing Axos' overall risk management and compliance programs, including enterprise risk management, consumer and lending compliance, bank secrecy act/anti-money laundering, third party risk and credit risk management functions. Axos' SSOF ¶ 8. The CICR Committee was responsible for oversight of the compliance and ICR functions of Axos. Axos' SSOF ¶ 9. As part of this oversight, the CICR Committee approved the ICR schedule, including completion dates for each ICR review, based on prior ICR schedules, the portfolio being examined and the estimated sample size. Axos' SSOF ¶ 10.

Brinker's job was to review the Axos' lending portfolios to examine, measure, monitor, and report weaknesses and deficiencies with Axos' lending and risk management standards and practices. Brinker's SSOF ¶ 2. During her tenure, Brinker

---

[3] In response to each parties' separate statement of undisputed material facts, Brinker and Axos fail to meaningfully respond to several of the other party's asserted undisputed facts. *See*, *e.g.*, Axos' Response to Brinker's SSOF, Doc. No. 230-3 at ¶ 6; Brinker's Response to Axos' SSOF, Doc. No. 234-10 at ¶ 55. Instead, the parties fail to respond or merely respond with evidentiary objections. To the extent a party fails to dispute a fact or purport to dispute a fact but fail to set forth a relevant basis for doing so, the Court treats the fact as undisputed.

completed five ICR reviews in the following order: Correspondent Lending ("CL"), Equipment Finance, Warehouse Lending, Lender Finance and SFR Warehouse. Axos' SSOF ¶ 13.

**B. <u>Confidentiality Obligations and Handling of Information</u>**

As a condition of employment with Axos, Brinker was required to sign an Employee Confidentiality, Non-Disclosure, and Non-Recruitment Agreement (the "Confidentiality Agreement"). Brinker's SSOF ¶ 6. The Confidentiality Agreement defines "Trade Secrets" as "information . . . that:

> (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons or entities who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain it secrecy. Bofl's Trade Secrets include, but are not limited to, the following: . . . business plans, financial projections, . . . customer information (lists and preferences), . . . business know-how, processes (including process diagrams and flow charts), . . . and personnel information[.]

Brinker's SSOF ¶ 7. The Confidentiality Agreement defines "Confidential Information" as:

> information belonging to Bofl, whether reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, that has been provided to Employee during his/her employment with Bofl and/or Employee has gained access to while employed by Bofl and/or was developed by Employee in the course of Employee's employment with Bofl, that is proprietary and confidential in nature. Bofl's Confidential Information includes, but is not limited to, the following: Information believed by Bofl to be a Trade Secret that ultimately does not qualify as such under California law but nonetheless was maintained by Bofl as confidential including, but not limited to, information concerning the nature of Bofl's business and its manner of operation; . . . financial and accounting information, . . . client and/or customer profiles, financial policies and procedures . . . information concerning Bofl's clients and/or customers and prospective clients and/or customers; . . . client and/or customer lists; prospective client and/or customer lists[.]

Brinker's SSOF ¶ 8.

On May 22, 2019, Brinker emailed Cardoso and copied her personal email, attaching an ICR draft report for the EQF portfolio.  Brinker's SSOF ¶ 52.  ICR reports created from templates or old ICR reports would automatically be marked as confidential for purposes of Axos' systems.  Brinker's SSOF ¶ 54.  During her employment with Axos, especially between October 2, 2020 and her eventual termination, Brinker emailed copies of documents that she was working on to her personal Gmail address, including ICR drafts and completed reports as attachments.  Brinker's SSOF ¶¶ 3, 4, 14.

Brinker did not remove any confidential information through electronic means other than sending emails to a private email address.  Brinker's SSOF ¶ 55.  The only electronic documents that Axos contends Brinker accessed outside the scope of her employment are real estate property profiles of certain properties, and she did not email this information to herself or otherwise copy it from Axos' systems.  Brinker's SSOF ¶ 59.  Axos admits that it is not aware of Brinker providing confidential information to anyone other than her attorneys.  Brinker's SSOF ¶ 60

**C. CICR Board Meetings**

In May 2019, the ICR Board Committee merged with the Compliance Committee to form the new CICR Board Committee, which met on a quarterly basis.  Axos' SSOF ¶¶ 16–17.  Brinker's CL Review was finalized and approved for submission in April 2019, and she presented the CL Report to the ICR Board Committee on May 21, 2019.  Axos' SSOF ¶¶ 18–19.  The inaugural meeting of the CICR took place on June 18, 2019, which Brinker and the ICR team attended.  Axos' SSOF ¶¶ 20–21.  On that date, Brinker provided an update on the CL Report to the CICR Committee.  Axos' SSOF ¶ 22.

Cardoso instructed the ICR team to "keep it short" when they presented at the June 18, 2019 meeting, as CICR would need time to discuss other issues, such as "how the directors want ICR to report to them in the new committee."  Axos' SSOF ¶ 23.  The following month, Cardoso informed ICR that they would "probably need to trim down [the ICR] packet, as the [CICR] Directors will now need to review much more material[.]"  Axos' SSOF ¶ 24.  For the next CICR meeting in September 2019, the CICR

Directors requested that "only the ICR Committee members" and not the ICR team attend "because the agenda of the CICR became too dense and lengthy" after the committees merged, which was relayed to the entire ICR department, including Brinker, who responded that this was "an unfortunate change for the [ICR] team." Axos' SSOF ¶ 25. Cardoso replied that he understood the CICR Directors' decision because "[t]here is just too much to cover in that meeting." Axos' SSOF ¶ 26. Brinker was later invited to attend a CICR meeting on September 10, 2020. Axos' SSOF ¶ 27.

**D. Archer Database Access**

On October 9, 2020, Brinker emailed Cardoso and Tolla about certain features on the Archer database. Axos' SSOF ¶ 69. Brinker's email made Cardoso realize that the ICR team, as well as other teams, had access to certain risk assessments on Archer that Cardoso believed they should not have been able to access. Axos' SSOF ¶ 70. Accordingly, access to certain risk assessments was removed for the entire ICR team. Axos' SSOF ¶ 72. Brinker never lost all access to Archer; rather her access was limited to records within the ICR department. Axos' SSOF ¶ 73.

**E. Internal Job Applications and Career Discussions**

Brinker reached out to Cardoso regarding transitioning out of ICR in December 2019, and Cardoso offered to assist her with her internal job pursuits. Axos' SSOF ¶¶ 29–30. However, she did not seek or identify a specific open position. Axos' SSOF ¶ 31. Between December 2019 and February 2020, Cardoso reached out to CFO Andy Micheletti multiple times to share Brinker's interest in exploring roles at Axos. Axos' SSOF ¶¶ 32–33. Specifically, in January 2020, when Brinker reached out to Micheletti herself, she likewise did not seek or otherwise identify a specific open position. *Id.*

In March 2020, Brinker formally applied for the Internal Consulting position and was interviewed by Steve Carney. Axos' SSOF ¶¶ 34–35. Yet, there is no evidence Carney was involved in any of Brinker's ICR reviews. Axos' SSOF ¶ 37. In any event, Brinker did not receive the Internal Consulting position. Axos' SSOF ¶ 36.

That same month, Brinker also applied for the Special Assets Manager position, which would not have offered her an increase in salary, title, or benefits. Axos' SSOF ¶¶ 39–40. Nevertheless, Brinker did not receive the Special Assets Manager position. Axos' SSOF ¶ 41.

In addition, Cardoso and Tolla reached out on Brinker's behalf to Senior V.P. Controller Ann Gill ("Gill") to see if she was hiring. Axos' SSOF ¶ 43. In March 2020, Brinker met with Gill to discuss accounting positions, though Brinker is not an accountant. Axos' SSOF ¶ 44. Gill ultimately decided to hire an accountant for the position. Axos' SSOF ¶ 45. Brinker admitted that not being offered the accounting positions "worked out better" as it would have "bored her to tears." Axos' SSOF ¶ 46.

In April 2020, Chief Credit Officer Tom Constantine ("Constantine") reached out to Brinker inquiring if she "might be interested in moving over to credit and helping [them] out" or if that was "just wishful thinking on[his] part." Axos' SSOF ¶ 49. Brinker confirmed her interest, and Constantine initiated the possibility of creating a "pre-audit credit role." Axos' SSOF ¶ 50. Brinker then met with Carl Printer ("Printer") from the Credit team to discuss potentially creating a role for her to complete "pre-audit work." Axos' SSOF ¶ 51. Printer described the pre-audit credit role to Brinker, and she declined the role. Axos' SSOF ¶ 52. Brinker noted to a colleague that such a position would "bore [her] to tears or antidepressants." *Id.*

In June 2020, Brinker met with Viviane Tschanz to discuss her interest in Commercial & Industrial Lender Finance. Axos' SSOF ¶ 53. That same month, Brinker informed Senior Vice President-Director of Credit, Steve VanSickler, of her interest in opportunities outside of ICR. Axos' SSOF ¶ 55. A person named John Care continued looking for a clear role for Brinker in credit, including in September 2020, but the credit role never became an open position during her tenure. Axos' SSOF ¶¶ 57–58.

Additionally, in September 2020, Brinker was offered the position of Associate V.P. – CIR, which included managing the ICR team, a salary increase, and a bonus. Axos' SSOF ¶ 59. However, Brinker rejected the offer, characterizing it as a "demotion."

Axos' SSOF ¶¶ 60–61.  That same month, Care mentioned to Brinker that there might be a role in Asset Based Lending under David Park ("Park"), following a departure in that group.  Axos' SSOF ¶ 62.  However, the Asset Based Lending role was not replaced after the previous employee left Axos.  Axos' SSOF ¶ 63.  Brinker and Park met in mid-September and October 2020 to discuss reorganizing C&I Portfolio Management, but Park did not have a role for her.  Axos' SSOF ¶¶ 64–65.

Finally, in late December 2020, Erik Bowen reached out to Brinker regarding possible roles in the Commercial Real Estate Specialty Lending business unit.  Axos' SSOF ¶ 66.

**F.  Equal Pay Act and Comparative Employment History**

Brinker alleges one employee, Anthony Maniscalco ("Maniscalco"), was paid a higher salary when they held the exact same title as Senior ICR Officers and performed the exact same job duties under the exact same circumstances.  Axos' SSOF ¶ 91.  From July to November 2017, Maniscalco was employed as Axos' First V.P. – ICR.  Axos' SSOF ¶ 92.  In Maniscalco's role as First V.P. – ICR, he was tasked with leading the entire ICR department with an annual salary of $150,000.  Axos' SSOF ¶ 93.  Then, Maniscalco was hired to work at Axos again in November 2018 on a part-time basis as a Senior ICR Officer.  Axos' SSOF ¶ 95.

Brinker began work at Axos on October 1, 2018, as a Senior ICR Officer at an $80,000 annual salary.  Axos' SSOF ¶ 94.  When Brinker and Maniscalco were purportedly performing the exact same job duties under the exact same circumstances, Maniscalco was working on a part-time basis at $65 per hour, as a Senior ICR Officer.  Axos' SSOF ¶ 96.

According to their resumes, when Brinker obtained her first job out of college as an Analyst in 1993, Maniscalco was already serving as a Senior Vice President and Chief Credit Officer at a lending institution in San Diego.  Axos' SSOF ¶ 97.  In fact, Maniscalco is more than twenty years older than Brinker.  Axos' SSOF ¶ 101.  By 1993, Maniscalco had already served as a Lieutenant in the Navy and worked for several years

in "various major Commercial banks and financial institutions."  Axos' SSOF ¶ 98.  In the 25 years before she joined Axos, Brinker's job titles were "Investment Counselor," "Associate," "Investment Analyst," "Equity Analyst," and "Investment Advisor."  Axos' SSOF ¶ 99.  While every role Maniscalco held in the 25 years prior to working at Axos was "Senior Vice President," "Executive Vice President," "Vice President," or "Chief Credit Officer."  Axos' SSOF ¶ 100.  Further, the majority of Maniscalco's roles in the 25 years prior to working at Axos as a Senior ICR Officer were related to lending and credit; whereas Brinker's roles largely were not, per their resumes.  Axos' SSOF ¶ 102.

In March 2016, Brinker declared under penalty of perjury that she had not been employed for five years and that she was concerned her skills were "outdated."  Axos' SSOF ¶ 103.  In February 2017, Brinker was the subject of a vocational evaluation in connection with her divorce proceedings.  Axos' SSOF ¶ 104.  The evaluation provided that Brinker was employable in the San Diego job market, at an initial approximate earning capacity of $70,000 to $75,000 per year.  *Id.*  In Brinker's declaration, she responded to the 2017 evaluation by pointing out that her "self employment track record is unimpressive given the lack of client base and business revenue," that her "'investment analyst' work experience has become stale and [ she is] less competitive" after leaving the industry for five years, and that her competition for investment analyst positions had "more current academic backgrounds or industry  expertise."  Axos' SSOF ¶ 105.

### G. Complaints, Whistleblowing, and Investigations

Throughout her employment, Brinker claims to have raised several concerns, including management interference with her ICR reports; underwriting failures in some of Axos' portfolios; Axos' failure to establish a contingency plan for one of its clients; Axos' failure to conduct a mandatory annual independent analysis of the risk factors associated with one of its portfolios; Axos' failure to follow "Know Your Customer" guidelines in connection with some of its portfolios; inaccuracies in Axos' risk rating systems in connection with some of its portfolios; and Axos' failure to monitor loan covenants for loans that it issued in some of its portfolios.  Brinker's SSOF ¶ 9.

On October 2, 2020, Brinker complained about unequal pay, unfair treatment, and retaliation through Axos' Reporting Hotline. Brinker's AMF ¶ 10. She then spoke with Human Resources on October 5, 2020 regarding her October 2nd complaint. Brinker's SSOF ¶ 12. In connection with these complaints and Axos' ensuing investigation, Brinker sent several emails attaching evidence that she believed supported her claims. Brinker's SSOF ¶ 13. Ciarfardini completed her report on the investigation in the middle of November 2020. Brinker's SSOF ¶ 15.

**H. Termination and Post-Termination Events**

### 1. Axos' outsourcing of ICR

Axos first discussed the potential outsourcing or seeking outside help for ICR in September 2018. Axos' SSOF ¶ 75. As time went on, ICR missed many deadlines to submit reports to the CICR, and in 2020 only two reports were timely delivered. Axos' SSOF ¶¶ 11, 78. On December 9, 2020, Brinker told Tolla that "it's probably a good development that you hire Fred [Cabrera], [it] will help address some of the issues." Axos' SSOF ¶ 82. That same day, Brinker expressed similar sentiments to Maniscalco, stating that "with an upswing in credit risk on the horizon, they will need experienced examiners or reviewers anyway." Axos' SSOF ¶ 83. As 2020 came to a close and the problems persisted, Tolla began revisiting outsourcing options. Axos' SSOF ¶ 77.

### 2. Termination

Brinker's employment at Axos, along with the entire ICR Department, ended on January 5, 2021 when Axos claims to have outsourced the ICR function. Brinker's SSOF ¶ 16; Axos' SSOF ¶¶ 3, 14. Tolla, Brinker's indirect supervisor, told her that she was being fired, and Mary Ellen Ciafardini told her she needed to clean out her desk. Brinker's SSOF ¶ 17. Afterwards, Alyssa Calstair, a Human Resources employee, was assigned to accompany Brinker to her desk and stood nearby for a period of time as Brinker packed up her cubicle into boxes. Brinker's SSOF ¶¶ 18–19. Calstair had a notebook or document in her hand. Brinker's SSOF ¶ 20. Individuals were given an hour or less to clean out their desks. Brinker's SSOF ¶ 57.

Brinker believed that many of the documents in her cubicle related to the extensive concerns that she had raised about Axos' practices—concerns that she believed at the time led to her retaliatory firing. Brinker's SSOF ¶ 22. Given the short time that she had to pack up her cubicle, Brinker was not able to go through the many documents in detail, but she believed that many of them contained information relevant to her prior whistleblowing and relevant to regulatory complaints that she intended to make in the future. Brinker's SSOF ¶ 23. Brinker packed up all the documents and belongings in her cubicle into boxes, which did not have lids and were not closed. Brinker's SSOF ¶¶ 24, 25, 27. The documents in Brinker's cubicle, either electronically or physically, were all copies. Brinker's SSOF ¶ 30, 32. At his deposition, Tolla admitted that he never asked Brinker what was in those boxes. Brinker's SSOF ¶ 29.

### 3. <u>Arbitration and Litigation</u>

On January 12, 2021, Axos sent a letter to Brinker demanding that she immediately return or delete all of Axos' confidential information and to certify that she had not misused any such information. Axos' SSOF ¶ 86. Then on February 5, 2021, Axos initiated arbitration against Brinker alleging four causes of action: Breach of Contract, Conversion, Trespass to Chattels, and Breach of the Duty of Loyalty. Brinker's SSOF ¶ 38; Plaintiff's AMF ¶ 69.

On February 23, 2021, Brinker filed a whistleblower retaliation complaint with the U.S. Department of Labor ("OSHA Complaint")[4] against Axos alleging violations of

---

[4] Brinker submits a request for judicial notice in support of her opposition to Axos' motion for summary judgement, Doc. No. 234-7, which involves filings made before OSHA, filings before the U.S. Department of Labor, Office of Administrative Judges, and the amended judgment in *Erhart v Bofi Federal Bank* (Case No. 15-cv-02287-BAS-NLS). The Court GRANTS the request, as Courts may take judicial notice of filings and records in other proceedings, as well as other matters of public record. *See United States v. 14.02 Acres of Land More or Less in Fresno Cnty.*, 547 F.3d 943, 955 (9th Cir. 2008) ("Judicial notice is appropriate for records and 'reports of administrative bodies.'"); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record.").

banking best practices and Securities and Exchange Commission regulations.  Brinker's SSOF ¶ 40; Axos' SSOF ¶ 1; Plaintiff's AMF ¶ 70.  On June 17, 2021, Brinker sought leave to amend her OSHA Complaint and attached an amended complaint that contained similar allegations to the complaint filed in this case.  Plaintiff's AMF ¶ 72.

Brinker filed her federal complaint against Axos on March 21, 2022.  Axos' SSOF ¶ 2.[5]  On November 21, 2023, Axos responded to the complaint and filed its counterclaims against Brinker.  Brinker's SSOF ¶ 43; Axos' SSOF ¶ 89.  Axos only identified that it was seeking attorneys' fees pursuant to its claims under California Penal Code sections 496 and 502.  Brinker's SSOF ¶ 70; *see also* Doc. No. 230-3 at ¶ 70.  Axos seeks injunctive relief for its claims for breach of contract and Penal Code section 502.  Brinker's SSOF ¶ 72.

On January 21, 2024, Brinker filed an answer to Axos' counterclaims, where she admitted that "she is in possession of Axos policies and guidelines, information about OCC reviews, Credit Authorization Memoranda, Credit Investment Reviews, ICR Process Reviews, and minutes of the Independent Credit Review Management Committee."  Axos' SSOF ¶ 90.

During discovery, when asked to identify any damages it claims to have suffered due to Brinker's retention of confidential information, Axos did not assert that the physical condition, quality, or value of the information had been interfered with and even admitted that none of its computer systems were damaged by any act of Brinker.  Brinker's SSOF ¶ 44.  Additionally, Axos stated during discovery that it is seeking compensatory damages including sums paid to identify, investigate, and/or remediate the alleged stolen information, as well as damage to its reputation and loss of goodwill.  Brinker's SSOF ¶ 46.

---

[5] While Brinker filed her original federal complaint on March 21, 2022, she did not assert her EPA claim until she filed her First Amended Complaint on July 7, 2022.  *See* Axos' SSOF ¶ 106.

Notably, when Axos' systems detect confidential information leaving its secure environment, they send an alert to Axos' information security office, and from there to the senior manager or executive who oversees the employee. Brinker's SSOF ¶ 50. Further, Tolla testified that each instance where Brinker sent herself an ICR report or draft should have generated such an alert as they were marked confidential by Axos' systems. Brinker's SSOF ¶ 51.

On March 27, 2024, Axos propounded Interrogatory No. 8, which requested that Brinker "[i]dentify, including by date, each act of RETALIATION YOU allegedly suffered." Axos' SSOF ¶ 15. Brinker responded to Interrogatory No. 8 and identified five (5) separate categories of retaliation: (1) not being permitted to attend CICR Board Committee meetings; (2) not being able to obtain other jobs within the Bank; (3) being largely locked out the internal Archer database; (4) being terminated; and (5) Axos' filing of the arbitration claims and counterclaims against her. *Id.*

## II. EVIDENTIARY OBJECTIONS

The parties each raise a variety of evidentiary objections to the evidence presented by the opposing party. *See* Doc. Nos. 234-3; 234-4; 234-5; 234-6; 239-4. Most of these objections are raised on the grounds that the evidence lacks foundation, is conclusory, violates the Best Evidence Rule, is irrelevant, or is not based on personal knowledge. The parties also object on the ground that the evidence is speculative, not properly authenticated, constitutes hearsay, or reflects improper opinion testimony.

The Court begins with the general position that most, if not all, evidentiary objections are inappropriate at summary judgment. At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001) (explaining that at summary judgment, "a party does not necessarily have to produce evidence in a form that would be admissible at trial"). "Rule 56[(c)] requires only that evidence 'would be admissible,' not that it presently be admissible." *Burch v.*

*Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006).  Thus, "[t]he focus is on the admissibility of the evidence's contents, not its form." *Estate of Hernandez-Rojas ex rel. Hernandez v. United States*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014) (first citing *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004); and then citing *Fraser*, 342 F.3d at 1036)).  Objections such as lack of foundation, speculation, hearsay, relevance, or that evidence is conclusory or constitutes an improper opinion "are all duplicative of the summary judgment standard itself" and unnecessary to consider here.  *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).

After reviewing the parties' evidence and their respective objections, the Court finds that the parties' objections concern evidence that could be presented in an admissible form at trial.  *See Fonseca*, 374 F.3d at 846 ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial.'"); *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1551 (9th Cir. 1990) (holding trial court's consideration of unauthenticated document on summary judgment was harmless error where a "competent witness with personal knowledge could authenticate the document"); *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1125 (E.D. Cal. 2016) (summarily overruling objections at summary judgment on the basis of relevance, hearsay, lack of foundation, lack of personal knowledge, prejudice, improper character evidence, and assuming facts not in evidence); *Hunt v. City of Los Angeles*, No. CV 17-8064 JFW (PVC), 2021 WL 768248, at *11 (C.D. Cal. Jan. 26, 2021) (noting that objections that evidence violates the "best evidence" rule go to the form of the evidence rather than its ultimate admissibility), *report and recommendation adopted*, 2021 WL 765418 (C.D. Cal. Feb. 26, 2021), *aff'd*, No. 21-55310, 2022 WL 3714490 (9th Cir. Aug. 29, 2022).  Accordingly, the Court **OVERRULES** the parties' objections at this time.  The parties may reassert their evidentiary objections as appropriate at a later stage in the proceedings.  *See Madrigal v.*

*Allstate Indem. Co.*, No. CV 14-4242 SS, 2015 WL 12747906, at *8 (C.D. Cal. Sept. 30, 2015).

To the extent the parties object to the portions of the opposing parties' brief, the Court **OVERRULES** such objections.  *See* Doc. No. 239-4.  These are not evidentiary objections but rather disputes with the other party's characterization or description of the evidence, which the Court does not consider.  *See Paine v. Inv. & Admin. Comm. of Walt Disney Co. Sponsored Qualified Benefit Plans*, 630 F. Supp. 3d 1275, 1280 (C.D. Cal. Sept. 27, 2022) (citing *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1034 (C.D. Cal. 2013)).

## III. DISCUSSION

### A. BRINKER'S MOTION FOR SANCTIONS

#### 1. Legal Standard

Rule 26 requires that a party initially disclose, among other things, witnesses and a computation of damages.  Fed. R. Civ. P. 26(a)(1)(A).  The purpose of Rule 26's initial disclosures requirement is to enable defendants to understand their potential exposure and make informed decisions as to settlement and discovery.  *City & Cty. of San Francisco v. Tutor-Saliba Corp.*, 218 F.R.D. 219, 221 (N.D. Cal. 2003); *see also Hewlett Packard Co. v. Factory Mut. Ins. Co.*, No. Civ. 04-2791 TPG DF, 2006 WL 1788946, at *14 (S.D.N.Y. June 28, 2006) (explaining "early disclosure of a party's damages computation provide[s] [the] opposing party with an early understanding of the basis and amount of any damages claim it is facing, so that it may conduct meaningful discovery as to the underpinning of such a claim").  Moreover, "[c]omputation of each category of damages," as used in Rule 26, "contemplates some analysis beyond merely setting forth a lump sum amount for a claimed element of damages."  *Silver State Broad., LLC v. Beasley FM Acquisition*, No. 2:11-CV-01789-APG-CWH, 2016 WL 320110, at *2 (D. Nev. Jan. 25, 2016) (citing *Tutor-Saliba Corp.*, 218 F.R.D. at 221), *aff'd*, 705 F. App'x 640 (9th Cir. 2017); *see also Grouse River Outfitters, Ltd. v. Oracle Corp.*, 848 F. App'x

238, 244 (9th Cir. 2021) ("Rule 26(a)(1)(A)(iii) contemplates damages computation analysis and explanation").

Accordingly, a plaintiff "cannot shift to the defendant the burden of attempting to determine the amount of the plaintiff's alleged damages." *Jackson v. United Artists Theatre Circuit, Inc.*, 278 F.R.D. 586, 593 (D. Nev. 2011). Defendants are not required to compute damages, "Rule 26 requires plaintiffs to do so." *Villagomes v. Lab. Corp. of Am.*, 783 F. Supp. 2d 1121, 1129 (D. Nev. 2011).

Parties are required to supplement their initial disclosures. Fed. R. Civ. P. 26(e). Rule 37, in turn, calls for the exclusion of any evidence or information that a party fails to disclose as required by Rule 26(a) and (e). Fed. R. Civ. P. 37(c)(1); *see also Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1179 (9th Cir. 2008). "Rule 37(c)(1) is an 'automatic' sanction that prohibits the use of improperly disclosed evidence." *Merchant v. Corizon Health, Inc.*, 993 F.3d 733, 740 (9th Cir. 2021) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)). "As the Rule plainly states, litigants can escape the 'harshness' of exclusion only if they prove that the discovery violations were substantially justified or harmless." *Id.* (quoting *Yeti*, 259 F.3d at 1106). "The automatic nature of the rule's application does not mean that a district court *must* exclude evidence that runs afoul of Rule 26(a) or (e)—Rule 37(c)(1) authorizes appropriate sanctions '[i]n addition to or instead of [exclusion].'" *Id.* (quoting Fed. R. Civ. P. 37(c)(1)). "Rather, the rule is automatic in the sense that a district court *may* properly impose an exclusion sanction where a noncompliant party has failed to show that the discovery violation was either substantially justified or harmless." *Id.* (citing *Yeti*, 259 F.3d at 1106–07).

Therefore, where a failure to provide a computation of damages was not substantially justified or harmless, courts have granted motions to preclude evidence of those damages under Rule 37(c)(1)'s automatic sanction. *See, e.g.*, *Hoffman*, 541 F.3d at 1179–80 (holding district court did not abuse its discretion in excluding evidence of damages under the Fair Labor Standards Act and California Labor Code provisions where

damage calculations were not disclosed); *Grouse River Outfitters*, 848 F. App'x at 244 (concluding district court did not abuse its discretion in excluding evidence of damages where plaintiff did not adequately disclose damages computation and explanation).

### 2. **Analysis**

Brinker seeks Rule 37(c)(1) sanctions for Axos' alleged failure to disclose a computation of damages as required by Rule 26(a)(1)(A)(iii). *See* Doc. No. 197-1. Brinker maintains that nearly all of Tolla's time that Axos claims as damages occurred prior to its initial expert disclosure in February of 2024. *Id.* at 5–6. Similarly, Brinker states that Axos was in possession of the information necessary to compute Tolla's imputed hourly rate since it had access to his total compensation. *Id.* at 6. Brinker also contends that Axos had paid the only vendor invoice that it identifies as relating to its damages in June of 2022, more than two years before its disclosure. *Id.* Brinker claims that Axos' refusal to provide these calculations until after the close of fact discovery (on October 25, 2024) is not reasonably justified. *Id.* Brinker also contends that Axos' nondisclosure was not harmless, maintaining that Axos did not reveal it would seek Tolla-time damages before fact discovery closed, then presented a computation through Micheletti that rested almost entirely on Tolla's own accounts of dates, tasks, and hours. *Id.* Brinker claims to have been unable to depose Tolla on those specifics or obtain the underlying documents, data, and communications, as well as unable to conduct third-party discovery, due to discovery having been closed. *Id.* Brinker argues that Axos' amended disclosures does not cure its inadequate damages calculation as it still did not provide a calculation of its damages or any basis for those damages, only a "lump sum" of $100,000. *Id.* at 6–7.

Regarding damages in its February 1, 2024 initial disclosures, Axos claimed "1. Direct, consequential damages, including any sums paid to identify and attempt to recover Confidential Information 2. Attorneys' fees. 3. Punitive damages" and stated that the "above-listed items of damage may be supported by Axos' expert and fact witness

testimony, any invoices paid by Axos and such other documents and things." Doc. No. 197-3 at 7–8.

As for Axos' response on March 15, 2024 to Brinker's Request for Production No. 9, which requested documents regarding "any damages [Axos] claim to have suffered from Ms. Brinker's alleged misuse of information or documents," Axos stated that it "will produce responsive, non-privileged documents that are in Axos' possession, custody or control." Doc No. 197-6, Ex. 4. Axos gave the same answer on July 1, 2024 in response to Brinker's Request for Production No. 49 regarding Axos' damages in relation to its counterclaims. Doc. No. 197-7, Ex. 5.

Additionally, Axos also provided its response to Brinker's Interrogatory No. 8 on July 1, 2024, which requested Axos to identify any documents regarding any damages that Axos claim to have suffered as a result of Brinker's retention of information that Axos claims is confidential. Doc. No. 197-5, Ex. 3. The interrogatory asked for each category of damages that Axos claims to have suffered, the amount of damages attributable to each category, and the calculation of the amount of damages claimed for each category. *Id.* In response, Axos stated its objections and responded as follow:

> 1. Axos is seeking compensatory damages, including both general damages and special damages. These damages include any sums paid to identify, investigate and/or remediate the stolen information, including time spent by Axos personnel, consultants and outside counsel; and damage to Axos' reputation and loss of goodwill. Axos also seeks to recover damages for efforts to assess the damages caused by Brinker's conduct.
>
> 2. Axos is entitled to treble damages for its claim for Violation of California Penal Code Section 496.
>
> 3. Nominal damages.
>
> 4. Attorney's fees pursuant to Axos' claim for violation of California Penal Code Sections 496 and 502, and costs of suit.
>
> 5. Punitive damages pursuant to Axos' claims for conversion and violation of California Penal Code Section 502.
>
> 6. Injunctive relief pursuant to Axos' claims for breach of contract and violation of California Penal Code Section 502.

> Certain items of damages are continuing in nature. Discovery is ongoing and Axos reserves the right to supplement its response to this Interrogatory. Calculations will be provided in expert discovery.

*Id.* at 9–10.  Notably, in Axos' Further Supplemental Initial Disclosures served on October 25, 2024 (the date of the fact discovery completion deadline), Axos stated the following in regard to its claimed compensatory damages:

> 1. Axos is seeking compensatory damages, including both general damages and special damages in an amount of no less than $100,000. These damages include any sums paid to identify, investigate and/or remediate the stolen information, including time spent by Axos personnel, consultants, outside counsel and a requested forensic examination of Brinker's electronic devices; and damage to Axos' reputation and loss of goodwill. Axos also seeks to recover damages for efforts to assess the damages caused by Brinker's conduct. Such information will be provided further in expert discovery.

Doc. Nos. 197-4 at 10; 99 at 2 ("Fact Discovery Cutoff […] October 25, 2024").

Axos produced the sole invoice that it received from the third-party vendor regarding damages in connection with its counter-claims on November 14, 2024, which was an invoice submitted in May 2022.  Doc Nos. 197-8, Ex. 6; 197-9, Ex. 7; 212 at 1210–12.[6]  On November 20, 2024, Axos provided its expert disclosures where it identified Micheletti, Axos' Executive Vice President of Finance, as a non-retained individual who may be called upon to express opinion testimony at trial.  Doc. No. 197-10 at 3.  Micheletti's proposed testimony was to cover economic injury in the form of expenses and costs that Axos incurred, and damages to Axos' reputation and loss of goodwill due Ms. Brinker's conduct in taking Axos' confidential information.  *Id.* However, out of all of the time Tolla spent investigating into the extent of Brinker's

---

[6] The Court notes that certain documents initially lodged under seal were denied sealing and never resubmitted.  *See* Doc. Nos. 238, 249.  Given the potential significance of these materials, the Court ORDERS counsel for both Plaintiff and Defendant to refile publicly any document for which sealing was denied in regards to any of the motions within fourteen (14) days of this order.

conduct, 20 of the 25 entries happened before initial disclosures were even made in February 2022. Doc. Nos. 197-10 at 562.

Rule 26(a)(1)(A)(iii) requires "a computation of each category of damages claimed" and the production of the documents on which the computation is based. A lump-sum or category-only disclosure does not satisfy the rule, as some analysis and computation are required so the opposing party can understand exposure and plan discovery. *See Tutor-Saliba Corp.*, 218 F.R.D. at 221–22 (stating that the one claiming damages "should provide more than a lump sum statement of the damages allegedly sustained" and that "the 'computation' of damages required by Rule 26(a)(1)(C) contemplates some analysis; for instance, in a claim for lost wages, there should be some information relating to hours worked and pay rate."); *see also Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 241–43 (D. Nev. 2017) ("The initial disclosure must contain a damages computation with the information then reasonably available to the plaintiff. […] There is no bright line rule that such supplementation is improper if made after the expert disclosure deadline or even after the close of discovery. […] Instead, the key inquiry is whether the timing of the supplemental disclosure is reasonable based on when the information was available to the plaintiff.").

On this record, Axos did not provide a Rule 26-compliant computation during fact discovery. Its February 1, 2024 initial disclosures identified broad categories and stated that expert and documents would support damages, but supplied no dollar figures or computation. Doc. No. 197-3 at 7–8. Its July 1, 2024 interrogatory response again listed categories and stated "Calculations will be provided in expert discovery," without any numbers or computation by category. Doc. No. 197-5 at 9–10. Axos' October 25, 2024 supplemental disclosure added only a floor, "no less than $100,000," still with no breakdown or computation. Doc. No. 197-4 at 10. Meanwhile, the $486.22 Setec invoice existed since May 2022 and was produced after the October 25, 2024 fact cutoff, on November 14, 2024. Doc. Nos. 197-8, 197-9; 212 at 1210–12. And the time Tolla spent investigating were overwhelmingly from periods predating Axos' February 2024

disclosures, with Axos' files containing the underlying hours/tasks and Tolla's compensation data necessary to calculate an hourly rate.  Doc. No. 197-10 at 562.

The Court agrees with Brinker that Axos' initial and supplemental disclosures were inadequate.  Rule 26 requires each party, at the outset of the case, to provide "a computation of each category of damages claimed," as well as the documents on which the computation is based.  Axos failed to do so here.  Axos' initial disclosure recited categories but without any computations.  The later supplemental disclosure offered the unallocated damage amount of "no less than $100,000," still without any breakdown or explanation of how the number was derived.  This was insufficient.  While "the Rules do not require in every case that a complete and unchangeable damages computation be presented at the outset of the case," *Silvagni*, 320 F.R.D. at 241, the initial or supplemental disclosures still should, at a minimum, provide a dollar-figure estimate for each of the various categories of damages being sought and provide some computation for how those figures were calculated.

The inadequacy of Axos' initial or supplemental disclosures, however, does not inexorably lead to the conclusion that Axos' damage claims must be stricken.  Under Rule 37(c)(1), the default sanction for failing to disclose or supplement is exclusion unless the failure was substantially justified or harmless.  *Yeti by Molly, Ltd.*, 259 F.3d at 1106; *see Merchant*, 993 F.3d at 740–41.  To determine whether a violation is substantially justified or harmless, courts consider the following factors: "(1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence."  *Lanard Toys, Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010) (citing *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003)); *see also Nat'l Fire Prot. Ass'n, Inc. v. Upcodes, Inc.*, No. 2:21-cv-05262-SPG-E, 2023 WL 5505888 at *5 (C.D. Cal. Aug. 8, 2023) (collecting cases).  Further, discovery conduct may be deemed substantially justified "if there is a genuine dispute or if reasonable people could differ as to the appropriateness of the contested

action." *Newcombe-Dierl v. Amgen*, No. CV222155DMGMRWX, 2022 WL 19377168, at *1 (C.D. Cal. May 25, 2022); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

As an initial matter, Axos' principal justification is that it had a good faith belief that it was not required to fully disclose its damages calculations until it made its expert disclosures under Federal Rule of Civil Procedure 26(a)(2), which is reflected in each of its disclosures and its discovery responses. Doc. No. 226 at 13. However, "future expert analysis does not relieve a plaintiff of providing the information reasonably available to [it] as for [its] damages computation." *Edwards v. Lattimer*, No. 218CV01072JCMNJK, 2020 WL 13533315, at *3 (D. Nev. Feb. 11, 2020); *see also EpicentRX, Inc. v. Bianco*, No. 21-CV-1950-MMA-DDL, 2024 WL 56995, at *12 (S.D. Cal. Jan. 4, 2024) (Plaintiff's "justification is essentially that it need not offer a computation of damages because that is the realm of an expert and "Bianco will be able to depose [Plaintiff's] expert on the amount, methodology, and computation of damages. [Plaintiff's] position is not only untenable for the reasons discussed above, but it also wholly ignores the fact that [Plaintiff] is required by Rule 26 to provide a computation of damages or otherwise offer some analysis or information such that [Defendant] could understand his potential exposure and make informed decisions as to settlement and discovery"), appeal dismissed, No. 24-627, 2024 WL 3648024 (9th Cir. May 22, 2024).

As for prejudice or surprise to the party against whom the evidence is offered, the record shows prejudice. Axos did not provide a Rule 26-compliant damages computation in its disclosures[7] or during fact discovery. Yet, there seems to be at least some data for the computations that was within Axos' control. For instance, 20 of the 25 entries regarding Tolla's investigation into the extent of Brinker's conduct happened before February 2024—the date that Axos made its initial disclosures. *See* Doc. Nos. 197-10 at

---

[7] Axos' Further Supplemental Initial Disclosures stated only that it sought "no less than $100,000" in compensatory damages, without any category-by-category breakdown or computation. *See* Doc. No. 197-4 at 10. A minimum amount is not a precise figure for damages nor is it a damages computation, which requires some analysis. *See Tutor-Saliba Corp.*, 218 F.R.D. at 221–22.

562.  And the $486.22 Setec invoice existed since May 2022—2.5 years before it was first produced in November 2024.  *See* Doc. Nos. 197-8, 197-9; 212 at 1210–12.  Despite Axos' repeated statements that computations would come through expert testimony, deferring the computation to experts effectively deprived Brinker of damages discovery.

The failure was not harmless.  Axos claims that this failure was harmless, as Brinker was able to depose Tolla for a third time after the fact discovery cut-off and after Axos served its initial and supplemental disclosures and interrogatory responses, on October 29, 2024.  Doc. No. 226 at 14–16.  However, by the time Brinker deposed Tolla for a third time, the only additional discovery Axos had provided was the supplemental disclosure provided just four days earlier, stating that it was seeking "no less than $100,000" with no breakdown or computation.  Doc. No. 197-4.

It was not until November 14, 2024 when Axos provided the sole invoice that it received from the third-party vendor back in May 2022 (2.5 years earlier) regarding damages in connection with its counter-claims.  Doc Nos. 197-8, Ex. 6; 197-9, Ex. 7; 212 at 1210–12.  Further, the additional information regarding the expenses and costs that Axos has incurred or will incur, including Tolla's time investigating, was not provided until November 20, 2024 as a part of Axos' expert disclosures.  Axos offers no explanation for why this information was withheld and not produced during the first two to two-and-a-half years of this litigation.  Accordingly, based on the record, Brinker was unable to depose Tolla on the claimed hours and tasks or obtain the underlying documents and communications, as well as unable to pursue potential third-party discovery, because that information was revealed through Micheletti's expert disclosures and deposition, after fact discovery closed.  That is the precise prejudice Rule 26 is meant to avoid.  *See Tutor-Saliba*, 218 F.R.D. at 221–22.

The Court recognizes that early in litigation a party may lack sufficient information to compute damages.  However, a party "has a duty to diligently obtain the necessary information and prepare and provide its damages computation within the discovery period."  *Edwards*, 2020 WL 13533315, at *3 (citing *Jackson*, 278 F.R.D. at 593; *Design*

*Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006) (damages computation should be more detailed as the case progresses)). Axos failed to do so here. Further, the prejudice is not easily cured without reopening discovery to allow Brinker to investigate into damages via document production, depositions and potential third-party discovery.

As for the likelihood of disruption of the trial, this factor is neutral, as no trial date has been set. Regarding whether bad faith or willfulness was involved in the untimely disclosures, the present record reflects lack of diligence, without foreclosing an inference of bad faith since Axos was in possession, custody, or control of this information since May 2022 and does not explain why it was not provided earlier. On this record, Axos possessed the Setec invoice since May 2022 and the inputs to estimate Tolla's time and rate since February 2022—well before its 2024 disclosures, yet did not produce the information in fact discovery and deferred computations until expert disclosures. Even if that view of Rule 26 was mistaken, the conduct reflects negligence, and potentially willfulness.

However, exclusion sanctions are generally limited to "extreme situations." *See Tutor-Saliba*, 218 F.R.D. at 220–21; *see also Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988) (exclusion sanctions are harsh remedies that "should be imposed only in rare situations"). Courts in this Circuit often weigh the *Wendt* factors when deciding exclusion and alternatives. *See Edwards v. Lattimer*, 2020 WL 13533315, at *5–*6 (D. Nev. Feb. 11, 2020); *see also Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997). In deciding on exclusion, courts assess the following factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the other parties; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Edwards*, 2020 WL 13533315, at *4. "The first two of these factors favor the imposition of sanctions in most cases, while the fourth cuts against a [...] dismissal sanction. Thus, the key factors are prejudice and the availability of lesser sanctions." *Henry v. Gill Indus.*, Inc., 983 F.2d 943, 948 (9th Cir. 1993).

The first factor favors exclusion, as this case has been pending for years, fact discovery closed on October 25, 2024, and Axos' damage computations/invoice surfaced only after that cutoff despite having most of the information for over two years.  Doc. No. 99.  Reopening discovery now to fix damages disclosures would delay resolution and disrupt case management, which weighs in favor of sanctions.  The second factor favors exclusion for similar reasons.  *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992).

The third factor, risk of prejudice to the other parties, also favors exclusion.  A damages computation is what enables the opponent to understand exposure and plan discovery.  Axos did not provide a Rule 26 compliant computation during fact discovery.  The time Tolla spent investigating rests on Tolla's own dates, tasks, and hours that Brinker could not test once discovery closed.  That left Brinker unable to depose on the specifics, obtain underlying materials, or craft a tailored response.

While the fourth factor weighs against exclusion, it carries less weight here as the violation creates real prejudice that cannot be fixed without reopening discovery, extending deadlines, and increasing costs. As for the fifth factor, the Court must consider whether a lesser remedy is available.  *See R & R Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1247 (9th Cir. 2012).  Under these circumstances, it would be improper to exclude Axos' entire damage claims due to untimely disclosure.

Brinker was aware of the deficiency of Axos' damages-related disclosures, specifically regarding experts addressing damages, since the moment he received Axos' initial disclosures.  Specifically, on February 1, 2024, Axos' initial disclosures stated "1. Direct, consequential damages, including any sums paid to identify and attempt to recover Confidential Information 2. Attorneys' fees. 3. Punitive damages" and stated that the "above-listed items of damage *may be supported by Axos' expert and fact witness testimony*, any invoices paid by Axos and such other documents and things."  Doc. No. 197-3 at 7–8 (emphasis added).  Additionally, Axos provided its response to Brinker's Interrogatory No. 8 on July 1, 2024, wherein it stated that "[c]alculations will be provided

in expert discovery." Doc. No. 197-5, Ex. 3.  Due to Axos' disclosures being inadequate, Brinker appeared to have pursued clarification through discovery requests.  After all, "the initial disclosure requirements are meant to provide necessary information to provide a balanced playing field" and "should not be viewed as procedural weapons through which parties seek to gain a tactical litigation advantage."  *Silvagni*, 320 F.R.D. at 243.  Brinker repeatedly sought the information through discovery, but Axos failed to produce it and now attempts to repackage it as expert evidence.  However, even assuming for the sake of argument that the Court *could* strike Axos' damage claims as a sanction under Rule 37(b) despite the absence of an earlier motion to compel and without regard to whether Axos' violation was substantially justified or harmless, the Court declines in its discretion to do so.  *See*, *e.g.*, *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011) (exercising discretion to deny exclusion sanction as a matter of "fairness" and to avoid an "unjust" result).

    While the Court has not ruled out the possibility of willfulness, fault, or bad faith, the Court finds that the appropriate less drastic sanction is targeted exclusion: Axos is precluded from seeking (1) reputational and loss of goodwill damages, as no computation and no supporting records were provided during fact discovery;[8] and (2) vendor invoice/amounts, including the $486.22 listed in the Setec invoice.  *See* Fed. R. Civ. P. 37(c)(1); *Edwards*, 2020 WL 13533315, at *5.  Accordingly, Axos is limited to seeking the following damages that it actually computed and substantiated, and only for the five time entries arising after the start of this litigation— Tolla's investigation damages from the Summer 2024 until November 19, 2024 in the amount of $3,251.93.  *See Edwards*,

---

[8] Axos states that "at a minimum, Tolla should be allowed to testify regarding […] his understanding of the damage to Axos' reputation and loss of goodwill."  Doc. No. 226 at 18.  However, that assumes he has personal knowledge to support such opinions.  Tolla's deposition seems to suggest otherwise when he was asked about whether he was "aware of any reason to believe that Axos suffered any loss of investors or other financial consequences because of concerns about confidential information, as opposed to the allegations in Ms. Brinker's lawsuit about failures regarding banking practices," Tolla responded that he would not know.  Doc. No. 226-2 at 20–21.

2020 WL 13533315, at \*5–\*6 (allowing only substantiated slice as appropriate sanction). This tailored exclusion remedies the prejudice and case management concerns without resorting to harsher sanctions.

**B. DAUBERT MOTIONS**

Brinker moves to exclude portions of the expert testimony of Andrew Micheletti. *See* Doc. No. 198. Axos moves to exclude portions of the expert testimony of Brad Abbott. *See* Doc. No. 199. For the reasons set forth below, the Court **GRANTS IN PART** Brinker's motion to exclude Micheletti's expert testimony and **DENIES** Axos' motion to exclude Abbott's expert testimony.

### 1. Legal Standard

The Federal Rules of Evidence differentiate between opinion testimony provided by lay and expert witnesses. Fed. R. Evid. 701, 702. Under Rule 701, a lay witness may provide opinion testimony if it is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

"Rule 701(a) contains a personal knowledge requirement." *United States v. Lopez*, 762 F.3d 852, 864 (9th Cir. 2014); *see also* Fed. R. Evid. 602 (noting that except for expert testimony under Rule 703, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter"). "In presenting lay opinions, the personal knowledge requirement may be met if the witness can demonstrate firsthand knowledge or observation." *Lopez*, 762 F.3d at 864. "A lay witness's opinion testimony necessarily draws on the witness's own understanding, including a wealth of personal information, experience, and education, that cannot be placed before the jury." *United States v. Gadson*, 763 F.3d 1189, 1208 (9th Cir. 2014). "But a lay opinion witness 'may not testify based on speculation, rely on hearsay or interpret unambiguous, clear statements.'" *United States v. Lloyd*, 807 F.3d

1128, 1154 (9th Cir. 2015) (quoting *United States v. Vera*, 770 F.3d 1232, 1242 (9th Cir. 2014)).

Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. As the Ninth Circuit recently explained:

> Under *Daubert* and its progeny, including *Daubert II*, a district court's inquiry into admissibility is a flexible one. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted).
> "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* at 564 (quoting *Daubert*, 509 U.S. at 597). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (citation and internal quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969–70.

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043–44 (9th Cir. 2014). "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *Id.* at 1044.

The tests for admissibility in general, and reliability in particular, are flexible. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), as amended (Apr. 27, 2010). The

court "has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of [the expert's] methodology." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995). Once the threshold established by Rule 702 is met, the expert may testify and the fact finder decides how much weight to give that testimony. *Primiano*, 598 F.3d at 565.

Further, Rule 703 "relaxes, for experts, the requirement that witnesses have personal knowledge of the matter to which they testify." *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 501 (9th Cir. 1994). Experts may offer opinions based on otherwise inadmissible testimonial hearsay if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject," Fed. R. Evid. 703, and if they are "applying [their] training and experience to the sources before [them] and reaching an independent judgment," as opposed to "merely acting as a transmitter for testimonial hearsay," *United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013) (quoting *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009)).

## 2. Brinker's Motion to Exclude Axos' Expert Andrew Micheletti

Brinker moves to exclude "all evidence, reference to evidence, testimony, or argument relating to opinion testimony or argument by Micheletti regarding damages, including (1) digital forensic activities supplied to Axos by Setec Investigations; (2) internal labor costs incurred by Axos; (3) damages for Axos' reputation and loss of goodwill; and (4) damages for efforts to assess the damages allegedly caused by Ms. Brinker's conduct." Doc. No. 198-1 at 2. Brinker claims that Axos' expert Andrew Micheletti, who is an Axos employee, does not meet the standards of a lay or expert witness under Federal Rules of Evidence 701, 702, and 703; and thus, his testimony as to Axos' damages must therefore be excluded. *Id.*

Axos disclosed Andrew Micheletti, Axos' Executive Vice President of Finance, on November 20, 2024 as a non-retained "expert" who may be called upon to express opinion testimony at trial. *Id.* at 3. Part of Micheletti's proposed testimony covers economic injury in the form of expenses and costs that Axos incurred, and damages to Axos' reputation and loss of goodwill due Brinker's conduct in allegedly taking Axos' confidential information. *Id.*

### a. Expert Testimony Under Rule 702

Brinker argues that Micheletti is not a proper expert witness because "his opinions do not consist of any scientific, technical, or other specialized knowledge that will assist the jury in understanding the evidence. *Id.* at 8. Brinker argues Micheletti is not a proper expert because his testimony amounts to "basic arithmetic," by converting salary to an hourly rate and multiplying by hours worked, without applying any specialized expertise. Doc. No. 198-1 at 8. Axos responds that Micheletti's damages calculations involved judgment and assumptions based on his experience with payroll, taxes, and benefits, not "just multiplication." Doc. No. 221 at 6.

Micheletti's estimate of damage calculations is not based on contemporaneous business records but instead on hours supplied by Tolla and others. Micheletti admitted he did not observe or verify the tasks performed, did not review time logs, emails, or meeting minutes, and could not explain the basis for many of Tolla's entries. *See* Doc. No. 198-4 at 5 ("Q: Okay. So I understand that Mr. Tolla provided the dates, the content, the amount of hours that he spent, and that you yourself made the calculation that is listed under the -- one, two, three – the fourth column titled Calculation. Is that right? [Tolla:] Correct."); 28 ("Q: Do you have any understanding as to how Mr. John Tolla came to the conclusion that he spent one hour on this task? [Tolla:] My understanding is he -- he reviewed his own personal information to identify this -- these hourly totals. Q: When you say that 'he reviewed his own personal information,' what do you mean by that? [Tolla:] Could be his calendar, in meetings. It could be emails. I only asked him to confirm that it be accurate to his best knowledge, in which he said yes."); 45 ("Q: Do you

have an understanding as to how Mr. Tolla was able to determine the amount of hours that he spent on these tasks even though there are no specific dates listed there? […] [Tolla:] He likely reviewed his calendar and his emails and other items which would have provided him an indication of who, what, when, and where, and then recalled what the topic was.· But I did not assemble it, so I don't know exactly how each of the entries was compiled."). Micheletti simply multiplied Tolla's asserted hours by an imputed hourly rate derived from compensation, benefits, and tax figures. *Id.* at 4–5.

While courts recognize that damages calculations need not involve "complicated mathematical calculations" to warrant expert assistance, *WWP, Inc. v. Wounded Warriors Family Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011), this testimony must still reflect "reliable principles and methods," Fed. R. Evid. 702; *see also Primiano*, 598 F.3d at 564 ("[T]he test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology."). Here, there is no methodology beyond just converting salary to an hourly rate and multiplying by hours supplied by others, without independent verification. That is not "reliable application of principles and methods." Fed. R. Evid. 702(d). This is precisely the defect identified in *Erhart v. BofI Holding, Inc.*, 445 F. Supp. 3d 831, 840–41 (S.D. Cal. 2020), where the same witness was excluded as an expert for presenting nothing more than basic arithmetic based on others' accounts.

Rule 703 does not cure these defects. While experts may consider hearsay if "experts in the particular field would reasonably rely" and the expert "appl[ies] [his] training and experience … and reach[es] an independent judgment," courts exclude testimony where the expert "merely act[s] as a transmitter for testimonial hearsay." *Gomez*, 725 F.3d at 1129. Micheletti's deposition shows no independent analysis and instead relying on Tolla's unsworn counts and counsel communications and then did arithmetic, which exemplifies conduit testimony. Micheletti could not explain how hours were logged, what the tasks entailed, or whether they were caused by Plaintiff's conduct. *Id.* Nor did Axos explicitly argue that reliance on such hearsay is "reasonable" within the

meaning of Rule 703.  Accordingly, the lack of independent judgment renders Micheletti's opinions regarding damages inadmissible as an expert witness under Rule 702 and 703.

### b.  Lay Testimony Under Rule 701

Brinker argues that Micheletti is also not a proper lay witness because he has no personal knowledge and relies on hearsay or speculation as the only basis for his "opinions."  Doc. No. 198-1 at 10.  Brinker argues that the "little knowledge Micheletti has about the contents of the table is based on speculation, hearsay, or he is merely regurgitating unambiguous, clear statements.  *Id.* (internal quotations omitted).

Axos maintains that Micheletti's testimony is still undeniably relevant and admissible as lay opinion testimony.  Doc. No. 221 at 8.  Axos claims that courts have repeatedly affirmed the admissibility of lay witness testimony where corporate executives use business records and knowledge obtained by virtue of their positions to perform arithmetic damages calculations.  *Id.*  Axos argues that Micheletti's testimony falls within the bounds of situations where courts allow officers to testify as to damages suffered by a company based on their knowledge of the company's finances.  *Id.* at 9.

Rule 701 permits lay opinion only if it is (a) rationally based on the witness's perception, (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge.  Fed. R. Evid. 701(a)–(c).  And since the Ninth Circuit enforces a personal-knowledge requirement, a lay witness "may not testify based on speculation, rely on hearsay or interpret unambiguous, clear statements."  *Lloyd*, 807 F.3d at 1154; *see also Lopez*, 762 F.3d at 864.

Although the Court has found that Micheletti's testimony does not satisfy Rule 702, the Court recognizes that he may still testify about Axos' damages under Rule 701.  "[T]here is an abundance of case law where corporate employees are permitted to testify about damages or company valuation without qualifying as an expert."  *Joshua David Mellberg LLC v. Will*, 386 F. Supp. 3d 1098, 1105 (D. Ariz. 2019); *see also* McCormick

on Evidence § 10 (8th ed. 2020) (collecting cases).  And "most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert."  Fed. R. Evid. 701 Advisory Committee's note to 2000 amendment.  Such opinion testimony is permitted "because of the particularized knowledge that the witness has by virtue of his or her position in the business."  *Id.*; *see In re Palmdale Hills Prop., LLC*, 577 B.R. 858, 868–69 (Bankr. C.D. Cal. 2017) (reasoning business owner and manager could testify about lost profits or damages); *Bright Harvest Sweet Potato Co. v. H.J. Heinz Co., L.P.*, No. 1:13-cv-296-BLW, 2015 WL 1020644, at *5–6 (D. Idaho Mar. 9, 2015) (permitting president and CFO of company to "testify about lost profits to the extent that they have personal and particularized knowledge of the facts that form their opinions"); *see also*, *e.g.*, *Miss. Chem. Corp. v. Dresser–Rand Co.*, 287 F.3d 359, 373–74 (5th Cir. 2002); *HM Compounding Servs., LLC v. Express Scripts, Inc.*, 349 F. Supp. 3d 781, 792 (E.D. Mo. 2018).

Put differently, the personal-knowledge requirement in Rule 701 does not mean a witness must have been personally present for every interaction he describes.  *See Gadson*, 763 F.3d at 1209–10 (upholding testimony based on the witness's knowledge of the case, including information from others, "rather than merely his personal observations").  If Micheletti, Axos' CFO, has particularized knowledge with Axos' payroll/financial records by virtue of his role, he satisfies Rule 701 even if the records were prepared by others.  *See Lightning Lube, Inc. v. Witco Corp.*, 802 F. Supp. 1180, 1193 (D.N.J. 1992), aff'd, 4 F.3d 1153 (3d Cir. 1993)

Additionally, limiting Micheletti to Rule 701 lay opinion testimony cures Brinker's complaint that his opinions were premised on "assumptions."  Doc. Nos. 198-1 at 11, 12; 229 at 5.  The Court will require that Rule 701 opinion testimony be grounded in "personal and particularized knowledge of the facts."  *See Bright Harvest Sweet Potato Co.*, 2015 WL 1020644, at *6.  Axos will also have to lay a proper foundation for any damages testimony, which cannot rest on mere speculation.  *See Lloyd*, 807 F.3d at 1154–

55; *see also Express Scripts*, 349 F. Supp. 3d at 792 ("Personal knowledge acquired through review of records prepared in the ordinary course of business, or perceptions based on industry experience, is a sufficient foundation for such testimony.").

Accordingly, despite finding that Micheletti's opinions regarding damages are inadmissible as an expert witness under Rule 702 and 703, the Court finds that Axos can proceed with its alleged damages via properly founded lay testimony by Micheletti, limited to the damages set forth above, *supra* Section IV.A.2.[9]

### c.  Conclusion

For these reasons, the Court concludes that permitting Micheletti to testify as an expert under Rule 702 and 703 is neither appropriate nor supported by the record. Accordingly, Brinker's motion to exclude Micheletti's expert testimony is GRANTED. Nevertheless, for the reasons described above and as limited by the Court's prior sanctions ruling, the motion is DENIED to the extent it seeks to preclude Axos from offering properly founded lay opinion testimony from Micheletti under Rule 701.

### 3.  Axos' Motion to Exclude Brinker's Expert Brad Abbott

Axos moves to exclude certain testimony of Brinker's designated damages expert Brad Abbott ("Abbott") for failure to satisfy Federal Rule of Evidence 702 and *Daubert*. Doc. No. 199.  In this case, Brinker seeks damages for economic losses allegedly resulting from her wrongful termination as an Axos employee and for Axos paying her at a rate less than the rate it paid one male co-worker, Maniscalco, for the same work.  Doc. No. 199-1 at 6.  In his written expert report, Abbott purports to estimate these losses using four alternative "scenarios" that he identifies as Scenarios 1, 2, 3, and 4.  *Id.*  These scenarios differ according to the assumptions underlying them.  *Id.*  Axos seeks to exclude Abbott's testimony regarding Scenarios 2, 3, and 4 and his tax neutralization

---

[9] While the parties raised arguments regarding whether Axos timely disclosed its damages calculations, Doc. Nos. 221 at 10–11; 229 at 5–9, the Court has already addressed these arguments in ruling on Brinker's motion for sanctions, *supra* Section III.A.2.

adjustments.  *Id.*  Brinker opposes this motion, Doc. No. 224, and Axos filed its reply in support, Doc. No. 225.  The Court addresses the four topics in turn.

### a.  Scenarios 2 & 4: No Offset for Actual Interim Earnings

Axos claims that Scenarios 2 and 4 fail to deduct Brinker's actual post-termination earnings from First Republic from the estimated earnings.  Doc. 199-1 at 10.  According to Axos, this violates state and federal law and the basic economic principles Abbott ordinarily applies and therefore renders those scenarios inadmissible.  *Id.*  Axos admits that Abbott correctly offsets the estimated earnings Brinker would have obtained but for her alleged wrongful termination by the amounts she actually earned through her post-termination employment at Ballast and First Republic in Scenarios 1 and 3.  *Id.* at 11.  However, Axos claims that Abbott departs from his usual method in Scenarios 2 and 4 by offsetting Brinker's Ballast self-employment earnings but not her First Republic wages, a change Abbott says was made at Brinker's counsel's direction based on the assumption that First Republic employment was "not comparable" to her Axos role, which is not "the product of reliable principles and methods."  *Id.* at 12.

In opposition, Brinker argues that Axos fails to cite any case law to support its argument that Abbott's opinions should be excluded simply because he followed an assumption provided to him by counsel, while citing to cases that found that reliance on assumptions provided by counsel or other experts is not a bar to testimony.  Doc. No. 224 at 12.  Brinker claims that Abbott is an economist with over twenty years' experience and has conducted hundreds of employment damages analyses.  *Id.* at 13.  Brinker maintains that Abbott reviewed the record and financial data, including court filings, depositions, discovery, her pay and benefits, job offers, other income, taxes, and Bureau of Labor statistics.  *Id.*  Brinker claims that Abbott then produced a report explaining his methodology, quantifying damages, citing data sources, and stating his assumptions, which Plaintiffs contend makes the opinion admissible.  *Id.*  Brinker states that Abbott takes no position on whether Brinker's First Republic job is comparable to her Axos role.  *Id.*  Brinker responds that Axos' criticism of Abbott's "comparability" assumption goes

to weight, not admissibility, and is properly addressed through cross-examination and contrary evidence, particularly because comparability fell outside what was asked of Abbott. *Id.* at 13–14.

Axos' challenge to Scenarios 2 and 4 targets Abbott's mitigation assumptions, mainly whether First Republic constitutes "comparable" employment, rather than any defect in Abbott's economic methods. Doc. No. 199-1 at 10. However, the question under *Daubert* is "whether or not the reasoning is scientific and will assist the jury. If it satisfies these two requirements, then it is a matter for the finder of fact to decide what weight to accord the expert's testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230–31 (9th Cir. 1998); *see also Primiano*, 598 F.3d at 564–65 ("[T]he test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology. […] Under Daubert, the district judge is a gatekeeper, not a fact finder. When an expert meets the threshold established by Rule 702 as explained in Daubert, the expert may testify and the jury decides how much weight to give that testimony.") (internal quotations omitted). "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Id.* (internal quotations omitted) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)); *see also In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1219 (S.D. Cal. 2010) (noting that the determination of weight and sufficiency of expert evidence is the sole province of the jury). Moreover, any dispute over Abbott's selection and weighting of inputs, including his treatment of post-termination earnings, goes to the weight of the evidence and is for the jury to resolve. *S.E.C. v. Moshayedi*, No. SACV1201179JVSMLGX, 2013 WL 12129282, at *6 (C.D. Cal. Nov. 20, 2013) ("Moshayedi's argument that Bergin failed to disaggregate confounding factors is simply mistaken. Whether he chose the correct factors and gave them the correct weight is for the jury.").

Here, Abbott's testimony meets the standard under Rule 702. Abbott reviewed payroll and benefits records, offer letters, and discovery materials; selected growth rates

from Bureau of Labor Statistics indices; valued unvested Axos RSUs by reference to vesting dates and historical share prices; calculated fringe benefits (health insurance and employer 401(k) match); discounted future losses to present value using a Treasury-based rate; and performed a tax-neutralization analysis using federal and state brackets and filing statuses. *See* Doc. Nos. 196-1 at 3–14; 223 at 70–81. Abbott then presented damages under multiple scenarios, incorporating an alternative comparability premise at counsel's direction, while taking no position on that legal question. *Id.* This work required specialized economic expertise to assemble, verify, and model the inputs, and to quantify losses under the alternative comparability premise.

Under Rule 702, disputes over an expert's assumptions or factual predicates ordinarily go to the weight of the testimony, tested through cross-examination and contrary evidence, rather than admissibility, so long as the expert explains a reliable methodology and applies it consistently. *See City of Pomona*, 750 F.3d at 1043–44; *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969–70 (9th Cir. 2013); *Primiano*, 598 F.3d at 564–65; *see also Odyssey Wireless, Inc. v. Apple Inc.*, 2016 WL 7644790, at *15 (S.D. Cal. Sept. 14, 2016) (attacks on factual underpinnings go to weight); *Acentra Inc. v. Staples, Inc.*, 2010 WL 11459205, at *5 (C.D. Cal. Oct. 7, 2010) (expert may work with counsel on report).

Here, Abbott expressly discloses that Scenarios 2 and 4 model counsel's comparability assumption. For instance, Abbott indicates in his report:

> Per counsel, I have been asked to calculate Ms. Brinker's losses under several scenarios: 1) assuming damages begin at the time of termination and continue through September 2022, when she obtained alternative employment; 2) assuming damages begin at the time of termination and that her alternative employment is not comparable, with losses calculated through 2027 (3 years), 2029 (3 years) and August 2033 (statistical work life); 3) assuming damages begin upon higher in October 2018 due to an equal unequal pay and continue through August 2033 (statistical work life); and 4) assuming damages begin upon higher in October 2018 due to unequal pay and that her alternative employment is not comparable, with losses calculated through 2027 (3 years), 2029 (3 years) and August 2033 (statistical work life).

Doc. Nos. 196-1 at 4; 223 at 71. Abbott does not take any position in regards to the legal issue of whether comparable work should be included or not, indicating that "[he] hold[s] no opinion as to the appropriate duration of damages on these scenarios." *Id.* Further, looking at the calculations, Abbott otherwise applies the same growth rates, benefits, RSU treatment, and discounting mechanics he uses in Scenarios 1 and 3. Doc. Nos. 196-1 at 5–14; 223 at 72–81.

The Court notes that expert testimony premised on an erroneous understanding or application of the law does not satisfy Rule 702 because it cannot assist the trier of fact. *In re Katz Interactive Call Processing Pat. Litig.*, No. 07-2196 RGK (FFMX), 2009 WL 10676152, at *2 (C.D. Cal. Mar. 11, 2009); *see also Olin Corp. v. Lamorak Ins. Co.*, No. 84-CV-1968 (JSR), 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018) ("Expert testimony also should be excluded when it applies the wrong legal standard."). Here, however, the governing mitigation rule is unsettled as California appellate courts are split on the issue. Compare *Villacorta v. Cemex Cement, Inc.*, 221 Cal. App. 4th 1425, 1432 (2013), with *Martinez v. Rite Aid Corp.*, 63 Cal. App. 5th 958, 975 (2021).

In this posture, Rule 702 does not authorize exclusion based on a party's disputed legal premise. "Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. The judge is "a gatekeeper, not a factfinder," "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable," and is "not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.*; *see also City of Pomona*, 750 F.3d at 1043–44; *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969–70. Axos' argument that Scenarios 2 and 4 must deduct First Republic earnings regardless of whether First Republic position constitutes comparable employment, presents a merits issue that should be addressed by motions in limine, jury instructions, and tested through cross-examination and contrary evidence, not exclusion under Rule 702. *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d at 1219.

Accordingly, exclusion of Scenarios 2 and 4 in Abbott's report is unwarranted on this record as Axos' criticisms go to weight, not admissibility.  Therefore, the Court DENIES Axos' motion to exclude Scenarios 2 and 4 of Abbott's opinion.

### b.  Scenarios 3 & 4: Comparator "Fit" Under the EPA

Axos claims that Abbott's testimony regarding Scenarios 3 and 4 are inadmissible because Abbott's use of Maniscalco 2017 salary as the relevant comparator rate for estimating EPA related damages is fundamentally flawed.  Doc. No. 199-1 at 13.

Axos maintains that Scenarios 3 and 4 use EPA damages to Maniscalco's $150,000 salary rate from a 2017 managerial role that ended before Brinker was hired, rather than to the $135,200 salary rate Maniscalco earned during the 2018–2021 period when he overlapped with Brinker and allegedly performed the "exact same" work.  *Id.* at 14.  Abbott admitted he used the $150,000 figure at counsel's direction.  *Id.*  Because the EPA requires comparison to substantially similar work, and Brinker's TAC defines the comparator as the overlapping, same-title/same-duties period, Axos claims that Scenarios 3 and 4 contradict Brinker's own admissions and misalign the damages model with Brinker's liability theory.  *Id.* at 13–15.

Brinker first notes that Axos makes no argument that Abbott's methodology used with respect to Scenarios 3 and 4 is unreliable and thus concedes the point.  Doc. No. 224 at 16.  Brinker then argues that her TAC's allegations are not binding judicial admissions because they were pled on information and belief and merely set a floor subject to clarification through discovery.  *Id.* at 17.  Even if deemed admissions, Brinker contends the absence of a $150,000 comparator allegation is not binding and, under ordinary pleading standards for EPA claims, the TAC need only give fair notice, which it did by identifying Maniscalco and comparing duties.  *Id.* at 17–18.  Brinker further maintains there is a factual basis for using $150,000 and that which salary is the proper comparator is a question for the jury to decide.  *Id.* at 17–19.  Brinker claims that Axos' critiques of Abbott's opinions are nothing more than a disagreement with his conclusions.  *Id.* at 20.

This dispute concerns the factual assumptions underlying Abbott's calculations, not the reliability of his methodology. *See* Doc. No. 199-1 at 13–15. Axos attacks the factual predicate for Scenarios 3 and 4 in relation to Abbott's choice of comparator, asserting that Abbott should have used Maniscalco's overlapping $135,200 salary rather than the $150,000 figure in 2017, and does not contest the underlying economic methodology. *See id.*; *see also* Doc. No. 224 at 16–20. Axos characterizes the $150,000 input as legally and factually untenable because the EPA compares wages for "substantially similar work," Cal. Lab. Code § 1197.5, and Brinker's TAC frames the comparator as the overlapping, same-title/same-duties period when Maniscalco earned $135,200. Doc. No. 44 at ¶ 137 ("Mr. Maniscalco—a male employee—held the exact same title as Ms. Brinker. […] In other words, Mr. Maniscalco performed the exact same job duties under the exact same circumstances as Ms. Brinker."); ¶ 138 ("Despite the fact that [he] performed the same work under the same circumstances, Mr. Maniscalco was paid nearly twice as much as Ms. Brinker."). However, as indicated above, the Court's *Daubert* gatekeeping role focuses on (1) reliability of principles and methods and (2) relevance/helpfulness to the trier of fact. Any disagreements with an expert's assumptions or the factual inputs to an otherwise reliable model ordinarily go to weight, not admissibility. See *City of Pomona*, 750 F.3d at 1043–44; *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969–70; *Primiano*, 598 F.3d at 564–65.

The Court finds that this does not warrant exclusion at this stage. First, the choice of the EPA comparator rate is a merits determination bound up with "substantially similar work" and the scope of the claim. That is not the kind of threshold reliability call Rule 702 is designed to decide. *See Primiano*, 598 F.3d at 564–65 ("[T]he district judge is 'a gatekeeper, not a fact finder.'"). Second, the TAC's allegations, pleaded on information and belief, do not operate as binding judicial admissions and are not dispositive of the comparator question. Allegations pleaded on information and belief are generally not binding judicial admissions, and pleadings serve to provide fair notice rather than to resolve every factual contingency before discovery. *See Deerpoint Grp., Inc. v.*

*Agrigenix, LLC*, 345 F. Supp. 3d 1207, 1232 (E.D. Cal. 2018) ("[T]he relevant allegations were made by Deerpoint on 'information and belief.' Courts appear to be reluctant to construe allegations expressly made on 'information and belief' as binding judicial admission."); *BNSF Ry. Co. v. Float Alaska IP, LLC*, Case No. 2:23-cv-03934-MCS-JC, 2023 WL 6783506, at *4 (C.D. Cal. Aug. 28, 2023) ("[E]ven if '[a]llegations in a complaint are considered judicial admissions,' […] it does not follow that the absence of an allegation constitutes any binding judicial admission. Otherwise, a plaintiff would be required to plead every possible factual contingency lest it lose its ability to raise additional arguments after the benefit of fact discovery. But, unless a heightened standard applies, all that is required is a short and plain statement of the claim providing the defendant with fair notice of what the claim is and the grounds upon which it rests."); *Duke v. City Coll. of S.F.*, 445 F. Supp. 3d 216, 223 (N.D. Cal. 2020) (no heightened pleading for EPA).

Axos' reliance on *Robinson v. G.D. Searle & Co.*, 286 F. Supp. 2d 1216 (N.D. Cal. 2003), is misplaced.  In *Robinson*, exclusion turned on undisputed record admissions that directly contradicted the expert's foundational fact, leaving the opinion without "sufficient facts or data." *Id.* at 1221–22.  Here, by contrast, Abbott's use of the $150,000 figure is a disclosed and contested assumption made at counsel's request, and the alternative $135,200 figure can be modeled using the same methodology.  *See* Doc. Nos. 196-1 at 3–14; 223 at 70–81.  Rule 702 asks whether the expert had sufficient factual grounds to proceed, not whether the court agrees with the ultimate factual choice. *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1025–26 (9th Cir. 2022) ("Although '[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered," […] Rule 702 does not license a court to engage in freeform factfinding, to select between competing versions of the evidence, or to determine the veracity of the expert's conclusions at the admissibility stage.").

Should the controlling legal standard require use of the $135,200 rate, the appropriate course is to adjust the calculations and limit the testimony to that assumption,

as Abbott has already modeled damages at both $150,000 and $135,200 rates.  Where the identity of the comparator is submitted to the jury, Axos' objections go to weight and are properly tested through cross-examination, limiting instructions, and contrary evidence.

Accordingly, exclusion of Scenarios 3 and 4 is unwarranted because Axos' objections address the factual premise underlying the comparator rate and its alignment with Brinker's liability theory, which goes to weight and not admissibility.  Therefore, Axos' motion to exclude Scenarios 3 and 4 of Abbott's opinion under the EPA comparator theory is therefore DENIED.

### c.  Scenarios 3 & 4: "Total Loss" Figures

Axos claims that Scenarios 3 and 4 assume EPA (and wrongful-termination) liability and compute losses starting in October 2018.  Doc. No. 199-1 at 15–16.  But Axos claims that EPA damages are limited to the two years before the claim, which would be July 6, 2020.  *Id.*  Axos argues that Abbott's "total loss" figures include pre-limit amounts and, as a result, are contrary to law and fail to assist the trier of fact under Rule 702(a).  *Id.*

Brinker counters that the UCL's four-year statute of limitations permits a UCL claim predicated on EPA violations and allows restitution of unpaid wages over that four-year period.  Doc. No. 224 at 20–21.  Brinker states that she began working at Axos on October 1, 2018 and that she asserted her EPA and UCL claims in her FAC on July 7, 2022.  *Id.* at 21–22.  Brinker claims that Abbott may calculate losses back to her October 2018 start date, due to Brinker filing her UCL claim within the four-year statutory period.  *Id.*  Brinker claims that she is allowed to use her EPA claim as the basis for her UCL claim, and thus is appropriate for Abbott to calculate Brinker's estimated losses starting from October 2018.  *Id.*

The parties' dispute on this point turns on the applicable limitations period for different causes of action, not on the reliability of Abbott's economic techniques.  The California EPA limits backpay to "no later than two years after the cause of action occurs, except that a cause of action arising out of a willful violation may be commenced

no later than three years after the cause of action occurs."  Cal. Lab. Code § 1197.5(i).  By contrast, the Unfair Competition Law ("UCL") carries a four-year statute of limitations, and unpaid wages unlawfully withheld may be recovered as restitution under the UCL within that four-year window.  Cal. Bus. & Prof. Code § 17208; *Beaver v. Tarsadia Hotels*, 816 F.3d 1170, 1177 (9th Cir. 2016) (UCL limitations period governs UCL claims "even when that claim is based on an underlying law with its own separate statute of limitations"); *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 177–78 (2000) (unpaid wages are restitution under § 17203); *see also RA Med. Sys., Inc. v. PhotoMedex, Inc.*, 373 F. App'x 784, 786 (9th Cir. 2010); *Sanchez v. Russell Sigler, Inc.*, Case No. CV 15-01350-AB (PLAx), 2016 WL 11760184, at *4 (C.D. Cal. May 31, 2016).

Axos' dispute regarding total losses and EPA's limitations period concerns scope, not method.  Under Rule 702, the relevant inquiry is whether Abbott's calculations will assist the jury once the applicable temporal limits are made clear, not whether his model includes dates that are legally pertinent to some causes of action but not others.  Given that Abbott itemizes past losses year by year but does not allocate those amounts among the EPA, UCL, and wrongful-termination theories, Doc. Nos. 196-1 at 20; 223 at 101, that omission does not warrant exclusion.  The issue can be addressed at trial through limiting instructions and a verdict form that confines recovery to the legally available windows.  Additionally, regarding the concern that Abbott's schedules include pre-July 2020 amounts, Abbott's testimony can be limited to explaining the year-by-year figures and how they correspond to each theory, and by instructing the jury which periods apply to which claims, rather than by striking Scenarios 3 and 4.  This approach follows Ninth Circuit guidance, which indicates that critiques aimed at the factual or legal assumptions underlying an otherwise explained and consistently applied model ordinarily affect weight, not admissibility.  *See City of Pomona*, 750 F.3d at 1043–44; *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969–70; *Primiano*, 598 F.3d at 564–65.

Axos' attempt to incorporate limitations arguments by reference to other filings is unpersuasive. Doc. No. 199-1 at 16 ("[See concurrently filed Defendant Axos Bank's Motion for Summary Judgment, Section IX.B]."). A Daubert motion must stand on its own and identify the precise legal constraint it says the expert ignored. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929–30 (9th Cir. 2003) (courts "will not manufacture arguments" and do not scour other briefs); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030–31 (9th Cir. 2001) (similar).

Accordingly, Axos' motion to exclude Scenarios 3 and 4 in regards to the "total loss" figures is DENIED.

### d. Tax Neutralization (Gross-Up)

Axos moves to exclude Abbott's tax-neutralization opinions under Rule 702, also known as a "gross-up," arguing Brinker has not shown it is more likely than not that the opinions rest on sufficient facts or data. Doc. No. 199-1 at 16. While gross-ups are permissible, the 2023 Rule 702 amendments make clear that the sufficiency of an expert's basis is an admissibility question. *Id.* at 16–17. Axos claims to have identified concrete foundational defects. First, Axos points out that Abbott did not use complete 2018–2023 returns. *Id.* at 17. Second, despite Abbott purporting to rely on the partial 2019 and 2020 tax returns, Axos maintains that upon closer inspection Abbott does not appear to use the data actually contained in those partial returns. *Id.* at 18–19. Further, Axos argues that Abbott's calculations assume the "standard deduction and exemption amounts" in each year, but yet fails to account for any tax credits among other tax adjustments that may be applicable in each year. *Id.* at 19. Axos state that Abbott does not explain these discrepancies and thus, cannot show that the tax neutralization adjustments are more likely than not supported by facts and data. *Id.* Axos also contends Abbott assumed without explanation that Brinker had no other income, despite record evidence of substantial trust disbursements and other additional income. *Id.* at 19–20. Finally, Axos argues that Abbott makes no mention of the taxes that Brinker would avoid

by receiving earnings as a lump-sum award, also known as "gross-down," with Abbott's deposition confirming that he failed to consider this avoidance of taxes. *Id.* at 20.

Brinker responds, contending that she has met her Rule 702 burden by a preponderance of the evidence because Abbott's tax-neutralization analysis rests on sufficient facts or data. Doc. No. 224 at 22. Brinker argues that reliance on 2019–2020 tax returns and extrapolation for other years does not compel exclusion, as trained experts commonly extrapolate. *Id.* at 22–23. In any event, Brinker claims that objections to study "inadequacies" go to weight, not admissibility. *Id.* at 23. Brinker notes that Abbott explained the key assumptions Axos attacks via his deposition. *Id.* at 24–25. Further, Brinker states that a minor 2019 state-tax miscalculation regarding Abbott's tax neutralization calculations is not disqualifying. *Id.* at 25. Brinker maintains that Abbott used a reliable methodology in arriving to calculations, and if Axos wishes to challenge these assumptions, it can do so at trial. *Id.* at 26. Despite Axos arguing that Abbott failed to justify excluding other income sources, Brinker claims that no explanation was required because Axos never asked about it at his deposition. *Id.* at 27. Brinker states that Axos' objections go to the weight, not the admissibility, of Abbott's opinions and that disagreement with an expert's assumptions is not, by itself, a basis for exclusion under Rule 702. *Id.* Brinker represents that Axos' contention that the tax neutralization calculations do not account for Brinker's potential tax benefits by virtue of a lump-sum award is not grounds for exclusion. *Id.* at 27–28. Brinker contends that Abbott is substantially qualified and has demonstrated a reliable methodology, and at this stage the Court need only decide admissibility, not whether to exercise its discretion to award Brinker any adjustment which are matters for cross-examination. *Id.* at 28.

Rule 702 places the burden on the proponent to show by a preponderance that Abbott's opinions are based on sufficient facts or data, use reliable principles and methods, and that those methods were reliably applied. Fed. R. Evid. 702. As indicated above, foundational defects go to admissibility while disputes over inputs or assumptions go to weight. *See Primiano*, 598 F.3d at 564–65; *City of Pomona*, 750 F.3d at 1043–44;

*Alaska Rent-A-Car, Inc.*, 738 F.3d at 969–70.  "Sufficient facts or data" requires foundation, not perfect corroboration.  *Elosu*, 26 F.4th at 1025.

In his report, Abbott identifies his assignment and scenarios, while explaining a framework that uses wage-growth indices, employer-benefit cost trends, RSU valuation at vesting, present-value discounting with risk-free rates, and a tax-neutralization based on federal and California brackets with stated filing statuses.  *See* Doc. Nos. 196-1 at 3–14; 223 at 70–81.  Abbott then produces year-by-year outputs and explains key modeling choices, such as treating certain credits as offsetting across but-for vs. lump-sum scenarios and taxing pre-tax contributions up front to avoid speculative future rates.  *See id.*; *see also* Doc. Nos. 196-1 at 16–22; 223 at 97–119.  That is a disclosed, facially coherent method tied to identified data sources, which is enough to clear Rule 702's threshold.  *See Primiano*, 598 F.3d at 564–65; *City of Pomona*, 750 F.3d at 1043–44.

Axos' motion targets inputs, not the existence of a coherent method, namely the absence of complete 2018–2023 returns, alleged nonuse of figures in the partial returns, the use of the standard deduction and non-modeling of certain credits, the omission of other income (e.g., trust distributions), and the lack of a payroll-tax "gross-down."  Doc. No. 199-1 at 16–21.  Even accepting those characterizations, Axos is still challenging completeness and parameter choices rather than a foundational flaw under Rule 702.  The Ninth Circuit treats such disputes as matters of weight, to be tested through cross-examination and contrary proof.  *See Primiano*, 598 F.3d at 564–65; *City of Pomona*, 750 F.3d at 1043–49; *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969–70; *Elosu*, 26 F.4th at 1025–26.  Axos' cited cases address whether to award an equitable tax adjustment after liability, not *Daubert* admissibility or exclusion of an otherwise disclosed expert opinion under Rule 702.  *See* Doc. No. 199-1 at 16–21. (citing *White v. Oxarc, Inc.*, No. 1:19-CV-00485-CWD, 2022 WL 17668781, at *1 (D. Idaho Dec. 13, 2022); *Lane v. Grant Cnty.*, Case No. No. CV–11–309–RHW, 2013 WL 5306986 (E.D. Wash. Sept. 20, 2013), *aff'd*, 610 F. App'x 698 (9th Cir. 2015); *Argue v. David Davis Enters., Inc.*, No. CIV A 02-

9521, 2009 WL 750197 (E.D. Pa. Mar. 20, 2009); *Hoglund v. Sierra Nevada Mem'l-Miners Hosp.*, 102 Cal. App. 5th 56, 63 (2024)).

Any disagreement with assumptions, absent a showing they "veer into unreliable nonsense," typically does not justify exclusion. *Unknown Party v. Arizona Bd. of Regents*, 641 F. Supp. 3d 702, 723, 727 (D. Ariz. 2022). And any minor arithmetic errors, if present, go to weight. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Any potential risk of confusion does not justify exclusion under Rule 702 and is better addressed through cross-examination, contrary evidence, and tailored presentation, not wholesale exclusion. *See Baker*, 423 F. Supp. 3d at 906–07 (shortcomings in inputs are for cross-examination and presentation tailoring, not exclusion, where the methodology is otherwise reliable).

On this record, the methodology is disclosed and consistently applied, and Axos' critiques target inputs better addressed through cross-examination and contrary proof. Accordingly, the motion to exclude Abbott's tax-neutralization opinions is DENIED.

### C. SUMMARY JUDGMENT MOTIONS

#### 1. Legal Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). A fact is material if it could affect the "outcome of the suit" under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *See id.*

If the moving party meets its burden, the nonmoving party must go beyond the pleadings and, by its own evidence or by citing appropriate materials in the record, show by sufficient evidence that there is a genuine dispute for trial.  *See Celotex*, 477 U.S. at 324.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A "scintilla of evidence" in support of the nonmoving party's position is insufficient; rather, "there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson*, 477 U.S. at 252.  Moreover, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda."  *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982).  That said, the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in its favor.  *Anderson*, 477 U.S. at 256.

Rule 56 mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322–23.  Because both parties have moved for summary judgment, the Court considers each motion separately and reviews the evidence submitted in support of each.  *See Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) ("In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion. Accordingly, our conclusion that the district court was required to review the evidence that Plaintiffs had submitted in support of their cross-motion imposes no additional burden upon the district court."); *see also* Fed. R. Civ. Pro. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

**2. Axos' Motion for Summary Judgment**

Axos moves for summary judgment on each cause of action in Brinker's TAC. Doc. No. 201 at 11–38. The Court will address each cause of action in turn.

**a. Sarbanes Oxley Act & California Labor Code § 1102.5 – Whistleblower Protection**

**i. Time Barred**

Axos argues that the Sarbanes–Oxley Act ("SOX") requires administrative exhaustion by filing a complaint with DOL/OSHA within 180 days of each alleged retaliatory act, making only acts occurring on or after August 27, 2020 in this case actionable since Brinker filed a complaint with DOL/OSHA on February 23, 2021. Doc. No. 201-1 at 22–23. Axos contends that each "discrete act" starts its own limitations clock and is not actionable if time barred. *Id.* On that basis, Axos identifies nine alleged discrete acts before August 27, 2020 as untimely. *Id.* at 23. Axos further maintains the continuing violation doctrine does not revive time-barred discrete acts and that ongoing effects are insufficient. *Id.* Axos concludes that Brinker's SOX claim may proceed, if at all, only on alleged retaliatory acts after August 27, 2020. *Id.*

Axos also contends that Brinker's Labor Code § 1102.5 claim is untimely. *Id.* at 23–24. Axos argues the one-year statute in Cal. Code Civ. Proc. § 340 applies where a plaintiff seeks that penalty, since § 1102.5 includes a civil penalty remedy and does not specify a limitations period. *Id.* Axos further asserts that when a § 1102.5 claim seeks both damages and the statutory penalty, as Brinker's does, the one-year period governs the entire claim. *Id.* Further, Axos maintains that § 1102.5's civil penalty is mandatory and thus triggers § 340. *Id.* On that basis, Axos argues the § 1102.5 claim is time-barred to the extent it relies on alleged retaliation before March 21, 2021. *Id.*

Brinker responds, indicating that she "does not seek damages for these acts of retaliation—rather, she properly introduces these acts to show Axos' intent in terminating Brinker." Doc. No. 234 at 19–20. In its reply, Axos asserts that Brinker concedes any

pre–August 27, 2020 conduct is time-barred under SOX and, because she did not address the point in her opposition, she abandoned the issue.  Doc. No. 239 at 9.

As for § 1102.5, Brinker contends that it is not uniformly subject to a one-year statute of limitations.  Doc. No. 234 at 22–25.  Brinker argues that California law uses different limitations periods based on the remedy: claims for penalties are governed by the one-year period in Code of Civil Procedure § 340(a), while claims for compensatory damages are governed by the three-year period in § 338(a).  *Id.*  Brinker characterizes § 1102.5 as supporting two severable theories: (1) an individual, private damages claim and (2) a civil-penalty claim serving public deterrence.  *Id.*  Brinker urges the Court to follow the view that the three-year period in § 338(a) governs § 1102.5 damages claims, while the one-year period in § 340(a) governs civil penalties.  *Id.*

### A. Sarbanes Oxley Act Analysis

Whether alleged retaliatory acts occurring before August 27, 2020 can support SOX liability or damages, and whether those acts may nonetheless be considered to show intent, turns on SOX's 180-day filing requirement and the discrete act accrual rule.  A SOX claimant must file with DOL/OSHA within 180 days of each alleged retaliatory act, and discrete acts outside that window cannot support liability or damages.  *See* 18 U.S.C. § 1514A(b)(2)(D); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–14 (2002). In any event, time-barred events may still be admissible to prove intent.  *See Erhart v. BofI Holding, Inc.*, 2022 WL 119191, at *2 (S.D. Cal. Jan. 12, 2022); *see also Erhart v. BofI Holding, Inc.*, 612 F. Supp. 3d 1062, 1083–84 (S.D. Cal. March 31, 2020).

Here, Brinker filed a complaint with DOL/OSHA on February 23, 2021, which sets the start of the actionable period at August 27, 2020.  Doc. No. 216, Exhibit O.[10] Accordingly, the identified prior discrete acts, including the 2019 CICR-meeting

---

[10] The Court notes that certain documents initially lodged under seal were denied sealing and never resubmitted.  *See* Doc. Nos. 238, 249.  Given the potential significance of these materials, the Court ORDERS counsel for both Plaintiff and Defendant to refile publicly any document for which sealing was denied within fourteen (14) days of this order.

exclusion and eight job-pursuit denials from December 2019 to June 2020, are therefore time-barred as standalone SOX violations and cannot support liability or damages.  But Brinker states she offers them only to show Axos' intent.  On that basis, the Court does not exclude pre-August 27, 2020 conduct altogether and will consider it for context and intent.  Thus, any potential evidentiary use remains subject to the Federal Rules of Evidence and will be addressed, if necessary, at the appropriate stage of the pretrial proceedings.  *See Erhart*, 2022 WL 119191, at *2 ("BofI's intent is a fact 'of consequence in determining' Erhart's whistleblower retaliation claims. Therefore, it would not be appropriate to exclude this post-termination conduct.").

### B.  California Labor Code § 1102.5 Analysis

Axos argues Brinker's § 1102.5 claim is untimely because she filed this action on March 21, 2022, approximately fourteen months after her January 5, 2021 termination.  *See* Doc. No. 201-1 at 23–24; Axos' SSOF ¶¶ 2–3.  Axos emphasizes that Brinker expressly prayed for "all available relief under Labor Code § 1102.5, including […] a civil penalty of $10,000 for each violation," which in Axos' view triggers the one-year statute for an "action upon a statute for a penalty[.]"  *Id.* at 24; *see also* Cal. Civ. Proc. Code § 340(a); Doc. Nos. 1 at ¶ 97; 44 at ¶ 130.

While § 1102.5 does not include its own limitations period, there are two provisions of the California Civil Procedure that may apply.  Section 340(a) imposes a one-year limitations period for "[a]n action upon a statute for a penalty or forfeiture," while § 338(a) provides a three-year period for "[a]n action upon a liability created by statute, other than a penalty or forfeiture."  Cal. Civ. Proc. Code §§ 338(a), 340(a).  Courts are divided on which provision applies, particularly when a plaintiff seeks damages, civil penalties, or both.

One line of authority holds that because § 1102.5 states an employer "is liable for" a civil penalty upon a violation, the statute is penal in nature and the one-year limitations period applies to the claim as a whole, regardless of whether damages are also sought.  *See Cunning v. Skye Bioscience, Inc.*, 2022 WL 3643756, at *5–6 (C.D. Cal. July 28,

2022) (applying one-year statute of limitation where plaintiff sought both damages and penalties), vacated and remanded, No. 23-55248, 2024 WL 4540775 (9th Cir. Oct. 22, 2024); *Delgado v. MillerCoors LLC*, 2017 WL 1130165, at *4–5 (C.D. Cal. Mar. 16, 2017) (reasoning that penalty language is mandatory); *see also Wilden v. Cty. of Yuba*, 2012 WL 12990444, at *2 (E.D. Cal. Mar. 2, 2012) ("Whistleblower Retaliations Claims under California labor Code § 1102.5 must be filed within one year of the alleged retaliatory act").

A second line of cases recognizes that § 1102.5 forms the basis for two distinct claims.  These decisions apply a "dual framework," three-year statute to damages claims and the one-year statute to claims for penalties.  *See Vincenzini v. Transit America Servs., Inc.*, 2024 WL 4982987, at *4 (N.D. Cal. Dec. 4, 2024) (civil penalties time-barred, damages timely); *Ayala v. Frito Lay, Inc.*, 263 F. Supp. 3d 891, 916–17 (E.D. Cal. June 30, 2017) (describing § 1102.5 as creating "two distinct claims" with different limitations periods); *Newton v. Bank of Am.*, 2018 WL 6219946, at *5–6 (C.D. Cal. Jan. 18, 2018) (finding that the three-year statute applies to the damages only claim where the court indicated that "one California statute may be subject to different statutes of limitations."); *De Souza v. Dawson Tech., Inc.*, 2022 WL 298368, at *3–4 (S.D. Cal. Feb. 1, 2022) (same).  These courts emphasize that the damages remedy under § 1102.5 was established well before the Legislature enacted the civil penalty provision in 2003, and reducing the limitations period to one year for all claims would run contrary to the statute's remedial purpose.  *See Newton*, 2018 WL 6219946, at *4–6. The Court finds this second line of cases more persuasive.

Here, Brinker filed suit on March 21, 2022, more than one year but less than three years after her January 5, 2021 termination.  Axos' SSOF ¶¶ 2–3.  Because her complaint seeks both damages and civil penalties, the authorities adopting the "dual framework" indicate that the civil penalty request is time-barred under § 340(a), but that the damages claim would remain timely under § 338(a).  The Court finds that reasoning more consistent with the statutory text, history, and purpose.

Accordingly, the Court holds that Brinker's request for civil penalties is time barred and finds her § 1102.5 claim for damages as timely.  Thus, the Court DENIES Axos' summary judgment motion on statute-of-limitations grounds in relation to the § 1102.5 claim.

ii.   Equitable Tolling as to California Labor Code § 1102.5

Despite the time bar, Brinker may proceed on the civil penalty theory if she proves equitable tolling.  In her opposition, Brinker argues that her § 1102.5 claim is timely under equitable tolling even if a one-year limitations period applies.  Doc. No. 234 at 20–22.  Brinker points to her DOL/OSHA retaliation complaint filed on February 23, 2021, about one month after her January 5, 2021 termination, and her amended administrative complaint accepted on June 28, 2021, which she contends mirrors the allegations in this action.  *Id.*  While that administrative matter was pending, Brinker filed this suit on March 21, 2022 and then notified the DOL, which closed the agency case.  *Id.*

Brinker contends (1) Axos received notice because the DOL/OSHA complaint was timely as to post-August 27, 2020 events filed and alerted Axos to investigate alleged retaliation; (2) the agency and court claims arise from the same facts, so Axos would suffer no prejudice in defending the later suit; and (3) she acted in good faith by pursuing administrative remedies before filing.  *Id.*

In its Reply, Axos argues equitable tolling does not save Brinker's § 1102.5 claim. Doc. No. 239 at 14–16.  Axos notes that Brinker was terminated on January 5, 2021, and then filed her DOL/OSHA complaint on February 23, 2021.  *Id.*  And after SOX's 180-day period, Axos claims that Brinker could have filed in federal court as of August 22, 2021, but instead waited until March 21, 2022 to sue under SOX and § 1102.5.  *Id.*  Axos addresses tolling's three elements of timely notice, lack of prejudice, and the plaintiff's good-faith reasonable conduct.  *Id.*  Axos emphasizes that the third prong was not met. *Id.*  Axos characterizes equitable tolling as a narrow remedy not extending to "garden-variety" neglect and argues that Brinker failed to identify any external obstacle that prevented a timely § 1102.5 filing.  *Id.*  Axos claims that Brinker had retained current

counsel by June 2021 and notes that her March 2022 complaint largely tracked her June 2021 amended DOL/OSHA filing. *Id.* Axos also points out that the arbitration it initiated in 2021 provided a forum in which Brinker could have asserted her § 1102.5 claim, but she did not. *Id.* Axos concludes that Brinker cannot show the requisite good-faith, reasonable conduct to warrant equitable tolling. *Id.*

Here, the question is whether Axos has shown an absence of evidence supporting equitable tolling and, if so, whether Brinker adduces specific facts creating a triable issue. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 322–25.

The material dates are not disputed: Brinker was terminated on January 5, 2021, Axos' SSOF at ¶ 3, Doc. No. 234-10 at ¶ 3; Brinker's DOL/OSHA complaint filed February 23, 2021, Brinker's Resp. to Axos' SSOF at ¶ 3; Brinker's motion to amend that complaint with allegations similar to those here was granted June 28, 2021, Doc. No. 239-1 at ¶ 73; Brinker's civil complaint being filed on March 21, 2022 while the DOL matter remained pending, Doc. No. 1, Brinker's Resp. to Axos' SSOF at ¶ 2. Axos argues that SOX let Brinker sue after 180 days without a final agency decision, which would be August 22, 2021, and that she also could have raised the §1102.5 claim in the 2021 arbitration but chose not to. Doc. No. 239 at 14–16.

Because the claim at issue arises under California Labor Code § 1102.5, California law governs equitable tolling. Under that doctrine, Brinker is required to produce evidence from which a reasonable jury could find (1) timely notice via the first proceeding, (2) lack of prejudice to Axos in evidence-gathering, and (3) good-faith, objectively reasonable conduct in filing the second action. *See Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131, 1137–38 (9th Cir. 2001); *see also Saint Francis Mem'l Hosp. v. State Dep't of Pub. Health*, 9 Cal. 5th 710, 724, 729–30 (2020); *Elkins v. Derby*, 12 Cal. 3d 410, 414–20 (1974).

Regarding timely notice, Brinker's evidence is sufficient to create a triable issue. Brinker filed her DOL/OSHA complaint less than two months after termination, alleging she was fired for protected complaints to HR about "retaliation, unlawful and unethical

activities […] gender discrimination, unequal pay and others," and then amended to add details mirrored in this suit.  Brinker's Resp. to Axos' SSOF ¶¶ 1, 3, 71–73; *see also* Doc. No. 234-7 at 11, Ex. 4[11].  A reasonable factfinder could conclude those filings alerted Axos to investigate the same employment incident and alleged whistleblowing/retaliation now at issue.  *See Daviton*, 241 F.3d at 1138 ("That claim must alert the defendant in the second claim of the need to begin investigating the facts which form the basis for the second claim.").  As the California Supreme Court has recognized, "[t]he filing of an administrative claim, whether mandated or not, affords a defendant notice of the claims against it so that it may gather and preserve evidence, and thereby satisfies the principal policy behind the statute of limitations."  *McDonald v. Antelope Valley Cmty. Coll. Dist.*, 45 Cal. 4th 88, 102 (2008).  Accordingly, Axos was put on notice of this claim from the pending DOL/OSHA administrative filings.

Regarding any prejudice to Axos in evidence-gathering, Axos points to no case-specific evidentiary prejudice, and the administrative filings concern the same time period, people, and termination decision.  Doc. Nos. 234-7, Ex 1–7; 239 at 14; *see also* Doc. No. 239-1 at ¶¶ 70–75.  On this record, a jury could find Axos had the opportunity to preserve witnesses and documents pertinent to the same facts, since the facts of the two complaints are identical or at least so similar that Axos' investigation of the DOL/OSHA claims would put it in a position to fairly defend this case.  *See Elkins*, 12 Cal. 3d at 418–20 ("The likelihood, however, that the employer will suffer prejudice if the compensation

---

[11] In her opposition to Axos' summary judgment motion, Brinker requests the Court to take judicial notice of her DOL/OSHA whistleblower complaint, the related DOL and OALJ filings, and the October 4, 2023 amended judgment in *Erhart v. BofI Federal Bank*, No. 15-cv-02287-BAS-NLS (S.D. Cal.).  Doc. No. 234-7.  The Court GRANTS Brinker's request for judicial notice.  The DOL/OSHA complaint, related DOL/OALJ filings, and the amended judgment in *Erhart v. BofI* are public records not subject to reasonable dispute and related to issues here.  *See* Fed. R. Evid. 201(b), (c)(2); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (stating that courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue."); *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

claimant files a tort action more than one year after the date of injury is minimal."); *Collier v. City of Pasadena*, 142 Cal. App. 3d 917, 925–26 (Ct. App. 1983) ("The critical question is whether notice of the first claim affords the defendant an opportunity to identify the sources of evidence which might be needed to defend against the second claim."). That is sufficient to forestall summary judgment on the prejudice prong.

As for whether there was good-faith, objectively reasonable conduct in filing the second action, Brinker's evidence shows she promptly invoked her whistleblower complaint with DOL/OSHA, Doc. Nos. 234-10 at ¶ 70, 239-1 at ¶ 70; sought to align that proceeding with her later allegations, *Id.* at ¶ 72; and then filed this action while DOJ/OSHA complaint remained pending, *Id.* at ¶¶ 73–74, Doc. No. 1. California authority permits tolling even when exhaustion is not mandatory if a plaintiff reasonably pursues one remedy to avoid duplicative filings and the defendant is on notice. *Elkins*, 12 Cal. 3d at 414–20 ("[D]uplicative proceedings are surely inefficient, awkward and laborious. If, in order to avert loss of his rights, an injured party is forced to initiate proceedings with both the compensation board and a superior court, he brings onerous procedural burdens upon himself, his employer, and the already overtaxed judicial system."); *Daviton*, 241 F.3d at 1136–38. A reasonable jury could view Brinker's sequence, i.e., the DOL/OSHA filing then a prompt amendment, and a later civil filing while the DOL/OSHA matter was still open, as consistent with those principles.

However, Axos argues that after the SOX 180-day period expired on August 22, 2021, Brinker waited another six months before filing suit on March 21, 2022, despite having counsel by June 2021 and a draft complaint that largely mirrored her amended DOL/OSHA filing, and that no external obstacles prevented an earlier filing. Doc. No. 239 at 14–16. Axos also notes that Brinker could have brought her § 1102.5 claim in the arbitration proceeding but did not do so. *Id.* On this record, Axos has identified a discrete period, August 22, 2021 to March 21, 2022, during which it contends the delay reflects neglect rather than diligence. *See id.*; *see also Saint Francis*, 9 Cal. 5th at 724, 729–30 (tolling is a narrow remedy and does not extend to garden-variety neglect); *Tapia*

*v. Hyatt Corp.*, 2021 WL 3076650, \*5–7 (C.D. Cal. June 30, 2021) (failure to show diligence defeats tolling).

The main question here is whether Brinker has put forward specific evidence from which a reasonable jury could find that her post 180-day delay was objectively reasonable and in good faith in light of the administrative posture rather than mere inaction. *See Saint Francis*, 9 Cal. 5th at 729–30 ("Limiting the doctrine's applicability to only those cases in which a party demonstrates objective reasonableness and subjective good faith precludes the doctrine from being 'a cure-all for an entirely common state of affairs,' while ensuring that it provides a narrow form of relief in 'unusual circumstances' when justice so requires."); *Daviton*, 241 F.3d at 1137–38. The exhibits show the DOL/OSHA matter was pending and amended, but do not, by themselves, indicate what Brinker learned about DOL/OSHA's timetable after August 22, 2021 or why filing the complaint on March 21, 2022 was diligent in light of that everything going on at the time.

While Brinker argued that Axos has not offered any evidence that she did not act in good faith in waiting to exhaust her administrative remedies before filing this SOX retaliation action, Doc. No. 234 at 21–22, Brinker was the one that needed to point to evidence showing good faith and reasonable diligence during that period. *See Saint Francis*, 9 Cal. 5th at 729–30 ("A party seeking equitable tolling must satisfy a similar standard: It must demonstrate that its late filing was objectively reasonable under the circumstances. […] Limiting the doctrine's applicability to only those cases in which a party demonstrates objective reasonableness and subjective good faith precludes the doctrine from being 'a cure-all for an entirely common state of affairs,' while ensuring that it provides a narrow form of relief in 'unusual circumstances' when justice so requires."). Brinker failed to do so.

Although the first two tolling elements present triable issues, the third does not. Accordingly, the Court holds that equitable tolling is unavailable here as a matter of law; thus, Brinker's request for civil penalties remains barred by the statute of limitation.
///

iii.   Prima Facie Case

To the extent Brinker's SOX and § 1102.5 claims are timely, Axos argues that summary judgment is still warranted because she has not made out a prima facie case. Doc. No. 201-1 at 25.  Axos' claims that Brinker has failed to (1) identify actionable adverse employment actions and (2) show how her alleged protected activity was a contributing factor to the employment actions.  *Id.*  Axos contends that Brinker misidentifies several personnel actions as retaliatory, when in fact they are not actionable. *Id.*

Brinker argues summary judgment is improper because disputes of material fact remain.  Doc. No. 234 at 25–26.  Brinker notes that Axos concedes the first two elements, protected activity and knowledge, and limits its challenge to whether certain acts were adverse and whether her complaints were a contributing factor.  *Id.*  Brinker further contends that Axos does not argue that she failed to make a prima facie showing as to her termination and only addresses termination through its "same-action" defense.  *Id.* Brinker characterizes any challenge to the adverse-action or causation elements for termination as waived, and, in the alternative, maintains the record contains sufficient evidence for a jury to find her protected activity was a contributing factor in both her termination and the alleged retaliatory litigation.  *Id.*

Regulations promulgated by the DOL set forth four required elements of a prima facie case under SOX: (1) Brinker engaged in a protected activity; (2) Axos knew or suspected, actually or constructively, that Brinker engaged in the protected activity; (3) Brinker suffered an adverse employment action; and (4) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action.  *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 996 (9th Cir. 2009). By its terms, Cal. Labor Code § 1102.6 describes the applicable substantive standards and burdens of proof for both parties in a § 1102.5 retaliation case: "First, it must be 'demonstrated by a preponderance of the evidence' that the employee's protected whistleblowing was a 'contributing factor' to an adverse employment action."  *Lawson v.*

*PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 712 (2022).  "Then, once the employee has made that necessary threshold showing, the employer bears 'the burden of proof to demonstrate by clear and convincing evidence' that the alleged adverse employment action would have occurred 'for legitimate, independent reasons' even if the employee had not engaged in protected whistleblowing activities."  *Id.*

The Court focuses its analysis to the elements challenged in Axos' motion for summary judgment—(1)whether Brinker suffered an adverse employment action and (2) whether her protected activity was a contributing factor in that action—issues that arise under both SOX and § 1102.5.  *See* Doc. No. 201-1 at 25–37.

## A.  Adverse Employment Action

Under SOX, an employer may not "discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment" because of the employee's protected activity.  18 U.S.C. 1514A(a); *see also* 29 C.F.R. § 1980.104(e)(2)(iii) (plaintiff must demonstrate that she "suffered an adverse action").  "[A]ctions 'that would deter a reasonable employee from engaging in protected activity would be actionable under [SOX] as well."  *Erhart v. BofI Holding, Inc.*, 269 F. Supp. 3d 1059, 1075 (2017) (citation omitted) (noting standard under Title VII for adverse employment actions is a "helpful interpretive tool" in the SOX context).  Similarly, under § 1102.5(b), the plaintiff must demonstrate that she has been "subjected to an adverse employment action that materially affects the terms, conditions, or privileges of employment" rather than "minor or relatively trivial adverse actions […] [that] are reasonably likely to do no more than anger or upset an employee."  *Francis v. City of L.A.*, 81 Cal. App. 5th 532, 540–41 (2022).

In relation to CICR Meetings, Axos maintains that Brinker alleges retaliation because she stopped attending quarterly CICR/Board meetings after issuing her CL Report.  *See* Doc. No. 201-1 at 26.  Axos claims that the record shows that Brinker presented the CL Report on May 21, 2019 and gave an update on the report on June 18, 2019.  *Id.*  Axos argues that the only documented meeting Brinker was not invited to was

on September 30, 2019. *Id.* Axos states that omission from meetings is an adverse action only if it "materially impact[s] his or her employment conditions." *Id.* Axos contends that there is no evidence that Brinker's job was impeded, as the entire ICR team was not invited to the September meeting. *Id.* at 27.

Regarding ability to obtain other jobs within the bank, Axos contends Brinker's "failure to obtain a non-ICR job" theory does not show a materially adverse action under SOX or § 1102.5. *Id.* at 27–32. First, Axos argues that non-selection absent a vacancy is not actionable, as most of the roles Brinker references were not open positions during the relevant period. *Id.* at 28–30. Axos maintains that at least these eight out of thirteen job pursuits involved no vacancy and therefore cannot constitute adverse actions. *Id.* And where positions did exist, Axos asserts the evidence does not show they were objectively better than Brinker's Senior ICR Officer role. *Id.* at 30–31. Additionally, Axos argues the September 2020 offer to promote Brinker within ICR, to Assistant Vice President with managerial duties and increased salary and bonus, cannot be reframed as a demotion or otherwise adverse. *Id.* at 31–32. Axos points out that Brinker rejected the offer, and that elevating title and compensation is not an adverse employment action, especially when, as here, "a job demotion is not accompanied by a salary or status change, or any indication that the new position is less favorable." *Id.* Based on these points, Axos contends the non-selection and "demotion" predicates do not establish a materially adverse action and therefore cannot support Brinker's SOX or § 1102.5 claims.

Regarding access to Archer Database, Axos argues Brinker's narrowed Archer permissions do not constitute an adverse employment action since Cardoso directed removal of Enterprise Risk Management records access for the entire ICR team, and thus Brinker was not singled out. Doc. No. 201-1 at 32–33. Axos states that the change affected only a small subset of risk assessments managed outside the ICR process and there is no evidence Brinker, or ICR department, complained about the change or that it impeded their work. *Id.*

22-cv-0386-MMA (DDL)

Brinker argues the Court should evaluate adverse action under the "totality of the circumstances," not as isolated incidents.  Doc. No. 234 at 26–28.  Brinker contends that Axos engaged in a series of subtle but damaging acts reasonably likely to materially affect job performance and advancement, culminating in termination, which Axos does not dispute is adverse.  *Id.*  Brinker claims that Axos' exclusion of her from CICR meetings, asserting the pattern, not each event in isolation, meets the adverse-action threshold.  *Id.*  Brinker further contends that Axos' restriction of her access to portions of the Archer database shortly after her HR complaints on October 2nd and 5th constitutes an adverse action because it impeded her ability to "fully engage" in her ICR role.  *Id.*  And even if the Court finds that Brinker's restricted access to the Archer database is not an adverse employment action on its own, under the totality of circumstances, that restriction, in combination with Axos' other acts of retaliation "rises to the level of actionable conduct."  *Id.*

It is undisputed that Brinker identified five retaliation categories: (1) exclusion from CICR/Board meetings; (2) inability to obtain other jobs within Axos; (3) restricted access to the Archer database; (4) termination; and (5) Axos' initiation of arbitration claims and counterclaims.  Doc. No. 234-10 at ¶ 15.  Accordingly, the Court conducts its analysis under both the SOX and § 1102.5 claims.

I.    Sarbanes Oxley Act Analysis

Regarding the CICR / Board meetings, it is undisputed that: (1) the ICR and Compliance Committees merged into CICR in May 2019, Doc. No. 234-10 at ¶ 16; (2) the CICR met quarterly, *Id.* at ¶ 17; (3) the CL Review was finalized in April 2019, *Id.* at ¶ 18; (4) Brinker presented the CL Report to the ICR Board Committee on May 21, 2019, *Id.* at ¶ 19; (5) the inaugural CICR meeting was June 18, 2019, which the ICR team attended, including Brinker, and Brinker provided an update on the CL  Report, *Id.* at ¶¶ 21–22; (6) because the merged agenda was "too dense," the CICR Directors requested that only ICR Committee members and not the whole ICR team attend the September 2019 meeting, which was relayed department-wide and Brinker called it "an unfortunate

change," *Id.* at ¶ 25; (7) Cardoso agreed there was "too much to cover in that meeting," *Id.* at ¶ 26; and (8) Brinker was later invited to a September 10, 2020 CICR meeting, *Id.* at ¶ 27. On this record, the only documented non-invitation was September 30, 2019, which was applied to the entire ICR team, and predates the SOX 180-day window. As a standalone SOX claim, it is untimely and lacks strength as an adverse action because the restriction applied team wide.

Regarding Brinker's ability to obtain other jobs within the bank, Axos cites evidence that many referenced "roles" involved no open vacancy during the relevant period. Doc. No. 201-1 at 28–30; *see also* Doc. No. 234-10 at ¶¶ 29–34, 36, 37, 49–58, 62–65, 68. Where positions arguably existed, Axos points to no record of objectively superior pay/title/benefits, e.g. no proof Special Assets Manager Position was better, and the Accounting Position required a CPA. Doc. No. 201-1 at 30–31; *see also* Doc. No. 234-10 at ¶¶ 39–48. Additionally, Axos maintains that there is no evidence decisionmakers knew of protected activity and that Brinker testified "it worked out better" she did not get the Accounting Position. *Id.* Brinker disputes this characterization and urges a totality of the circumstances view, but on the excerpts supplied she does not meaningfully address Axos' argument. *See* Doc. No. 234 at 26–27. On this showing, in the light most favorable to Brinker, the non-selection cannot qualify as an adverse action since there was no actual vacancy, and Brinker offers no other role specific arguments to avoid summary judgment on this retaliation category.

As for the September 2020 promotion offer, it is undisputed that Axos offered Brinker an Assistant Vice President role with managerial duties and increased salary/bonus, which she declined. Doc. No. 234-10 at ¶¶ 59–61; *see also* Doc. No. 201-1 at 31–32. While Brinker labels it a "demotion," Axos disagrees. *See* Doc. Nos. 201-1 at 31–32; 234-10 at ¶ 61. On this record, in the light most favorable to Brinker, offering Brinker a higher title and greater compensation is not an adverse action, and simply re-labeling it as a demotion does not create a triable issue.

As for Archer database access, it is undisputed that on October 9, 2020, four days after Brinker's October 2nd and 5th HR interviews, Brinker emailed Cardoso and Tolla about Archer features.  Doc. No. 234-10 at ¶ 69.  Brinker's email made Cardoso realize that ICR, as well as other teams, probably had access to certain risk assessments they should not have access to.  *Id.* at ¶ 70.  Cardoso then instructed removal of that access for the entire ICR team, including former ICR employees.  *Id.* at ¶ 71.  Further, Brinker never lost all Archer access, her permissions were only limited to records within the ICR Department. *Id.* at ¶ 73.  Brinker highlights disputed evidence.  For instance, the Archer admin wrote, "Give me a few more minutes to verify that [Brinker] doesn't have access through some other method," then confirmed she did not.  Doc. No. 234 at 27; *see also* Doc. No. 216-3 at 60–64.  Brinker also testified that the restricted records related to risk management and an "ICR MRA," which allegedly required her to perform certain duties.  Doc. No. 239-1 at ¶ 21.  Brinker emphasizes the timing, as access change occurred on the same day as her email and four days after HR complaints.  Doc. No. 239-1 at ¶¶ 18, 21.  Given SOX's broad deterrence standard, this disputed evidence suffices to raise a triable issue as to whether the Archer restriction might have dissuaded a reasonable employee from engaging in protected activity.

Additionally, viewing the record in the light most favorable to Brinker, the arbitration/counterclaims retaliation category is supported by the post-termination chain of events.  For example, Axos sent a cease-and-desist on January 12, 2021.  Doc. No. 234-10 at ¶ 86.  Further, Axos sought to initiate arbitration against Brinker on February 5, 2021, as well as later filed counterclaims in this case.  *Id.* at ¶¶ 88–89.  Notably, Brinker identified this litigation as one of her five retaliation categories in response to Interrogatory No. 8.  *Id.* at ¶ 15.  Yet, Axos argues that post-termination conduct that is not actionable under SOX, and thus cannot constitute an adverse employment action.  Doc. No. 201-1 at 33.  Brinker disputes that she "improperly" removed information and asserts that she was authorized to access the documents while employed, Doc. No. 234-10 at ¶ 85, and that she "refused" to return it since the materials were provided to counsel

and later produced in discovery, *Id.* at ¶ 87.  Brinker also disputes Axos' stated basis for arbitration.  *Id.* at ¶ 88.

SOX's adverse-action element is construed broadly to capture non-tangible steps that are "more than trivial" and that would dissuade a reasonable employee.  *See Erhart*, 269 F. Supp. 3d at 1075.  Even under authority limiting SOX's reach for post-employment conduct, *see Erhart*, 2022 WL 119191, at *1, an exception recognizes liability where the conduct impacts subsequent employment.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 345–46 (1997) ("[E]xclusion of former employees from § 704(a) would undermine Title VII's effectiveness by allowing the threat of postemployment retaliation to deter victims of discrimination from complaining to the EEOC, and would provide a perverse incentive for employers to fire employees who might bring Title VII claims."); *Hashimoto v. Dalton*, 118 F.3d 671, 674–76 (9th Cir. 1997) ("There is little question that the dissemination of adverse employment references [post termination] can constitute a violation of Title VII if motivated by discriminatory intent. [...] The retaliatory dissemination of a negative employment reference violates Title VII, even if the negative reference does not affect the prospective employer's decision not to hire the victim of the discriminatory action.").[12]  Brinker offers evidence that Axos' litigation precipitated a July 2021 CFA Institute investigation with potential sanctions bearing directly on her professional standing.  Doc. No. 234-10 at ¶ 80; *see also* Doc. Nos. 234-1, 234-2.  With the timing of the counterclaims and disputed evidence on reasonableness and motive, the record supports a finding that the filings were not trivial and could deter protected activity.  Accordingly, Axos has not shown the absence of a genuine dispute as to whether its arbitration demand and counterclaims qualify as adverse employment actions under SOX.

---

[12] Courts have, at times, drawn on Title VII principles when evaluating SOX retaliation claims, including in contexts such as temporal proximity and the potential reach of post-employment conduct. *See*, *e.g.*, *Van Asdale*, 577 F.3d at 1003.

II.     California Labor Code § 1102.5 Analysis

Similarly, as for the CICR/Board meetings under § 1102.5, the only documented non-invitation is September 30, 2019, which applied to the entire ICR team due to an over-dense agenda, and Brinker later received another CICR meeting invite on September 10, 2020.  Doc. No. 234-10 at ¶¶ 16–19, 21, 22, 25–27.  On this record, Brinker identifies no attendant loss of pay, rank, duties, performance ratings, or tangible opportunity traceable to the one-off, team-wide attendance limitation.  In other words, Brinker did not demonstrate that the alleged adverse action materially affected the terms, conditions, or privileges of her employment.  Thus, the exclusion falls short of an adverse employment action under § 1102.5.  *See Francis*, 81 Cal. App. 5th at 540–45; *McRae v. Dep't of Corr. & Rehab.*, 142 Cal. App. 4th 377, 386–88 (2006).

Regarding the ability to obtain other jobs within the bank, Axos submits unrebutted evidence that many of the cited roles were never posted during the relevant period, and that where openings arguably existed, the record reflects neither objective superiority in compensation or status nor evidence that the decisionmakers were aware of Brinker's protected activity.  Doc. No. 201-1 at 28–30; *see also* Doc. No. 234-10 at ¶¶ 29–34, 36, 37, 49–58, 62–65, 68.  Non-selection without a vacancy or for hypothetical roles is not a material adverse action under §1102.5.  *See Lee v. Potter*, No. C 07-254 SBA, 2008 WL 4449568, at *9 (N.D. Cal. Oct. 1, 2008) ("As the terms and conditions of plaintiff's employment did not objectively change for the worse as a result of her lateral transfer or defendant's denial of her requests, it was not an adverse employment action as a matter of law."), *aff'd*, 358 F. App'x 966 (9th Cir. 2009); *McRae*, 142 Cal. App. 4th at 386–87 ("A change that is merely contrary to the employee's interests or not to the employee's liking is insufficient.").  As for the September 2020 promotion offer, the Court has already addressed this.  *See supra* note 14.

As for Archer access, on October 9, 2020, four days after Brinker's October 2nd and 5th HR interviews, Cardoso identified that ICR, and other teams, potentially had access to risk assessment records they should be unable to access.  Doc. No. 234-10 at ¶¶

69–70.  Cardoso then instructed the team-wide removal of that access while preserving permissions for ICR records.  *Id.* at ¶¶ 71, 73.  Brinker points to timing, an admin's specific check on her access, and her testimony that the newly restricted records were needed.  Doc. No. 234 at 27; *see* Doc. Nos. 216-3 at 60–64; 239-1 at ¶¶ 18, 21.  However, Brinker does not identify any concrete job impact flowing from the narrowed permissions, i.e. missed deadlines, negative evaluations, reduced pay/bonus, discipline, or sustained inability to perform core ICR functions.  On this evidentiary showing, a reasonable jury could not find an objectively material change in the terms, conditions, or privileges of employment under §1102.5.  *See Francis*, 81 Cal. App. 5th at 541–45; *McRae*, 142 Cal. App. 4th at 386–87.

As for termination, the date is undisputed as January 5, 2021.  Doc. No. 234-10 at ¶ 3.  Termination is categorically an adverse employment action, and thus the § 1102.5 adverse-action element is satisfied for the termination claim.  *See Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) ("Among those employment decisions that can constitute an adverse employment action are termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion.").

Regarding the initiation of arbitration and counterclaims, the sequence is undisputed: Axos sent Brinker a cease-and-desist on January 12, 2021, Doc. No. 234-10 at ¶ 86; initiated arbitration on February 5, 2021, *Id.* at ¶ 88; and later filed counterclaims in this action, *Id.* at ¶ 89.  Yet, post-termination litigation activity does not alter the terms, conditions, or privileges of employment and is generally protected by the litigation privilege.  *See McRae*, 142 Cal. App. 4th at 386–87; Cal. Civ. Code § 47(b).  On this record, the arbitration/counterclaim retaliation category does not present a triable §1102.5 adverse-action issue.

Courts can consider the "totality of the circumstances" to determine whether an "employee has been subject to treatment that materially affects the terms and conditions of employment."  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1036, 1054–55

(2005) (rejecting employer's argument that it is improper to consider adverse actions collectively stating, "there is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries."). In *Yanowitz*, the California Supreme Court explained:

> Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of sections 12940(a) and 12940(h).

*Id.* at 1054–55. Ultimately, the *totality of the circumstances* does not alter the outcome. As *Yanowitz* makes clear, a series of minor or trivial actions may be aggregated where, taken together, they materially affect the terms or conditions of employment. *Id.* Here, however, aside from the Archer access restrictions, termination, and initiation of litigation—which the Court has already determined constitute adverse actions—Brinker's other cited incidents span more than a year, were either team-wide or hypothetical, and are unsupported by evidence of any actual impact on her work conditions. Viewed collectively in the light most favorable to Brinker, those remaining incidents remain insufficient to meet the adverse action standard under the totality of the circumstances.[13]

### B. Contributing Factor

The Court analyzes causation under the contributing-factor framework common to §§ 1102.5/1102.6 and SOX. *See Murray v. UBS Sec., LLC*, 601 U.S. 23, 27–28 (2024); *Lawson*, 12 Cal. 5th at 712–15; 29 C.F.R. §1980.104(e). Axos argues that Brinker cannot satisfy the "contributing factor" element under SOX or § 1102.5. Doc. No. 201-1 at 34–

---

[13] The parties do not cite, and the Court is not aware of, any authority applying a "totality of the circumstances" analysis under SOX. Even if such an approach were recognized, the result here would be the same.

37. Axos focuses on the CICR meeting and the non-ICR job positions theories. *Id.* Axos contends there is no independent evidence of retaliatory motive, noting that the entire ICR team was not invited and she was later invited to a September 10, 2020 meeting. *Id.* Regarding the non-ICR job positions, Axos contends several cited roles did not exist and therefore could not have been affected by protected activity. *Id.* And for roles that did exist, Axos asserts there is no evidence the decisionmakers were aware of Brinker's ICR reporting. *Id.* Therefore, Axos maintains that no reasonable jury could find protected activity contributed to any challenged action. *Id.*

Brinker contends she need only show her protected activity was a "contributing factor" in the adverse action, a permissive standard satisfied by any factor that "tends to affect" the outcome. Doc. No. 234 at 28. Brinker argues causation may be established through circumstantial evidence, such as "temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward the complainant." *Id.* at 29. Brinker points to undisputed HR complaints on October 2 and 5, 2020; HR's closure of its investigation in November 2020; and Tolla's decision in early December 2020 to outsource ICR, thus eliminating her role. *Id.* Brinker characterizes the roughly two-month interval between her complaints and the outsourcing/termination decision as "tight" temporal proximity sufficient to meet her "relatively light" prima facie burden. *Id.* at 29–30. Brinker concludes the record permits an inference of causation and, separately, that Axos' proffered reasons are pretextual. *Id.* at 31.

Brinker contends her protected complaints were a contributing factor in Axos' decision to initiate litigation against her. *Id.* at 42–43. Brinker asserts Axos does not meaningfully contest this element and argues the record permits an inference of retaliatory motive based on selective enforcement, where Brinker alleges that Axos pursued claims against employees who engaged in protected whistleblowing but not

against others who allegedly handled confidential information similarly. *Id.* By contrast, Brinker identifies non-whistleblowing employees, such as Ciafardini and Bar-Adon, who allegedly emailed confidential materials to personal accounts without comparable device inspections, demands, or threatened litigation. *Id.*; *see also* Brinker's SSOF at ¶¶ 78–79. Brinker argues the "me-too" and comparator evidence supports an inference that protected activity contributed to Axos' decision to sue. *Id.*

Drawing reasonable inferences for the nonmovant, whether protected activity was a contributing factor is best assessed with respect to each alleged adverse act.[14] Regarding Brinker's Archer access is different: she made formal HR complaints on October 2nd and 5th, emailed Cardoso and Tolla about Archer access on October 9, 2020, and that same day Cardoso directed removal of risk-assessment access "for the entire ICR team." Doc. No. 234-10 at ¶¶ 69–71. The Archer administrator specifically verified that Brinker lacked alternate access before confirming the change. Doc. Nos. 216-3 at 60–64; 234 at 27. Additionally, Brinker testifies that the restricted records related to risk assessment duties needed for her role. Doc. Nos. 239-1 at 7, ¶ 21; 241-1 at 1, ¶ 21. Given the four-day sequence plus the admin's specific check on Brinker, a reasonable juror could infer her complaints contributed, at least in part, to the Archer access change.

On termination, Brinker claims that HR closed its investigation mid-November 2020, Tolla decided to outsource ICR in the first or second week of December 2020, and termination followed January 5, 2021, yielding about two months from the October HR complaints to the outsourcing decision. Doc. No. 234-10 at 2, ¶ 3; 38–39, ¶¶ 24, 27-28. Brinker also offers statements linking outsourcing to the difficulty in remediating her findings and remediation interfering with Axos' business. *Id.* at 34–35, ¶¶ 7–9. Axos

---

[14] The Court addresses causation only with respect to the adverse actions previously identified as actionable: Brinker's termination, the Archer access restriction, and the arbitration/counterclaims under SOX; and Brinker's termination under § 1102.5.

does not directly challenge whether Brinker's protected activity was a contributing factor in her termination.  Doc. Nos. 201-1 at 34–37; 239.  Taken together, the timing and those statements are sufficient to create a genuine dispute of material fact as to whether Brinker's protected activity was a contributing factor in her termination.

For the initiation of arbitration and counterclaims, the sequence is undisputed: January 12, 2021 cease-and-desist, February 5, 2021 arbitration initiation, and later counterclaims.  Doc. No. 234-10 at 25–26, ¶¶ 86, 88, 89.  It is also undisputed that Brinker admitted being in possession of various Axos materials in her Answer.  *Id.* at 26, ¶ 90.  Brinker disputes "improper removal" and "refusal to return," asserting she had access while employed and that materials were provided to counsel and produced in discovery.  *Id.* at 25, ¶ 85; 26, ¶ 87.  Brinker also offers independent indicators of contribution: "me too" differential enforcement and testimony that the authorizing decisionmaker, Bar-Adon, could not identify specific facts or a basis for relief at initiation.  Doc. No. 239-1 at 22, ¶¶ 78–79; 21, ¶¶ 76–77; 25–29, ¶¶ 87–105; *see also* Doc. No. 241-1 at 44, ¶¶ 93–105.  Axos counters that the confidentiality basis for litigation, Brinker's possession admission, and the closure of the CFA inquiry without discipline collectively defeat any reasonable inference that the protected activity was a contributing factor.  Doc. No. 239 at 16–17.

Since the initiation of arbitration and counterclaims qualifies as an adverse action under SOX, the competing evidence in the record creates a genuine dispute as to whether Brinker's protected activity was a contributing factor to the adverse employment action, i.e., the decision to litigate.

### C. Conclusion

In sum, Brinker has established triable disputes under SOX on both the adverse-action and contributing-factor elements with respect to three categories: her January 2021 termination, the October 2020 Archer access restriction, and Axos' initiation of arbitration and counterclaims.  Under § 1102.5, the only theory that survives on both elements is Brinker's termination.  The Court therefore turns to Axos' alternative

argument—that even if Brinker has established a prima facie case, it is entitled to summary judgment under the "same-action" defense.

> iv.   Burden Shifting Analysis / Same Adverse Employment Action Defense

Axos argues that, even if Brinker could establish a prima facie case under SOX and § 1102.5, summary judgment is warranted because Axos would have taken the same actions absent any protected activity.  Doc. No. 201-1 at 37–38.  Citing the two-step framework, Axos contends the undisputed record satisfies its burden.  *Id.* (citing 49 U.S.C. § 42121(b)(2)(B)(iii)–(iv); *Murray*, 601 U.S. at 27–28, 38).

As for the CICR Meetings, Axos points to contemporaneous communications reflecting that, beginning in 2019, the combined CICR Committee limited attendees, including the exclusion of the ICR team, due to lengthy agendas and time constraints.  Doc. No. 201-1 at 38–39.  Axos asserts this attendance decision applied across the board and would have occurred regardless of any protected activity.  *Id.*  As for the failure to obtain non-ICR positions, Axos contends many of the roles Brinker pursued did not exist or never opened, so no one could have been selected.  Doc. No. 201-1 at 39–40.  For roles that did exist, Axos asserts either that Brinker declined offers or that the relevant decisionmakers lacked knowledge of any protected activity and would have made the same decisions for an otherwise identical candidate.  *Id.*

As for Access to Archer, Axos maintains that Cardoso reduced Enterprise Risk Management record permissions bank-wide, which included the entire ICR team, after recognizing overly broad access.  Doc. No. 201-1 at 40.  Axos points out that Brinker still retained access to records within her department and claims that it would have narrowed permissions irrespective of any protected activity.  *Id.*

As for outsourcing ICR department, Axos asserts the January 2021 outsourcing of ICR, and corresponding layoff of the entire ICR team, resulted from persistent staffing shortages, chronic delays, regulatory demands, cost and coverage advantages of a vendor, and industry trend in moving towards outsourcing.  Doc. No. 201-1 at 40–42.  Axos

points out that Brinker does not have any evidence that the outsourcing was actually tied to Brinker or that anyone retaliated against her.  *Id.*  Axos claims that the same outsourcing decision would have been made regardless of any employee's protected activity.  *Id.*  On this record, Axos contends no reasonable juror could find otherwise under the "clear and convincing" standard, and that its same-action defense defeats Brinker's SOX and § 1102.5 claims.  *Id.*

Brinker states that after a prima facie showing, the burden shifts to the employer to prove by clear and convincing evidence that it would have taken the same adverse action absent the protected activity.  Doc. No. 234 at 31–32.  In response to this burden, Brinker describes Axos' contentions that it outsourced the ICR function due to staffing shortages, increased workload, delays, and cost savings, with outsourcing being under consideration since 2018.  *Id.*

Brinker identifies multiple disputes of fact that she argues preclude summary judgment on this defense.  *Id.* at 32–38.  Brinker highlights the timing of the renewed outsourcing push in December 2020, weeks after HR closed its investigation into her October 2020 complaints, and the compressed timeline between initial vendor contact and contract execution, which she contends undermines Axos' assertion of independent motivation.  *Id.* at 32–34.  Brinker points to inconsistencies between testimony and documents concerning when outsourcing discussions began, what vendor quotes were presented internally, and the transfer of another ICR employee.  *Id.*  According to Brinker, these conflicts could lead a reasonable jury to conclude Axos' explanation lacks credibility.  *Id.*  Brinker further identifies alleged procedural irregularities in the approval process, including truncated review, use of outdated bid information, and failure to obtain CICR Committee approval.  *Id.* at 34–35.

Brinker also relies on evidence that Axos offered her severance conditioned on a release and a declaration disclaiming illegal or unethical conduct, arguing this is probative of retaliatory intent and inconsistent with the notion that the decision was independent of her complaints.  *Id.* at 35–36.  Finally, Brinker proffers "me-too"

evidence of other employees who allegedly raised compliance concerns and were terminated within short intervals, involving overlapping decisionmakers and similar roles. *Id.* at 36–38. Brinker maintains that such material may be considered at summary judgment so long as it can be presented in admissible form at trial. *Id.*

Brinker claims that she may rely upon a comparison with these "me too" individuals to "support an inference that retaliation was the motive" for her termination. *Id.* at 38. Further, Brinker claims that the evidence provided in its opposition shows that Axos' litigation against whistleblowing employees raises a material dispute regarding Axos' motivation sue Brinker. *Id.*

Since Brinker has made the showing that her protected activity was a contributing factor in the unfavorable personnel action alleged in the complaint, the burden shifts to the employer to show "by clear and convincing evidence" that it "would have taken the same unfavorable personnel action in the absence of " the protected activity. *Murray*, 601 U.S. at 27–28, 38; *see also* 49 U.S.C. § 42121(b)(2)(B)(ii). The question is whether the employer would have "retain[ed] an otherwise identical employee" who had not engaged in the protected activity. *Murray*, 601 U.S. at 38.

Because the Archer access restriction remains materially disputed, Axos has not carried its same-action defense burden. It is undisputed that Brinker complained to HR on October 2nd and 5th, Brinker emailed Cardoso and Tolla about Archer on October 9, later that day Cardoso directed removal of risk-assessment access "for the entire ICR team," and Brinker retained ICR-department access. Doc. No. 234-10 at 20–21, ¶¶ 69, 70, 72, 73. Cardoso attests he would have made the same change regardless. Doc. No. 207 at 2. Brinker, however, points to the administrator's contemporaneous verification focused specifically on Brinker before confirming the restriction and testifies the removed risk-assessment records access related to an ICR MRA needed for her work. Doc. Nos. 239-1 at 6–7, ¶¶ 18–23; 241-1 at 1–2, ¶¶ 18–23. Given the four-day sequence from the HR complaints, the individualized access check, and the disputed materiality,

Axos has not shown by clear and convincing evidence that it would have restricted Brinker's Archer access absent her protected activity.

For the initiation of arbitration and counterclaims predicate under SOX, Axos relies on the January 12, 2021 cease-and-desist and Brinker's Answer admission of possession.  Doc. Nos. 234-10 at 25, ¶ 86; 26–27, ¶ 90.  While Brinker responds with "me-too" differential-enforcement evidence and testimony that the authorizing decisionmaker could not identify factual bases at initiation.  Doc. No. 239-1 at 22, ¶¶ 78–79; 21, ¶¶ 76–77; 25–29, ¶¶ 87–105; *see also* Doc. No. 241-1 at 44, ¶¶ 93–105.  On this record, Axos has not shown by clear and convincing evidence that it would have pursued litigation regardless of Brinker's protected activity.

Brinker's termination presents the most substantial factual conflicts.  Axos offers pre-existing consideration of outsourcing in September 2018, evidence of 2020 performance strain with only two timely reports, December 2020 re-engagement with vendors, and Brinker's December 9, 2020 statements that bringing in Cabrera would "help address some of the issues" and that more experienced reviewers would be needed.  Doc. Nos. 234-10 at 22 ¶¶ 75–77; 23 ¶¶ 78–80; 24 ¶¶ 82–83.  Axos also cites projected cost savings and an industry trend towards outsourcing and states the entire ICR team was laid off January 5, 2021.  *Id.* at 2 ¶ 3, 5 ¶ 14, 23 ¶¶ 79–81.  Brinker responds that the vendor push restarted only in December 2020, weeks after HR closed its mid-November investigation into Brinker's October complaints, and raises disputes that call into question Axos' asserted rationale.  *Id.* at 22–23 ¶¶ 76–77.  Brinker also disputed whether outsourcing truly saved costs as there is testimony that outsourcing the ICR department ended up costing Axos 25% more than their estimated cost, *Id.* at 23 ¶ 79; whether "industry trend" applied since Cate testified larger institutions kept ICR in-house, *Id.* at 23 ¶ 80; whether the entire ICR department was laid off since Lisa Kiess was transferred in December 2020 rather than laid off, *Id.* at 23–24 ¶ 81; and whether the outsourcing process was rushed and irregular, *Id.* at 39–44 ¶¶ 27–48, 57–58 ¶¶ 101–05.  Axos counters with Tolla's declaration that he would have outsourced regardless.  *See* Doc. No.

206 at 2.  However, the timing of vendor outreach, along with the inconsistencies and irregularities the parties highlight, raises credibility disputes that cannot be resolved at summary judgment.  On this record, Axos has not met the clear-and-convincing threshold that it would have made the same outsourcing/termination decision absent protected activity.

In sum, Axos advances legitimate business explanations for each challenged action, but the record contains material disputes undermining those rationales as to Brinker's Archer access, termination, and the initiation of arbitration and counterclaims.  Because Axos has not demonstrated by clear and convincing evidence that it would have taken these actions in the absence of protected activity, its same-action defense does not warrant summary judgment.  Accordingly, Axos' summary judgment motion on the same-action defense is DENIED.

### b.  Wrongful Termination Claim

Axos argues that Brinker's common-law wrongful-termination claim is derivative of her SOX and California Labor Code claims and therefore fails for the same reasons and to the same extent.  Doc. No. 201-1 at 42–43.  Brinker claims that her wrongful termination claim under California's common law must survive summary judgment, as it is derivative of her Labor Code claims.  Doc. No. 234 at 45.

California recognizes a wrongful termination claim where a discharge contravenes fundamental public policy embodied in statute.  *Tameny v. Atl. Richfield Co.*, 27 Cal. 3d 167, 170 (1980) ("[T]he relevant authorities both in California and throughout the country establish that when an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions.").  Both sides treated the common law claim as tied to the same facts and arguments raised under the statutory retaliation claim.  Doc. Nos. 201-1 at 42–43; 234 at 45.  On this record, three retaliation theories survive: (1) termination, (2) Archer access restriction, and (3) the initiation of arbitration and counterclaims under SOX.  *See supra* Section III.C.2.a.iii.  To the extent

those statutory theories proceed to trial, the common law wrongful termination claim necessarily does as well. *See*, *e.g.*, *Noone v. Hitachi Rail STS USA, Inc.*, No. 8:24-CV-00313-FWS-KES, 2025 WL 1118581, at *7 (C.D. Cal. Feb. 25, 2025) ("Because the court finds Plaintiff's § 1102.5 claim survives, Plaintiff's corresponding claim for wrongful termination survives as well."). Because the wrongful termination claim rests on the same three retaliation theories proceeding under SOX and § 1102.5, summary judgment is not appropriate. Accordingly, Axos' motion as to the wrongful termination claim is therefore DENIED.

### c. Equal Pay Act Claim

Axos contends Brinker's EPA claim fails because any wage differential was driven by gender-neutral, bona fide factors. Doc. No. 201-1 at 43. Axos notes that Cal. Lab. Code § 1197.5 prohibits unequal pay for "substantially similar work" but permits differentials based on a bona fide factor other than sex, e.g., education, training, or experience. *Id.* Under the two-step framework, Axos acknowledges Brinker must first establish that the employer paid different wages to employees doing substantially similar work under substantially similar conditions based on gender. *Id.* Axos argues Brinker's Equal Pay Act claim fails because the only pleaded comparator is Anthony Maniscalco, and any pay differential is explained by bona fide, gender-neutral factors. *Id.* at 43–46. Axos asserts that Brinker cannot present any evidence demonstrating that Axos' decision on Maniscalco's pay and Brinker's pay was based on gender. *Id.* at 46.

Brinker argues summary judgment is improper on her EPA claim because she has made a prima facie showing of a wage disparity for substantially similar work and Axos has not met its burden on any statutory defense. Doc. No. 234 at 45–47. Brinker notes that once she shows unequal pay for substantially similar work, the burden shifts to Axos to prove one of the Act's limited exceptions, such as seniority, merit, a system measuring quantity/quality of production, or a bona fide factor other than race/ethnicity/sex that is job-related and consistent with business necessity and for which no less discriminatory alternative exists. *Id.* at 45–46.

Brinker points out Axos concedes she and Maniscalco performed substantially similar ICR work and that he received a higher hourly rate. *Id.* at 46–47. Axos attributes the difference to Maniscalco's greater experience, whereas Brinker responds that the record permits a contrary inference since both were hired under the same Senior ICR requisition with an $80,000 annualized salary cap. *Id.*

Axos seeks summary judgment on the EPA claim on the theory that any wage rate differential between Brinker and Maniscalco was driven by a bona fide factor other than sex, principally his substantially greater experience and prior leadership in credit review. Doc. No. 201-1 at 43–46. On the current record, it is undisputed that the parties identify a specific comparator performing substantially similar Senior ICR Officer work under similar conditions. Doc. No. 234-10 at 28, ¶ 96. Brinker was salaried at $80,000 beginning October 1, 2018, *Id.* at ¶ 94, and Maniscalco was rehired in November 2018 on a part-time basis at $65/hour, *Id.* at ¶¶ 95–96. Axos does not meaningfully dispute the "substantially similar work" element and acknowledges the higher hourly rate. *See* Doc. No. 201-1 at 43–46. The analysis therefore turns on Axos' statutory defense under Labor Code § 1197.5(b). As *Rizo v. Yovino* confirms, the employer bears the burden to prove that its proffered factor actually explains the wage differential, is job-related and consistent with business necessity, and that no alternative practice would serve the same purpose. 950 F.3d 1217, 1222–32 (9th Cir. 2020); *see also* § 1197.5(b)(1)(D), (b)(3). Prior salary cannot, by itself, justify a gap. *Id.* at 1230–31.

Axos points to undisputed background showing Maniscalco is more than twenty years senior to Brinker and, by 1993, had already served as a Navy lieutenant and held VP/SVP/EVP/Chief Credit Officer roles at commercial lenders. Doc. Nos. 201-1 at 43–46; 234-10 at 28, ¶¶ 92–93, 97–102. Axos also noted that he previously served at Axos as First Vice President – Independent Credit Review in 2017 at $150,000, tasked with leading ICR. *Id.* It contrasts Brinker's resume and a pre-Axos five-year employment gap reflected in 2016–17 family-law filings describing "outdated" skills and $70–$75k earning capacity. Doc. No. 234-10 at 30, ¶¶ 103–05.

Brinker argues that some of this material in the 2016–17 family-law filings were not available when rates were set, so it cannot establish the actual basis for the differential.  Doc. No. 234 at 45–47.  Brinker also maintains that Maniscalco's 2017 supervisory scope was modest by supervising one colleague.  Doc. No. 234-10 at 28, ¶ 93.  Brinker claims that Tolla's stated rationale for the $65/hour figure was not by "experience" but by converting the same $80,000 annualized compensation to a part-time schedule and getting Maniscalco "close to the hourly rate" he previously earned at Axos.  *See* Doc. No. 234 at 45–47.  On that showing, whether experience and market/retention actually drove the rate, as opposed to a prohibited reliance on prior salary or a simple part-time annualization, is a triable dispute.  *See Rizo*, 950 F.3d at 1222, 1230–32 (prior salary alone cannot justify a differential; the employer must prove the asserted factor in fact explains the gap); *Allen v. Staples, Inc.*, 84 Cal. App. 5th 188, 195 (2022) (rejecting a defense that lacked specific, contemporaneously applied factors used to set pay).

Axos' experience narrative is substantial and, if credited, could support a finding that a higher rate for Maniscalco was job-related and consistent with business needs.  However, viewing the evidence in the light most favorable to Brinker, there is a material dispute over what Tolla actually considered when he set Maniscalco's hourly rate, whether the proffered factors establish business necessity with no viable alternative, and whether the explanation ultimately boils down to prior pay or a part-time conversion with no documented, gender-neutral basis.  That evidentiary conflict precludes summary judgment on liability under the EPA claim.

As it relates to whether damages should be limited to those incurred after July 6, 2020, it is undisputed that Brinker first asserted an EPA claim in her FAC on July 7, 2022.  *Compare* Doc. No. 1, *with* Doc. No. 4.  Absent proof of a willful violation, any backpay is limited to two years prior to filing.  *See* Cal. Lab. Code § 1197.5(i) ("A civil action to recover wages under subdivision (a) or (b) may be commenced no later than two years after the cause of action occurs, except that a cause of action arising out of a willful violation may be commenced no later than three years after the cause of action occurs.");

-78-                    22-cv-0386-MMA (DDL)

*O'Donnell v. Vencor Inc.*, 465 F.3d 1063, 1068–69 (9th Cir. 2006) ("[A]lthough the EPA violations may have been continuing, the continuing violation doctrine does not permit O'Donnell to recover back pay for discriminatory pay periods outside the applicable statute of limitations period."). Axos argues willfulness was not pleaded. Doc. No. 201-1 at 46–47. Brinker dose not respond to this argument. Doc. No. 234 at 45–47; *see also* Doc. No. 239 at 8. On this record, any potential recovery is limited to pay periods on or after approximately July 7, 2020, while disputed issues of fact regarding liability under the EPA remain for trial.

### d. UCL Claim

Axos seeks summary judgment on Brinker's UCL claim on the ground it is entirely derivative of the EPA claim. Doc. No. 201-1 at 47. Citing the principle that a UCL claim "stands or falls" with its predicate violation, Axos argues that Brinker's unlawful UCL claim necessarily fails wherever her EPA claim fails. *Id.* Axos further contends that Brinker fails to provide any additional bases for her UCL claim. *Id.* Brinker does not respond to this argument in her opposition. Doc. No. 234.

Because Brinker's UCL cause of action is pled as entirely derivative of her EPA theory, *see* Doc. No. 44 at 34–35, 37–38, Axos is not entitled to summary judgment. *See Portelli v. WWS Acquisition, LLC*, Case No. 17-cv-2367 DMS-BLM, 2018 WL 9539773, at *10 (S.D. Cal. July 6, 2018) ("A UCL claim 'stands or falls depending on the fate of antecedent substantive causes of action.' […] Plaintiff's UCL claim under the unlawful prong is premised on his FAL and CLRA claims. Because these claims fail, his UCL claim premised on the unlawful prong likewise fails, and is therefore, dismissed."). Accordingly, since Axos advances no additional argument for summary judgment on Brinker's UCL claim apart from its challenge to the underlying EPA theory, Doc. No. 201-1 at 47, and the EPA claim survives in part, the derivative UCL claim likewise survives to that same extent. Therefore, Axos' summary judgment motion on Brinker's UCL cause of action is DENIED.

### 3. Brinker's Motion for Summary Judgment

Brinker moves for summary judgment on each of Axos' Counterclaims.  Doc. No. 202-1 at 11–38.  The Court will address each cause of action in turn.

### a. Uniform Trade Secrets Act Displacement

The Court first addresses Brinker's argument concerning California's Uniform Trade Secrets Act ("CUTSA").  Doc. No. 202-1 at 11–18.  Brinker now argues that CUTSA displaces Axos' common law tort claims (Count II–Count V: conversion, trespass to chattels, breach of the duty of loyalty, and negligence).  *Id.* at 11.

Under CUTSA, a party may recover for the "actual loss" or other injury caused by the misappropriation of trade secrets.  Cal. Civ. Code § 3426.3.  CUTSA defines misappropriation as (1) the improper acquisition of a trade secret or (2) the non-consensual disclosure or use of a trade secret.  Cal. Civ. Code § 3426.1(b).  A "trade secret" is information that derives "independent economic value" from its confidentiality and is subject to "efforts that are reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).  "CUTSA provides the exclusive civil remedy for conduct falling within its terms."  *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 236 (2010), disapproved on other grounds by *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 337 (2011).

Because CUTSA provides an exclusive remedy, courts have reasoned it displaces common law tort claims in two circumstances.  First, CUTSA displaces claims that are "based on the same nucleus of facts as the misappropriation of trade secrets claim for relief."  *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.*, 171 Cal. App. 4th 939, 958 (2009).  Stated differently, CUTSA displaces tort claims where they "do not genuinely allege 'alternative legal theories' but are a transparent attempt to evade the strictures of CUTSA by restating a trade secrets claim as something else."  *Silvaco*, 184 Cal. App. 4th at 240; *see also K.C. Multimedia*, 171 Cal. App. 4th at 960–92 (concluding CUTSA displaced breach of confidence, interference with contract, and unfair competition claims).

Second, CUTSA displaces "all claims premised on the wrongful taking and use of confidential business and proprietary information, even if that information does not meet the statutory definition of a trade secret." *ChromaDex, Inc. v. Elysium Health, Inc.*, 369 F. Supp. 3d 983, 989 (C.D. Cal. 2019); *accord Copart, Inc. v. Sparta Consulting, Inc.*, 277 F. Supp. 3d 1127, 1158 (E.D. Cal. 2017); *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 987 (C.D. Cal. 2011). Afterall, a "prime purpose" of the Uniform Trade Secrets Act "was to sweep away the adopting states' bewildering web of rules and rationales and replace it with a uniform set of principles for determining when one is— and is not—liable for acquiring, disclosing, or using 'information ... of value.'" *Silvaco*, 184 Cal. App. 4th at 239 n.22. "Information that does not fit" the definition of a trade secret, "and is not otherwise made property by some provision of positive law, belongs to no one, and cannot be converted or stolen." *Id.* Hence, "if the basis of the alleged property right is in essence that the information [...] is 'not [...] generally known to the public,' then the claim is sufficiently close to a trade secret claim that it should be superseded notwithstanding the fact that the information fails to meet the definition of a trade secret." *SunPower Corp. v. SolarCity Corp.*, No. 12-CV-00694-LHK, 2012 WL 6160472, at *5 (N.D. Cal. Dec. 11, 2012) (citing Cal. Civ. Code § 3426.1(d)(1)).

Axos' tort claims implicate these principles. Axos does not plead a trade secrets misappropriation claim; yet the gravamen of Axos' tort claims is that Brinker wrongfully accessed and took its confidential and proprietary information. *See* Doc. No. 50 ("Axos' CC") at ¶¶28, 29, 32, 35, 36, 37, 38, 41, 42, 43, 47, 48. Indeed, the Axos repeatedly uses the terms "misappropriate" and "misappropriation" in its counterclaims. *Id.* at ¶¶ 12, 14, 15, 36, 38, 43, 47, 48. By not pleading a trade secrets misappropriation claim, Axos sidesteps CUTSA's requirements, including proving that the information rises to the level of a protectable trade secret. *See* Cal. Civ. Code § 3426.1(d).

Brinker points to Axos' interrogatory response identifying the "property" as documents containing "confidential and proprietary information," specifically "customers' names, social security numbers, [and] individuals' account statements."

Doc. No. 203 at 178–82, Exhibit 23; Brinker's SSOF No. 58.  Brinker also notes that the Confidentiality Agreement labels broad categories, business plans, processes, "customer information (lists and preferences)," personnel information, and "Trade Secrets." Brinker's SSOF Nos. 7–8.  On that record, Brinker contends that Axos' tort claims are preempted because the asserted value of the documents is their informational content. *See* Doc. No. 202-1 at 12–18.

Axos demonstrates that at least some of the allegations underlying its tort claims are distinguishable.  Axos relies on *Erhart*, which held CUTSA displaces tort theories aimed at generic "confidential/proprietary" business information but does not displace claims tied to customer or employee non-public personal information, which are treated as more akin to data-breach safeguarding than a restated trade-secret claim.  612 F. Supp. 3d at 1117–20.  Axos still seeks to impose liability on Brinker as it seeks to fulfill its duty to safeguard its customers' non-public personal information, not merely impose liability for Brinker's wrongful taking of information from Axos.  *See* Doc. No. 230 at 20–21. Axos cites its Interrogatory No. 12 response describing non-public personal information categories and record examples showing removal or personal-email transmission of documents containing such data, Doc. No. 203 at 178–82 ("King Decl."), Exhibit 23. Additionally, Axos cites to evidence of Brinker emailing to her personal account or otherwise removing from Axos' system, documents containing this same type of highly confidential and non-public information about Axos' business counterparties and customers.  *See*, *e.g.*, Doc. Nos. 230-11 at 5–6, Exh. C ("Q. Okay Ms. Brinker, when you were working at the bank, you had access to confidential information, correct? A. Yes. Q. And this would include confidential customer information? A. Yes. … Q. Were you allowed to transmit confidential information on your personal email? A. Was I allowed to? I – I guess no."); 230-19 at 1–3, Exh. K; 230-21 at 3–4, Exh. M (Brinker admitting to opening and saving information that Axos claims is confidential on her personal computer); 230-24 at 5, Exh. P ("RFA: Admit that YOU have documents in YOUR possession, custody or control that contain information about Axos' customers. . . . A:

Admit"); 251-1 at 33, Exh. F; 251-1 at 82, Exh. L.  And there is a factual dispute as to whether he had permission to retain any confidential information / documents.  *See* Doc. Nos. 230 at 26 ("[Brinker] further admits that Axos never gave her any consent, permission, approval or authorization to retain any Confidential Information in her possession, custody or control.") (citing Plocky Decl., ¶ 18, Exh. P, RFA 6); 230-11 at 5–6, Exh. C.

In light of this conduct, Axos argues that CUTSA does not displace its tort claims that pursue Brinker for the damages it incurred to recover this sensitive information and prevent unauthorized disclosures.  Axos maintains that it has an affirmative and continuing duty to safeguard its customers' non-public personal information.  Doc. No. 230 at 20.  Axos contends that its common law tort claims are not displaced by CUTSA because it does not seek to merely impose liability for Brinker's wrongful taking of information from Axos, but rather seek to fulfill its duty to safeguard its customers' non-public personal information.  *Id.*  The Court finds this argument persuasive.  Additionally, the Court finds that *Erhart*, 612 F. Supp. 3d at 1119, is also informative on this subject.

Similar to *Erhart*, Axos also has an obligation to protect the nonpublic personal information of its customers.  Viewed this way, Axos allegations regarding Brinker's unauthorized taking of customer financial information resemble a data breach claim rather than either a trade secrets claim, *see K.C. Multimedia*, 171 Cal. App. 4th at 958, or a "claim premised on the wrongful taking and use of confidential business and proprietary information," *see ChromaDex*, 369 F. Supp. 3d at 989.  Likewise, Axos' allegation that Brinker took nonpublic personal information of customers and counterparties is distinguishable.  *See* Axos' CC at ¶¶ 12, 13, 16, 30.  For CUTSA displacement, the Court finds there is a meaningful distinction between Axos' efforts to safeguard this information, as compared to Axos' efforts to impose liability on Brinker for wrongfully "taking of Axos' Confidential Customer Information."  *See* Axos' CC at ¶¶ 13, 48; *Cf. CTC Real Estate Servs. v. Lepe*, 140 Cal. App. 4th 856, 860 (2006) (noting

that one's personal identifying information "is a valuable asset" because its misuse "can have serious consequences to that person" and it can be the object of theft).

Given this blended result, the Court finds CUTSA displaces portions of Axos' common law tort claims.  To the extent that Axos seeks to impose liability on Brinker for taking and misusing its confidential and proprietary business information, the Court finds CUTSA displaces Axos' tort claims.  *See ChromaDex*, 369 F. Supp. 3d at 989; *see also Silvaco*, 184 Cal. App. 4th at 239 n.22.  It would defeat the purpose of CUTSA to allow Axos to maintain claims based on these allegations.  *See Silvaco*, 184 Cal. App. 4th at 239 n.22.

Additionally, the summary-judgment record contains evidence that at least some of the materials at issue included non-public personal customer information and that Brinker removed or transmitted such materials.  Viewing the evidence in the light most favorable to Axos, the Court finds CUTSA does not displace Axos' tort claims with respect to its allegation that Brinker misappropriated, disclosed and/or took Axos' confidential customer information.  *See Copart*, 277 F. Supp. 3d at 1160 (summarily adjudicating portions of claims based on CUTSA displacement but concluding the claims survived for trial to the extent that they relied on other conduct).

Accordingly, to the extent that Axos' tort claims seek to impose liability on Brinker for taking information, the Court will restrict Axos' tort counterclaims (conversion, trespass to chattels, breach of duty of loyalty, negligence) at trial to only those allegations involving its customers' and employees' nonpublic personal information.  Thus, the Court GRANTS IN PART Brinker's request for summary judgment on Axos' tort claims.

### b. Axos is Unable to Prove All Required Elements of the Tort Claims

Even if the Court finds that CUTSA does not displace the counterclaims above, Brinker argues that its conversion and trespass to chattels claims fail because Axos is unable to prove all required elements for those claims.  Doc. No. 202-1 at 18.

///

-84-                                          22-cv-0386-MMA (DDL)

i.   Conversion

Brinker maintains that Axos cannot show the second and third elements of a conversion claim, that the defendant's conversion by a wrongful act/disposition of property rights and damages. *Id.* at 18–19. Brinker claims that she has not disposed of, destroyed, or excluded Axos from use of its property because Plaintiff only took documents containing copies of information from Axos, which never lost access to its copies of the information. *Id.* at 19. Brinker points out that Axos even admits that it was never deprived of access to any of the information contained within the files or data allegedly taken by her, which Brinker claims is fatal. *Id.* Brinker also contends that Axos cannot meet the third element as well, since it cannot prove damages. *Id.*

Axos responds, arguing that possession of "copies" of information does not end the conversion analysis, as the inquiry also considers the nature of the information, the parties' relationship, how the information was obtained, and how it was used. Doc. No. 230 at 22–23. Axos claims that non-public personal information of its customers may properly serve as a basis for a conversion claim, despite the fact that only copies of such information was converted. *Id.* at 23–24. Axos contends that Brinker has effectively deprived Axos of the right to control access to this highly sensitive information, which it has an affirmative duty to safeguard, and fails to cite any cases that involve highly sensitive non-public information. *Id.* at 24. Axos claims that it was damaged due to the investigation and did bring the right claim to recover confidential information. *Id.* at 24–25.

Conversion requires (1) Axos' ownership or right to immediate possession, (2) a wrongful exercise of dominion or disposition of property rights by Brinker, and (3) damages. *See Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015). California recognizes conversion of certain intangible interests, including payment credentials and other uniquely identifying data, when the defendant's conduct deprives the plaintiff of control over the thing converted. *See Welco Elecs., Inc. v. Mora*, 223 Cal. App. 4th 202, 210–12 (2014) ("[I]f the law of conversion can be adapted to particular types of intangible

property and will not displace other, more suitable law, it may be appropriate to do so.") (collecting authorities); *In re Easysaver Rewards Litig.*, 737 F. Supp. 2d 1159, 1180 (S.D. Cal. 2010) (holding that plaintiffs stated a conversion claim based on misappropriation of debit card/PayPal information, an intangible property interest akin to a check, which could be used to withdraw funds from their accounts); *cf. People v. Kwok*, 63 Cal. App. 4th 1236, 1248–50 (1998) ("Making an unauthorized copy of a 'borrowed' key, which is analogous to making an unauthorized copy of a trade secret or an unauthorized copy of computer data, destroys the 'intangible benefit and prerogative' of being able to control access to one's residence just as thoroughly as outright theft of the key itself.").

The Court limits its analysis to the second and third elements of conversion, as Brinker contests only wrongful act or disposition of property rights and damages, and does not dispute the first element of ownership or right to possession.  Doc. No. 202-1 at 18–20.

On the second element, Brinker emphasizes Axos' admissions that it was never deprived of access, where Brinker "merely took copies," and argues copying cannot support conversion since she has not disposed of, destroyed, or excluded Axos from use of its property.  Doc. Nos. 202-1 at 19; 230-3 at 11 ¶ 32, 14 ¶¶ 44–45.  Axos maintains that the wrongful act here is the loss of control over sensitive non-public personal information, not whether it retained a copy, and points to evidence of transmission through non-secure channels to show interference with its rights.[15]  On this record, given

---

[15] *See* Doc. Nos. 230 at 22–25; 230-1 at ¶¶ 4–6 ("Brinker did not have unlimited access and authority to view all information at Axos in her capacity as a Senior ICR Officer. She would have needed to obtain authority from her supervisor, Manuel Cardoso, to access certain information. […] Brinker did not have authority to take home information in hard copy form. […] I did not know that Brinker was taking hard copy documents home. I did not authorize Brinker to take hard copy documents home, and I would not have authorized such conduct."); 230-2 at ¶ 4 ("I did not know that Brinker was taking hard copy documents home. I did not authorize Brinker to take hard copy documents home, and I would not have authorized such conduct."); 230-8 at ¶¶ 13 (230-19, Exhibit K) (Cardoso sent to Brinker an email stating "please 'do not' send Bank document to your gmail or other personal email account. This is sensitive bank information to only be share internally or externally only regulators or auditors through bank accepted secured communication channels. Thanks."); ¶ 12 (230-18, Exhibit J) (Brinker's responds to

the specific character of the data and the manner of removal/transmission, a jury could find that Brinker converted non-public personal information of Axos' customers and employees by interfering with Axos' control over access to non-public personal information, despite Axos' retaining access.  *See Erhart*, 612 F. Supp. 3d at 1123–24; *Kwok*, 63 Cal. App. 4th at 1249–51.  Accordingly, the second element of wrongful disposition or interference is met.

As for the third element, Brinker argues Axos cannot prove damages.  Doc. Nos. 202-1 at 19–20; 233 at 12–14.[16]  Brinker points to Axos' testimony that its systems were not impaired and its continued access to all information, and challenges Axos' claimed damages, i.e. forensic/vendor costs, internal time, and reputation/goodwill, as well as expert proof.  Doc. No. 230-3 at 14 ¶¶ 44–46, 63–69.  Axos identifies damages consisting of sums paid or to be paid to a digital forensics vendor, internal labor to investigate / mitigate, and reputation/goodwill injuries.  Doc. No. 230 at 24–25, 40–41; *see also* Doc. Nos. 203 at 168–93 (Exhibit 23), 194–213 (Exhibit 24); 230-8 at ¶¶ 19 (251-1 at 120, Exhibit Q), 20 (230-26, Exhibit R), 21 (230-27, Exhibit S).  Remedies for conversion include recovery of the property with damages for its detention, damages based on its value at the time of conversion plus interest, and reasonable expenses incurred in pursuing or recovering the property.  *See Trowbridge Sidoti LLP v. Taylor*, No. 8:16-CV-00771-ODW-SK, 2018 WL 2670656, at *3 (C.D. Cal. June 4, 2018) ("In California, [a]vailable remedies for conversion include specific recovery of property with damages for its detention and damages based on the value of the property. […] A plaintiff also has the option to recover damages for the value of the property at the time of conversion plus

Axos' Amended Requests for Admissions, Set One, admitting that Brinker opened information that Axos claims is Confidential on her personal computer and that she opened information that Axos claims is Confidential on non-Axos e-mail accounts or servers); ¶ 18 (230-24, Exhibit P) (same).

[16] In her reply, Brinker requests the Court to take judicial notice of certain filings with the Securities and Exchange Commission.  Doc. No. 233-3.  Importantly, a court may take judicial notice of SEC filings. *Hammitt v. Lumber Liquidators, Inc.*, 19 F. Supp. 3d 989, 1004 (S.D. Cal. 2014).  Accordingly, the Court GRANTS Brinker's request for judicial notice.

interest and the expense of pursuing the property.") (quotations omitted); *Flores v. Dep't of Corr. & Rehab.*, 224 Cal. App. 4th 199, 206 (2014) ("Available remedies for conversion include specific recovery of property with damages for its detention and damages based on the value of the property."); *Allstate Leasing Corp. v. Smith*, 238 Cal. App. 2d 128, 132 (1965) ("Allstate's remedies include specific recovery of the property, or its present value, plus damages for the period of its detention […]; or damages for the value of the property at the time of conversion plus interest and the expense of pursuing the property."). While Brinker raises additional points in reply, i.e. that any injury accrues to customers rather than Axos and that Axos' annual reports disclaim goodwill impairment, those appear new and, if so, can be noted and disregarded at summary judgment. *See* Doc. No. 233 at 12–14; *see also Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

On the present record, in the light most favorable to Axos, a jury could find some amount of damages tied to investigation, retrieval, and mitigation of non-public personal information dissemination, though the ultimate scope is narrowed by the Court's *Daubert* ruling above, *See* Section III.A.2. *See Erhart*, 612 F. Supp. 3d at 1123–24; *see also Haines v. Parra*, 193 Cal. App. 3d 1553, 1559 (Ct. App. 1987) ("Haines may be able to demonstrate that he did properly expend some time and money in pursuit of the converted property for which he is entitled to a fair compensation. [ ] To entitle a party to such compensation the [evidence] should tend to show that money was properly paid out and time properly lost in pursuit of the property, and how much." […] Such evidence should be definite and certain. […] Expenses incurred in preparation for litigation and not in pursuit of property cannot be allowed as damages.") (quotations omitted).

Accordingly, the Court GRANTS Brinker's motion for summary judgment on Axos' conversion claim to the extent that the claim is premised on her retention of broad "confidential" business materials or duplicate copies without interference with Axos' control. The Court DENIES the motion to the extent the claim is confined to the

conversion of Axos' customers' and employees' non-public personal information. *See Erhart*, 612 F. Supp. 3d at 1123–24 (limiting conversion to customer NPPI).

ii.     <u>Trespass to Chattels</u>

To prove that it was injured, Brinker states that Axos must show that she misappropriated of confidential information in a way that interfered with the "physical condition, quality, or value of the property, or deprive[d] [Axos] of its use for a substantial time." Doc. No. 202-1 at 20. Brinker maintains that this claim necessarily fails because Axos has admitted in sworn responses that neither type of harm occurred. *Id.* at 21. Brinker states that since Axos acknowledges the information was unharmed and it always retained access to the files, there is "no actionable injury" sufficient to maintain this cause of action. *Id.* Brinker notes that Axos alleges harm to itself and its affiliates, but identifies only investigation/remediation costs and reputational harm, which Brinker argues does not support trespass to chattels. *Id.* at 22. Brinker argues Axos' asserted injuries, including internal costs to identify, investigate, remediate, and assess the alleged misuse, are not cognizable trespass-to-chattels injuries because they do not directly affect possession, use, or the condition, quality, or value of any property. *Id.* at 23–24. Brinker notes that Axos alleges no damage to its computer systems, no impairment of system functioning, and no substantial deprivation of use, and contends nominal damages cannot sustain the claim. *Id.*

Axos argues that all conversions were understood to encompass trespasses to chattels. Doc. No. 230 at 25. Axos contends that it is therefore appropriate that courts treat trespass to chattels claims as embracing intangible property interests, since California law has expanded the original boundaries of conversion claims. *Id.* Axos maintains that as a result, given that its conversion claim survives summary judgment, so too, should its trespass to chattels claim. *Id.*

Trespass to chattels requires an intentional interference with possession of personal property that proximately causes injury, i.e. impairment to the property's condition, quality, or value, or a substantial deprivation of use; privacy or confidentiality injuries

alone do not suffice. *See Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1350–53 (2003); *Casillas v. Berkshire Hathaway Homestate Ins. Co.*, 79 Cal. App. 5th 755, 765 (2022) ("Because the copying did not affect the files or appellants' ability to use them, it caused no actionable injury to their asserted property interests. […] We reject appellants' reliance on their interests in privacy and confidentiality. As noted, Intel implied that trespass to chattels would not lie to protect interests in privacy."); *see also Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1087–89 (N.D. Cal. 2023) (dismissing trespass where tracking cookies did not impair device functionality); *Id.* at 1088 ("Here, […] there are no allegations that any functionality inherent in their computing devices has been impacted by Meta's conduct."); *123 Los Robles LLC v. Metzler*, No. 2:17-CV-00392-RGK-SK, 2017 WL 10311210, at *5 (C.D. Cal. Aug. 14, 2017) ("Plaintiff's interest in the confidentiality of its financial information is not the type of possessory interest protected by the tort of trespass to chattels.")

Here, it is undisputed that Axos admitted that it was never deprived of access because Brinker "merely took copies" and that no Axos computer systems were damaged or impaired. Doc. No. 230-3 at 11 ¶ 32; 14 ¶¶ 44–45. Axos' pleading frames the interference as the "misappropriating [of] … Confidential Customer Information" and an "impair[ment]" to the security of that information. Doc. No. 50 at 36. In other words, a harm based solely on loss of confidentiality, not on any functional impairment or meaningful loss of use. And the damages Axos identifies—digital forensics fees, internal labor, and reputation/goodwill—do not, without evidence of impaired system condition, quality, or value or of a substantial loss of use, create a triable issue on the injury element. Doc. Nos 230 at 40–41; 230-3 at 14–15 ¶ 46, 20–22 ¶¶ 63–69, 23 ¶ 73; *see also Hamidi*, 30 Cal. 4th at 1350–51, 1358–59; *Doe v. Meta*, 690 F. Supp. 3d at 1087–88; *Hiossen, Inc. v. Kim*, 2016 WL 10987365, at *10–11 (C.D. Cal. Aug. 17, 2016) (no trespass absent showing the system "actually did, or threatened to, interfere with the intended functioning of the system."). The fact that the conversion claim survives does not mean trespass necessarily follows. As indicated above, conversion can lie for certain

intangible interests or copies in limited circumstances, but trespass still demands functional impairment or substantial deprivation, which Axos has not shown.  On this record, there is no genuine dispute of material fact on injury under *Hamidi*.  Accordingly, the Court GRANTS Brinker's motion for summary judgment on Axos' trespass to chattels claim.

### c.  California Penal Code § 496

Brinker notes that Penal Code § 496(a) imposes liability on persons "who . . . conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained."  Doc. No. 202-1 at 24.  Brinker contends that Axos does not allege that she stole its confidential data and does not claim that she falsely or fraudulently appropriated the confidential information.  *Id.* at 24–25.  Brinker points out that Axos knew by 2019 that she had emailed confidential information to her personal account, taking no action, and Tolla also helped her leave with two boxes of hard-copy documents.  *Id.*  Brinker argues that Axos' claim fails for lack of "actual damages," noting that § 496(c) permits recovery only of compensatory damages and those damages must be proven to exist now or be reasonably certain to occur, not nominal, exemplary, or speculative.  *Id.* at 25.  Thus, Brinker contends that Axos' claim fails as it is unable to establish any actual damages.  *Id.*

Axos argues that there is no requirement that a complaint specifically use the word "stole" when alleging a §496 claim as Brinker asserts.  Doc. No. 230 at 25–26.  Axos' claim tracks that language of the statute.  *Id.* at 26.  Additionally, Axos maintains that there is substantial evidence that Brinker did conceal and withhold confidential information.  *Id.*  Axos' contends that Brinker did admit that she possesses Axos materials, including policies and guidelines, OCC review information, Credit Authorization Memoranda, Credit Investment Reviews, ICR Process Reviews, and Independent Credit Review Management Committee minutes.  *Id.*  Axos also claims that Brinker admits that it never authorized her to retain any confidential information.  *Id.*  Further, Axos argues that it did not learn the scope of her retention until litigation

revealed thousands of pages of confidential documents, which Axos contends effectively circumvented discovery and encouraged wrongful conduct. *Id.* Axos states that Brinker's claim that Axos knew she was sending confidential information and Tolla helped carry Brinker's boxes that had documents are material disputed facts. *Id.* at 27. Axos also disputes Brinker's assertion that it suffered no damages. *Id.*

Section 496 creates civil liability where a defendant "buys or receives" property "that has been stolen or that has been obtained in any manner constituting theft," or "conceals, sells, [or] withholds" such property "from the owner," provided the defendant acts "knowing the property to be so stolen or obtained." Cal. Pen. Code § 496(a), (c); *Bell v. Feibush*, 212 Cal. App. 4th 1041, 1046, 1048–49 (2013) (principal thief may be liable; no criminal conviction required). Courts recognize that theft for § 496 purposes includes theft by conversion or false pretenses and that the same conduct supporting a conversion theory can also satisfy § 496, especially under the "conceal or withhold" prong. *See Barrett v. Apple Inc.*, 2022 WL 2119131, at *5–6 (N.D. Cal. June 13, 2022) (collecting authorities and permitting § 496 claim on withholding theory); *see also Matthews v. Apple, Inc.*, 769 F. Supp. 3d 999, 1012–13 (N.D. Cal. 2024) (finding that earlier cases held property obtained by false pretenses was not stolen property under § 496(c), but California law already recognizes that it is); *Bell*, 212 Cal. App. 4th at 1048–49. While some courts are split on whether the property must already be "stolen" when received, concealment or withholding after it becomes "stolen or obtained" is still actionable. *See Barrett*, 2022 WL 2119131, at *5–6 ("Receipt of stolen property, however, is not the only way to violate section 496(a)—concealing or withholding stolen property is also actionable.").

On this record, Axos offers evidence that Brinker retained and used bank documents outside approved channels and without authorization. Brinker admits post-separation possession of Axos policies and guidelines, OCC review information, Credit Authorization Memoranda, Credit Investment Reviews, ICR Process Reviews, and Independent Credit Review Management Committee minutes. Doc. Nos. 54 at ¶ 11; 230-

3 at 4–6 ¶¶ 6–8.  Brinker also admits Axos never gave her consent to retain "Confidential Information."  Doc. No. 230-8 at ¶ 18 (230-24, Exhibit P) (admitting that Axos never gave Brinker any consent, permission, approval or authorization to retain or remove any confidential information).  Axos identifies documents she sent to a personal Gmail account and hard-copy materials removed when she left and Axos points to an instruction not to email bank materials to personal accounts.  Doc. No. 230-8 at ¶¶ 10 (251-1 at 49–81), 13 (230-19, Exhibit K) (Cardoso sent to Brinker: "please 'do not' send Bank document to your gmail or other personal email account. This is sensitive bank information to only be share internally or externally only regulators or auditors through bank accepted secured communication channels. Thanks."); 251-1 at 122–66, Exhibit T.  Axos also proffers discovery responses describing the contents as customers' names, Social Security numbers, account statements, and financial statements—i.e., non-public personal information.  Doc. No. 203 at 168–93, Exhibit 23.

A reasonable jury could read those facts to mean that Brinker knew she was holding onto Axos' property, taken in a way that qualifies as theft under § 484,[17] and that she was keeping it back or concealing it from the bank.  *See Matthews v. Apple, Inc.*, 769 F. Supp. 3d at 1012–13 ("Mathews alleges that Apple violated section 496 not by obtaining his property through false pretense but rather by withholding his property, which Apple knew to be stolen. By the plain meaning of the statute, the alleged conduct amounts to a violation."); *Barrett*, 2022 WL 2119131, at *6–7 ("Plaintiffs have pled direct knowledge[.] […]  Plaintiffs have also pled indirect suspicious circumstances[.] […] and that Apple nevertheless informed [plaintiffs] that there was nothing it could do for them despite those Plaintiffs' prompt notification of the theft. […] [T]he Court finds that [plaintiffs] have adequately pled a claim for concealing or withholding stolen

---

[17] Section 496(a) extends to property "that has been obtained in any manner constituting theft."  Penal Code § 484 describes acts constituting theft.

property under section 496(a)."); *Bell*, 212 Cal. App. 4th at 1049 (liability for withholding property when the owner asks for it back).  Brinker contends Axos knew she was emailing documents to herself in 2019 and that a supervisor helped carry boxes to her car, undermining any inference of concealment.  Doc. No. 202-1 at 24–25.  Brinker counters with testimony that she sent or retained documents only to perform her job or to blow the whistle, and thus did not know the materials were "stolen or obtained" in the sense § 496 requires.  Doc. No. 230-3 at ¶¶ 3–5, 14, 22, 31–32, 61–62.  Axos disputes those points, citing the Gmail directive and testimony that the supervisor believed the boxes contained personal items.  Doc. Nos. 230-3 at ¶¶ 26, 48, 53; 230-8 at ¶ 13 (230-19, Exhibit K).  Those competing narratives present a classic credibility and inference dispute on the knowledge element that cannot be resolved at summary judgment.  *See Barrett*, 2022 WL 2119131, at *6.

Brinker's contention that the claim fails because Axos did not use the verb "stole" in its pleading is unavailing.  Doc. No. 202-1 at 24–25.  Section 496 imposes liability not only for the initial taking but also for "conceal[ing]" or "withhold[ing]" property known to be stolen or wrongfully obtained.  Axos alleges that Brinker "concealed and/or withheld" its information and "knew" she "wrongfully took and kept" it, Doc. No. 50 at ¶¶ 51–53, and as indicated above, it has proffered record evidence supporting those allegations.

Finally, as to injury, § 496(c) authorizes recovery of "actual damages," meaning compensatory losses shown to exist or reasonably certain to occur, not nominal, exemplary, or speculative.  *Citizens of Humanity, LLC v. Costco Wholesale Corp.*, 171 Cal. App. 4th 1, 16–17, 22–23 (2009).  Brinker contends Axos cannot establish damages and that its claim fails on that basis.  Doc. No. 202-1 at 25.  Axos, however, identifies categories of loss tied to Brinker's alleged withholding, including fees for digital forensic review, internal labor costs to investigate and mitigate, and reputational harm, supported by a non-retained damages analysis.  Doc. No. 230 at 27; *see* Doc. Nos. 203 at 168–93, Exhibit 23; 230-3 at ¶¶ 6–8, 46, 63–71, 73.  Brinker disputes the sufficiency of those

showings, but such challenges go to weight and causation, not to whether some evidence of compensable injury exists.  Doc. No. 233 at 15–16.  The record contains evidence from which a jury could find that Axos incurred actual losses tied to the alleged concealment or withholding.

Accordingly, genuine disputes remain as to whether Brinker knowingly concealed or withheld Axos' confidential information and whether Axos sustained actual damages as a result.  Therefore, Brinker's summary judgment motion regarding Axos' § 496 claim is therefore DENIED.

### d.  California Penal Code § 502

Brinker maintains that this claim fails for four reasons: (1) the statute specifically exempts conduct by an employee acting within the scope of their employment, and Axos has not identified any actions by Brinker that falls outside that scope; (2) Brinker did not "use" Axos' data within the meaning of the statute by accessing or copying it, and Axos cannot show that she copied the data with an intent to engage in a fraudulent scheme or wrongfully obtain property as required to show a violation of § 502(c)(1); (3) Axos cannot show that she copied any information without permission; and (4) Brinker cannot be liable under the statute for any of the physical documents she has in her possession under the plain language of the statute, which requires that Brinker took data from a computer system without permission.  Doc. No. 202-1 at 25 - 29.

Axos responds that it is a disputed fact whether Brinker was acting in the scope of her employment, since its claim is based on Brinker's knowing access of confidential information and then subsequently, without permission, her taking, copying or making use of any data from an Axos computer, computer system or computer network.  Doc. No. 230 at 27–28.  Axos argues that Brinker's accessing of the property profile of her ex-husband was not authorized, not within the scope of her employment, and not reasonably necessary to the performance of her work.  *Id.* at 28.  Axos claims that the employment defense does not shield her from liability.  *Id.*  In any event, Axos argues that Brinker was not authorized to take, copy or make use of any confidential information.  *Id.* at 29.

Axos states that the Confidentiality Agreement prohibits employees from using or disclosing confidential information except as required in the conduct of Axos' business, or as authorized in writing by Axos. *Id.* Axos claims there is no evidence of any writing that Brinker was authorized. *Id.* Axos then indicates that it is not pursuing a § 502(c)(1) claim, and thus all of Brinker's arguments in Section III.E.(2) are irrelevant. *Id.* Axos argues that there is substantial evidence that Brinker was not permitted to take, copy or make use of confidential information, despite Brinker's argument incorrectly focusing on if she had the right to access information in the first place. *Id.* Regarding the hard copy documents, Axos states that Brinker's hard copy documents were printed from an Axos computer, computer system or computer network, and then were taken without permission, which is precisely the conduct covered by § 502. *Id.* at 30–31.

California Penal Code § 502 provides civil liability where a person "knowingly accesses" a computer or network and, "without permission," takes, copies, or makes use of "any data" or "supporting documentation," and the owner of the computer or data suffers damage or loss by reason of the violation. *See* Cal. Penal Code § 502(c)(2), (e); *United States v. Christensen*, 828 F.3d 763, 788–89 (9th Cir. 2016). The issues presented on summary judgment concern whether the record establishes (1) use of the computer system "without permission," (2) the applicability of the § 502(h)(1) scope-of-employment exception, and (3) proof of damage or loss.

As to permission, Axos cites evidence in support of its position that Brinker took the information without permission. Axos provides that Brinker was expressly told not to send bank documents to her personal Gmail. Doc. No. 230-3 at ¶ 48. Axos further points out that Brinker agreed by contract not to use or disclose "Confidential Information" except as required for Axos' business or if authorized in writing and admits that Axos never gave her consent to retain confidential materials. *Id.* at ¶¶ 6–8; *see also* Doc. No. 230-8 at ¶ 18 (230-24, Exhibit P). Axos notes that Brinker forwarded bank documents to her personal account, saved them to personal media, and continued possessing categories of Axos documents after separation. Doc. Nos. 54 at ¶ 11; 230-3 at ¶¶ 30–32, 55, 61. A

jury crediting that evidence could find that the act of taking, copying, or using the information itself was "without permission," particularly post-termination when any employment-based authorization had ended. *See Erhart*, 612 F. Supp. 3d at 1127–29 (triable § 502 issues where employee continued to take/delete bank data after access was curtailed).

Brinker maintains that she was acting within the scope of employment when accessing the materials in the first instance and, at most, violated policy about where data may be stored or transmitted, which she argues is not actionable "without permission" under § 502(c)(2). Doc. No. 202-1 at 25–29. The record allows for competing inferences: Axos points to categorical prohibitions on off-network transmission/retention and nonconsensual possession, Doc. Nos. 230-3 at ¶¶ 6–8; 230-19, Exhibit K, while Brinker emphasizes contemporaneous work access and the absence of evidence that she disseminated data beyond her counsel or impaired Axos' systems, Doc. No. 230-3 at ¶¶ 44, 60–61.

The parties also dispute hard-copy materials. Section 502(c)(2) expressly reaches taking or copying "supporting documentation, whether existing or residing internal or external to" a computer system. Axos asserts that the paper records Brinker retained were printed from Axos systems and then removed and kept without permission, including after termination. Doc. Nos. 230 at 29–30; 230-3 at 23–25; 230-8 at ¶¶ 11 (230-17,Exhibit I), 18 (230-24, Exhibit P). Whereas Brinker maintains that while printing could be "copying" if unauthorized, it is undisputed she had authority to create hard copies during employment and that simply taking previously printed papers home cannot itself violate § 502(c)(2). Doc. No. 230-3 ¶¶ 24–25, 31; 233 at 16–17. Axos submits that Brinker's access was not unlimited, and that she required supervisor approval for certain categories of records. Doc. Nos. 230-1 at ¶ 4. But even accepting those limitations, Axos' own evidence frames the issue as exceeding the boundaries of where records could be stored or transmitted, rather than an absence of authority to view

ICR materials in the course of her work.[18]  That distinction illustrates why the question of whether her conduct was "without permission" under § 502 cannot be resolved as a matter of law.

The discrete incident involving Brinker's viewing of a real-estate profile concerning her ex-husband is analytically different.  The record shows no taking, copying, or use of that file and no resulting injury.  *See* Doc. No. 230-3 at ¶ 59.  Courts construing § 502 make clear that merely viewing available information without harm is not actionable, as the statute treats "access" and "use" separately and requires more than a curiosity-driven lookup.  *See Chrisman v. City of Los Angeles*, 155 Cal. App. 4th 29, 34–37 (2007).

On the scope-of-employment defense, § 502(h)(1) exempts acts "reasonably necessary" to the job.  Brinker invokes *Chrisman* to argue her access and copying occurred within her job's general access remit, Doc. No. 202-1 at 26, while Axos points to the no-Gmail directive, the confidentiality agreement, and the admission of no authorization to retain materials to contend her off-network transmission, retention, and post-termination possession were not reasonably necessary—and could not have been "within scope" after separation, Doc. Nos. 203 at Exhibit 4; 230-8 at ¶¶ 13 (230-19, Exhibit K); 18 (230-24, Exhibit P).  Given those disputes, the scope-of-employment defense must be left for the factfinder.

As to loss or damage, § 502(e)(1) defines compensable damages to include reasonable expenditures to verify whether data was altered, damaged, or deleted.  Axos has identified investigative/forensic and internal response efforts of this kind.  Doc. Nos. 230-3 at ¶¶ 46, 63, 73; 230-8 at ¶ 21 (230-27, Exhibit S).  While Brinker disputes

---

[18] *See* Doc. Nos. 230-1 at ¶¶ 5–6 (Tolla declaring that "Brinker did not have authority to take home information in hard copy form. I did not know that Brinker was taking hard copy documents home. I did not authorize Brinker to take hard copy documents home, and I would not have authorized such conduct."); 230-2 at ¶ 4 (Cardoso declaring that "I did not know that Brinker was taking hard copy documents home. I did not authorize Brinker to take hard copy documents home, and I would not have authorized such conduct.").

causation and quantum and notes Axos' systems were not impaired, Doc. Nos. 230-3 at ¶ 44, these competing showings create a factual dispute over whether Axos incurred cognizable loss or damage, precluding summary judgment.

In sum, the record raises genuine disputes as to whether Brinker's conduct was "without permission," whether the scope-of-employment exception applies, and whether Axos suffered compensable loss.  Accordingly, Brinker's motion for summary judgment on Axos' § 502 claim is DENIED.

### a.  Breach of Contract Claim

Brinker claims that Axos' breach of contract claim fails for three reasons: (1). Brinker is protected by litigation privilege, as she has not "used" the confidential information or "disseminated" it to anyone other than her attorneys and regulatory agencies charged with enforcement of laws applicable to Axos; (2) any confidential information in Brinker's possession was retained for the express purposes of whistleblowing, supporting her claims, and/or provision to regulatory agencies; and (3) Axos has waived any right to assert this claim by its own conduct.  *Id.* at 29–33.

Axos claims that Brinker's contention that the litigation privilege shields her from liability for breaching the Confidentiality Agreement is incorrect.  Doc. No. 230 at 31. Axos argues that Brinker's assertion that she only retained documents for whistleblowing and litigation purposes is contradicted by contemporaneous documents and her own testimony.  *Id.* at 33.  Axos claims that its Confidentiality Agreement cannot be held as unenforceable pursuant to public policy as a matter of law, especially since Brinker does not contend nor is there any evidence to suggest that the documents or files she misappropriated and continues to possess are, or ever were, at risk of being destroyed. *Id.*  Additionally, Axos states that there is a genuine issue of material fact as to whether Axos waived its right to enforce the Confidentiality Agreement.  *Id.* at 38.

Under California law, to prevail on a cause of action for breach of contract, Axos must show (1) a contract; (2) Axos' performance or excuse; (3) Brinker's breach; and (4) resulting damages.  *See Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014).  The

Confidentiality Agreement required Brinker, among other things, (i) not to "use, publish or disclose" Axos' trade secrets or confidential information except as required for Axos' business or as authorized in writing, and (ii) upon termination, to return documents/records containing Axos' confidential information and submit personal devices for inspection.  Doc. Nos. 203 at Ex. 4; 203-3 at ¶¶ 6–8.

First, Brinker argues the claim is barred by the litigation privilege because her alleged "use" of confidential information occurred in litigation or to regulators.  Axos clarifies the counterclaim is premised on noncommunicative conduct—continued possession and failure to return confidential materials—not on communications in court or to agencies.  Doc. No. 230 at 31–32; *see also* Doc. No. 50 at ¶¶ 20–26.  The litigation privilege shields tort claims based on communicative acts, not non-communicative conduct like retention or possession, and it generally does not bar contract claims where the contract itself prohibits the conduct and applying the privilege would serve no purpose.  *See Jacob B. v. Cty. of Shasta*, 40 Cal. 4th 948, 956–58 (2007) ("Because the litigation privilege protects only publications and communications, a threshold issue in determining the applicability of the privilege is whether the defendant's conduct was communicative or noncommunicative."); *Crossroads Inv'rs, L.P. v. Fannie Mae*, 13 Cal. App. 5th 757, 787 (2017) ("[T]he privilege will apply to contract claims only if the agreement does not 'clearly prohibit' the challenged conduct, and if applying the privilege furthers the policies underlying the privilege.").

On this record, Axos points to provisions that "clearly prohibit" post-termination possession and require return/inspection, and represents it is not seeking to impose liability for communications to regulators or filings in this case.  Doc. No. 230-1 at 31–32; *see also* Doc. No. 203 at 37 (Exhibit 4); 230-3 at ¶¶ 6–8.  Brinker on the other hand focuses her argument on the giving of the information and documents to government agencies or apart of judicial proceedings.  Doc. No. 202-1 at 30–31.  Thus, the litigation privilege does not extend to noncommunicative conduct such as retention and failure to

return.  However, it does bar any theory premised on her litigation or government agency communications.

Brinker contends enforcement of the Confidentiality Agreement would contravene public policy protecting whistleblowers.  Doc. No. 202-1 at 31–32.  Courts have recognized a narrow exception where keeping or removing documents is reasonably necessary to report or prove alleged wrongdoing, but not where an employee indiscriminately takes large volumes of file.  *See U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1062 (9th Cir. 2011) ("Even were we to adopt [the public policy] exception, it would not cover Cafasso's conduct given her vast and indiscriminate appropriation of [ ] files."); *Erhart v. BofI Holding, Inc.*, 2017 WL 588390, at *12–*13 (S.D. Cal. 2017) ("BofI has not demonstrated Erhart engaged in a wholesale stripping of [BofI]'s confidential documents—or that his appropriation of its files was vast and indiscriminate. […] Thus, it is possible that a public policy exception may cover Erhart's conduct, and there is a genuine issue for trial as to whether Erhart's removal of documents was reasonably necessary to support his allegations of wrongdoing.") (quotations omitted). The application of that exception is fact-intensive and focuses on the nexus and necessity between the documents and the alleged misconduct, as well as the scope and manner of the taking.  *Cafasso*, 637 F.3d at 1062; *Erhart*, 2017 WL 588390, at *12–13.

Here, Brinker offers evidence that she retained materials, including ICR reports, "for the purposes of whistleblowing, supporting her claims, and/or provision to regulatory agencies," and that some ICR drafts were printed at home to support an internal HR complaint and potential regulatory reporting.  Doc. No. 230-3 at ¶¶ 13–14, 22–24, 47, 62.  Brinker also claims that when she was terminated abruptly, she was monitored while packing, and took materials she believed were relevant to prior whistleblowing and contemplated complaints.  *Id.* at ¶¶ 17–23, 57.  Axos counters that Brinker repeatedly emailed confidential materials to her personal account "to more easily access [them] while working at home," used "Print @ Home" subject lines, and sent

materials for convenience rather than whistleblowing; and that she "packed up all the documents and belongings in [her] cubicle into boxes" without regard to content, reflecting breadth inconsistent with a narrowly tailored, necessary taking.  Doc. Nos. 204 at ¶¶ 20, 34–38; 230 at 32–36.  On this record, viewing the evidence in the light most favorable to Axos, whether Brinker's retention/appropriation was "reasonably necessary" to support her protected activity, as well as the scope of any public-policy carve-out, presents disputed fact questions.

Axos also argues Brinker did not plead "illegality" as an affirmative defense, and thus the argument is waived.  Doc. No. 230 at 33.  Brinker responds that her Eighteenth Affirmative Defense encompasses illegality in reference to the Confidential Agreement.  Doc. No. 233 at 18 n.7.  Whether the defense was preserved turns on reading the pleadings to include a public policy argument, especially given the record's focus on whistleblower rationale.

Regarding breach, there is evidence that the Confidentiality Agreement barred the use and disclosure except as required for Axos' business or as authorized in writing and required post-termination return and device inspection.  Doc. Nos. 203 at 37 (Exhibit 4); 230-3 at ¶¶ 6–8.  Axos also cites Brinker's admission that Axos never gave her permission to retain confidential information post-separation.  Doc. No. 230-8 at ¶ 18 (230-24, Exhibit P).  Axos further points to multiple policy acknowledgments requiring safeguarding of confidential information.  Doc. Nos. 230 at 34–35; 230-8 at ¶ 7 (230-13, Exhibit E).  Brinker does not dispute the Agreement's text but asserts her retention was limited to materials used with counsel and regulators and was necessary for whistleblowing.  Doc. Nos. 202-1 at 31–32; 204 at ¶ 27 ("I have never shared any documents that I took from Axos, whether electronically or physically, with anyone other than with attorneys, OSHA, the California Department of Fair Employment Housing, Office of Comptroller of the Currency, and Securities Exchange Commission."); 230-3 at ¶¶ 22–24, 47, 62.  Whether her retention and failure to return constitute a material breach

turns on disputed facts concerning the scope, purpose, and continuing possession of the materials.

"California courts will find waiver when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished. […] Waiver is ordinarily a question of fact unless there are no disputed facts and only one reasonable inference may be drawn." *Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 78 (2017) (internal quotations omitted). The issue here is whether Axos, through its conduct, has waived its right to enforce the Agreement.  Brinker argues Axos waived enforcement by internal security alerts to Axos personnel reflecting she emailed ICR reports to her personal account from January 2019 through December 2020, without remedial direction; and a supervisor helping carry two boxes of papers to her car at termination without inquiry.  Doc. Nos. 202-1 at 32–34; 233 at 19; *see also* Doc. No. 230-3 at ¶¶ 29, 47, 50–52.  Brinker also notes that after Cardoso's May 2019 message telling her not to send bank documents to Gmail, Axos did not ask her to delete attachments already sent.  Doc. No. 233 at 19; *see also* Doc. No. 230-8 at ¶ 13 (230-19, Exhibit K).  As for evidence favoring Axos: (1) Cardoso expressly instructed "please 'do not' send Bank document to your gmail or other personal email account," undermining waiver; (2) Brinker signed multiple confidentiality and information-security acknowledgments; (3) the Agreement contains a non-waiver clause; and (4) Tolla believed the boxes contained personal items and had no reason to suspect removal of confidential documents.  Doc. Nos. 203 at 37 (Exhibit 4); 230-3 at ¶¶ 6–8, 26; 230-8 at ¶¶ 7 (230-13, Exhibit E), 13 (230-19, Exhibit K).   The competing evidence creates a triable dispute whether Axos' conduct was sufficiently inconsistent to constitute waiver despite the contractual non-waiver language.

Accordingly, Brinker has not shown entitlement to judgment as a matter of law as there are disputed issues remain as to whether her continued possession and failure to return confidential materials fall outside the litigation privilege, whether her conduct is

excused by public policy favoring whistleblowers, whether the Confidentiality Agreement was materially breached, and whether Axos waived its right to enforce that Agreement; which raise genuine issues of material fact for trial. Accordingly, Brinker's motion for summary judgment on Axos' breach of contract claim is DENIED.

### b. Axos' Damages

Brinker argues Axos cannot prove damages on its counterclaims. Doc. No. 202-1 at 34–38. Regarding injunctive relief, Brinker argues Axos cannot show ongoing or imminent irreparable harm. *Id.* at 35–36. As for damage categories, Brinker argues that Axos has no cognizable damages other than its effort to impermissibly seek litigation costs as damages. *Id.* at 36–37. Brinker asserts that Axos has waived its request to seek attorney's fees for all claims other than Penal Code §§ 496 and 502.[19] *Id.* at 38. Brinker also asserts that Axos has waived its request to seek punitive damages for all claims other than Penal Code §§ 496 and 502. *Id.* And in any event, Brinker claims that Axos cannot meet the clear-and-convincing standard for malice or oppression because Brinker took the documents to support whistleblower activity rather than to harm Axos. *Id.*

Axos maintains that it is a disputed issue as to whether it can show that it suffered damages it can properly seek injunctive relief, damages, punitive damages and attorneys' fees. Doc. No. 230 at 38. Axos claims that there is a threat of ongoing irreparable harm, since Brinker still has possession of confidential information on a variety of her personal devices. *Id.* at 38. Axos maintains that it properly seeks investigate costs as damages and not litigation costs, as courts have awarded damages for time expended by internal personnel and outside vendors to review or investigate an issue and propose a solution. *Id.* at 40. Regarding punitive damages, Axos maintains that it seeks punitive damages under its conversion claim both in its Counterclaims and in its response to Interrogatory

---

[19] Axos clarifies it has never sought fees under any other claim other than Penal Code §§ 496 and 502, so there is no waiver. Doc. No. 230 at 38 n.10. The Court notes that it is undisputed that Axos identified attorneys' fees only as to its claims under California Penal Code §§ 496 and 502, and thus does not reach the issue for any other claim. Doc. Nos. 202-1 at 38; 230 at 38 n.10; 230-3 at ¶ 70.

No. 8.  *Id.* at 41.  Axos claims that it is disputed whether Brinker's conduct was sufficiently malicious or oppressive to warrant punitive damages.  *Id.* at 41–42.

Regarding injunctive relief, under *eBay*'s four-factor test, a permanent injunction requires proof of (1) irreparable injury, (2) inadequacy of legal remedies, (3) a balance of hardships favoring equitable relief, and (4) service of the public interest.  *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391–93 (2006).  *Daimler AG v. A-Z Wheels LLC* applies this framework and emphasizes that in the Ninth Circuit irreparable harm is not presumed.  498 F. Supp. 3d 1282, 1292 (S.D. Cal. 2020).  Rather, a plaintiff must offer evidence of harm such as loss of control over reputation, goodwill, or customers.  *Id.* at 1292–95.  In similar settings, courts have found irreparable harm where a former employee retains confidential information and engages in conduct suggesting potential disclosure or mishandling.  *See Quest Diagnostics Inc. v. Elarja*, 2022 WL 2134301, at *5 (D. Nev. June 13, 2022) ("[A]llowing Defendant to continue possessing the alleged confidential information exposes Plaintiff to potential irreparable damage that cannot be remedied by monetary damages."); *Early Warning Servs. LLC v. Johnson*, 2024 WL 6077249, at *6–7 (D. Ariz. Dec. 4, 2024) ("Irreparable harm is harm for which there is no adequate remedy at law, such as money damages. […] [district] [c]ourts in Arizona have found that the loss of customer relationships or continued disclosure of trade secrets to constitute irreparable harm.").  As the court recognized in *Daimler*, if ongoing possession creates loss of control over sensitive information and goodwill that damages cannot adequately remedy, the balance of hardships and public interest can favor narrowly tailored injunctive relief.  498 F. Supp. 3d at 1293–95.

Here, Brinker cites the absence of evidence that she disseminated documents beyond counsel and regulators, and Axos' failure to seek preliminary injunctive relief over several years as undermining any present threat.  Doc. No. 202-1 at 36; *see also* Doc. No. 230-3 at ¶¶ 60–61.  Axos points to Brinker's continued possession of confidential materials across personal devices as an ongoing risk requiring forensic deletion.  Doc. No. 230 at 38; *see also* Doc. Nos. 230-3 at ¶ 61; 230-8 at ¶ 24 (230-30,

22-cv-0386-MMA (DDL)

Exhibit V).  Accordingly, whether Axos can establish the irreparable harm required for injunctive relief turns on disputed factual questions concerning Brinker's continued possession of confidential information.

As for cognizable damages, "loss" under the CFAA includes reasonable costs to respond to an offense, conduct a damage assessment, and restore data or systems, but excludes work performed purely to aid litigation.  *NovelPoster v. Javitch Canfield Grp.*, 140 F. Supp. 3d 954, 962–64 (N.D. Cal. 2014).  Other courts have similarly recognized that both CFAA and California Penal Code § 502 allow recovery of investigation expenses reasonably and necessarily incurred to verify whether systems or data were altered, damaged, or deleted.  *Copart, Inc.*, 277 F. Supp. 3d at 1162.  This court has even held that internal labor and outside digital forensics may be recoverable in a § 502 claim when tied to verifying alteration/deletion.  *Erhart*, 445 F. Supp. 3d at 840.

Brinker argues that Axos disclosed its compensatory-damages computation only after fact discovery and relies solely on Micheletti's table of Tolla's "internal labor" and a Setec invoice.  Doc. No. 202-1 at 36–38; *see also* Doc. No. 230-3 at ¶¶ 46, 63–66, 73.  Brinker also identifies line items tied to litigation activities, e.g. reviewing pleadings and supplying information to counsel, as nonrecoverable damages.  Doc. No. 202-1 at 37; *see also* Doc. No. 230-3 at ¶ 69.  Axos counters that it identified damage categories in initial and supplemental disclosures and then provided Micheletti's calculations and the Setec invoice with its non-retained expert designation/disclosures.  Doc. Nos. 203 at 227–38, Exhibit 27; 230-8 at ¶¶ 23 (230-29, Exhibit U), 24 (230-30, Exhibit V).  And even if Micheletti were excluded, Axos claims that Tolla can testify to internal time spent investigating and coordinating forensics.  Doc. No. 230 at 38–40.  On the present record, recovery may extend to investigative and restorative costs, including internal time, provided those efforts are tied to assessing and remedying the alleged misuse, but they distinguish litigation support work as it is not compensable as damages.  *See NovelPoster*, 140 F. Supp. 3d at 963–64; *Copart*, 277 F. Supp. 3d at 1162; *Erhart*, 445 F. Supp. 3d at 840.

Brinker further notes that Tolla is salaried and received no additional pay for performing any investigation related to the documents, and Micheletti's calculations do not reflect any non-speculative measure of damages based on Tolla's additional hours of work. Doc. Nos. 202-1 at 37; 230-3 at ¶¶ 66–68. The absence of added payroll does not preclude recovery if Axos can lay a non-speculative foundation that internal time was reasonably expended to assess and remediate the incident, while entries tied to litigation tasks remain nonrecoverable. *See NovelPoster*, 140 F. Supp. 3d at 962–64; *Copart*, 277 F. Supp. 3d at 1162. On this record, whether Axos can establish a non-speculative basis for internal time as compensable investigative costs, as opposed to unrecoverable litigation activities, presents a factual dispute that cannot be resolved at summary judgment. However, the Court's holding is confined to the restrictions articulated in its sanctions order above. *See* Section III.A.2.

Regarding punitive damages, Brinker argues waiver as to punitive damages beyond §§ 496 and 502 and, in any event, an inability to meet the clear-and-convincing standard. Doc. No. 202-1 at 38. Axos responds it preserved punitive damages for conversion and that malice/oppression. Doc. No. 230 at 41–42; *see also* Doc. Nos. 50 at ¶ 33; 203 at 168–92 (Exhibit 23). Where the record raises factual disputes over intentional or "despicable" conduct, punitive damages are for the jury. *PetConnect Rescue, Inc. v. Salinas*, 656 F. Supp. 3d 1131, 1178–79 (S.D. Cal. 2023). It is well settled that even if liability on the underlying claim is shown, punitive damages require clear and convincing proof of malice or oppression. *Ducre v. Veolia Transp.*, 2011 WL 13046882, at *25–29 (C.D. Cal. Mar. 29, 2011); *Zapata v. Neil Jones Food Co.*, 2016 WL 4764674, at *12 (E.D. Cal. Sept. 13, 2016). On this record, Brinker cites her stated whistleblowing purposes to negate malice, Doc. No. 230-3 at ¶¶ 22–24, 47, 62, while Axos cites testimony regarding the volume, sensitivity, storage, and refusal to return, Doc. No. 54 at ¶ 11; 230-8 at ¶ 5 (230-11, Exhibit C). Thus, whether Brinker's conduct amounts to "despicable conduct" sufficient to support punitive damages is a factual question.

Accordingly, Brinker's motion is DENIED as to Axos' damages, injunctive relief, and punitive damages theories, as the record presents triable disputes on those issues. However, this ruling is limited to the restrictions set forth in the Court's order on Brinker's motion for sanctions. *See* Section III.A.2. Further, Brinker's motion is GRANTED as to attorneys' fees, as it is undisputed that Axos has sought such fees only under Penal Code §§ 496 and 502 and may not recover them under any other claim.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Sanctions, Doc. No. 197; **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion to Exclude Defendant's Expert Andrew Miceletti, Doc. No. 198; **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Summary Judgment, Doc. No. 202; **DENIES** Defendant's Motion to Exclude Plaintiff's Expert Brad Abbott, Doc. No. 199; and **GRANTS IN PART AND DENIES IN PART** Defendant's Motion for Summary Judgment, Doc. No. 201.

**IT IS SO ORDERED**.

Dated: September 30, 2025

HON. MICHAEL M. ANELLO
United States District Judge

22-cv-0386-MMA (DDL)